# Exhibit B



# NATIONAL FOOTBALL LEAGUE

## July 28, 2015

### FINAL DECISION ON ARTICLE 46 APPEAL OF TOM BRADY

**I.    Background**

**ROGER GOODELL**
*Commissioner*

On January 18, 2015, the Indianapolis Colts and New England Patriots played the AFC Championship Game at Gillette Stadium in Foxboro. During the game, a question arose as to whether the footballs being used by the Patriots were inflated to levels consistent with the league's Official Playing Rules. The league office promptly undertook an investigation, and soon after retained a team led by Ted Wells of Paul, Weiss, Rifkind, Wharton & Garrison to conduct an independent inquiry. Mr. Wells and his team conducted an extensive investigation, the results of which were documented in a report that was released to the public on May 6, 2015 (the "Wells Report").

On May 11, 2015, relying on the factual findings and evidentiary record detailed in the Wells Report, I authorized discipline to be imposed on the New England Patriots in the form of a fine and loss of draft choices, and I authorized the suspension of New England quarterback Tom Brady without pay for the first four games of the 2015 regular season. These disciplinary decisions were communicated by NFL Executive Vice President for Football Operations Troy Vincent, Sr. In addition, the Patriots advised me that the club had indefinitely suspended two of its employees, John Jastremski, an assistant equipment employee, and James McNally, a game-day employee who served as the attendant in the Officials' Locker Room.

The Patriots did not appeal from the discipline that was imposed on the club. That discipline is not under review here. Mr. Brady, through the NFL Players Association, filed a timely appeal of his suspension. On June 23, 2015, at a hearing in that appeal, almost ten hours of sworn testimony and counsel argument were presented, resulting in a transcript more than 450 pages long. The hearing record also included more than 300 exhibits, including videos, scientific reports, newspaper articles and other publicly available material, and more than thirty summaries of interviews conducted by NFL security representatives prior to the retention of Paul Weiss.

Following the hearing, the NFLPA (on Mr. Brady's behalf) and the NFL Management Council each filed a post-hearing brief. Both before and after the hearing, Mr. Brady's attorneys and agents submitted additional correspondence, including phone records from Mr. Brady's cellphone carrier.

The most significant new information that emerged in connection with the appeal was evidence that on or about March 6, 2015—the very day that he was interviewed by Mr. Wells and his investigative team—Mr. Brady instructed his assistant to destroy the cellphone that he had been using since early November 2014, a period that included the AFC Championship Game and the initial weeks of the subsequent investigation. During the four months that it was in use, almost 10,000 text messages were sent or received by Mr. Brady using that cellphone. At the time that he arranged for its destruction, Mr. Brady knew that Mr. Wells and his team had

requested information from that cellphone in connection with their investigation. Despite repeated requests for that information, beginning in mid-February 2015 and continuing during his March 6, 2015 interview by the investigators, information indicating that Mr. Brady might have destroyed his cellphone was not disclosed until months later, on June 18, 2015, and not confirmed until the day of the hearing itself.

This decision is issued pursuant to Article 46 of the Collective Bargaining Agreement between the NFL and NFLPA, which confirms the Commissioner's authority to impose discipline for conduct by a player that is "detrimental to the integrity of, or public confidence in, the game of professional football." Under Article 46, this decision "will constitute full, final and complete disposition of the dispute and will be binding upon the player(s), Club(s) and the parties to this Agreement."

## II.    Factual Determinations and Findings

The record in this appeal is extensive. It includes a 139-page investigative report prepared by the Paul Weiss team, which itself was accompanied by separate and detailed analyses prepared by Exponent, a scientific and engineering consulting firm that was engaged by the Paul Weiss investigators. The Wells Report and accompanying material were the product of an extensive and independent investigation and formed the factual basis for the discipline that was imposed on both the Patriots and Mr. Brady.

While the factual record is detailed and in some respects contested, there are several points that are not in dispute and important to this decision.

*First*, there is no question that the NFL Official Playing Rules prescribe a specific permissible range of inflation for footballs, namely 12.5 to 13.5 pounds per square inch ("psi").

*Second*, at least by the time of the AFC Championship Game, the inflation level of the footballs was a matter of particular interest to Mr. Brady. He told the Patriots' equipment staff that he wanted the footballs inflated at the lowest permissible level; he reviewed a highlighted copy of the provision of the Playing Rules that addressed inflation of footballs; and he instructed the equipment staff to present a copy of the rule to the game officials. On the day of the AFC Championship Game, Mr. McNally told referee Walt Anderson that Mr. Brady wanted the balls inflated to a pressure of 12.5 psi. He told the investigators that "Tom … always has me pass a message to the Official's [sic] that he likes the balls at the minimum permissible PSI of 12.5. … I know this is what Tom wants, and I have been personally told by him of the ball weight preference."

*Third*, prior to the game and pursuant to established protocol, Mr. Anderson examined each of the Patriots' footballs in the Officials' Locker Room and, after adding air to two of the balls, confirmed that they were all inflated to a pressure at or slightly above 12.5 psi. (Mr. Anderson similarly inspected the Colts' footballs and confirmed that they were inflated to a level consistent with the Playing Rules.)

**ROGER GOODELL**
*Commissioner*

*Fourth*, after the footballs were examined and certified by the referee (but still prior to the start of the game), and without the knowledge or approval of Mr. Anderson or any other member of the officiating crew, Mr. McNally left the Officials' Locker Room with the Patriots' footballs and went into a bathroom where he remained, behind a locked door, for approximately one minute and forty seconds. (Mr. McNally initially told NFL investigators that he had walked directly from the Officials' Locker Room to the field.) Mr. McNally's unannounced removal of the footballs from the locker room was a substantial breach of protocol, one that Mr. Anderson had never before experienced. Other referees interviewed by the investigators said that they too would have considered Mr. McNally's actions to be a breach of protocol and that he had not engaged in similar conduct in the games that they had worked at Gillette Stadium.

*Fifth*, based on a complaint from the Colts during the first half of the game, which echoed concerns that the Colts had expressed on the day before the game, eleven of New England's footballs were tested at halftime; all were below the prescribed air pressure range as measured on each of two gauges. Four of Indianapolis's footballs were tested at halftime; all were within the prescribed air pressure range on at least one of the two gauges.

*Sixth*, on Monday, January 19, 2015—the day after the AFC Championship Game, as the fact of a league investigation into the possible deflation of the footballs was becoming public— Mr. Brady spoke to Mr. Jastremski by phone for more than 25 minutes, exchanged twelve text messages (which were recovered from Mr. Jastremski's cellphone) and met with him in person in "the QB room." These communications between Mr. Brady and Mr. Jastremski were their first significant cellphone communications (calls or texts) for at least the prior six months. Mr. Brady thought they would have spoken by phone no more than once or twice during the prior six months. Neither Mr. Brady nor Mr. Jastremski could recall exchanging any text messages during the prior six months. And Mr. Jastremski was clear that he had never before met with Mr. Brady in "the QB room." This pattern of multiple conversations and text messages continued on January 20 and 21.

*Seventh*, Mr. Brady, through his attorneys, declined to provide the investigators with access to highly relevant electronic information, such as emails and text messages. (The investigators had confirmed their earlier request for such information by email to Mr. Brady's lawyers/agents on February 28, 2015 and they reiterated their request when they interviewed Mr. Brady on March 6, 2015.) He did so despite the very substantial protections offered by the investigators to maintain the privacy of his personal information. On this basis, as well as the Wells Report's conclusion that Mr. Brady's denials of involvement in the tampering scheme were not credible, I found that Mr. Brady had failed to cooperate with the investigation.

As noted above, on June 18, 2015, shortly before the hearing and nearly four months after the investigators had first requested information from his cellphones, Mr. Brady's counsel submitted correspondence and other materials indicating that the cellphone that Mr. Brady had used from November 6, 2014, through March 5 or 6, 2015, was unavailable because it had been destroyed, and that the text messages exchanged on that cellphone could not be retrieved.

**ROGER GOODELL**
*Commissioner*

3

At the hearing, Mr. Brady testified that it is his practice to destroy (or to give to his assistant to destroy) his cellphone and SIM cards when he gets a new cellphone. Mr. Brady also testified that, based on his typical practice, he would have asked to have the existing cellphone destroyed at or about the same time that he began using his new cellphone. According to records provided by Mr. Brady, he began using a new cellphone—and based on what Mr. Brady and his counsel described as his ordinary practice, gave his old cellphone to his assistant to be destroyed—on or about March 6, 2015, the very day that he met with Mr. Wells and his team to be questioned about the tampering allegations.

Even though the prior request for his text messages was discussed during that interview, neither Mr. Brady nor his counsel ever advised Mr. Wells that the cellphone that Mr. Brady had used during the key time period had been destroyed. During the four months that Mr. Brady used that cellphone, he exchanged nearly 10,000 text messages with a wide range of individuals. Following the appeal hearing, Mr. Brady's representatives provided a letter from his cellphone carrier confirming that the text messages sent from or received by the destroyed cellphone could no longer be recovered.

The record contains much more information bearing on this matter. It includes text messages between Mr. Jastremski and Mr. McNally in which Mr. McNally refers to himself as "the deflator"; that expressly refer to inflation and deflation of footballs and "needles" in the context of deflating footballs; and that reflect Mr. McNally's requests for cash, shoes, clothing and items autographed by Mr. Brady.

The record also includes detailed scientific analysis by Exponent. That analysis was in turn reviewed by Professor Daniel Marlow, a professor of physics (and former chairman of the department of physics) at Princeton. The experts from Exponent concluded, and Professor Marlow agreed, that the deflation of the Patriots' footballs cannot be fully explained by environmental factors or scientific principles such as the Ideal Gas Law. As noted in the Exponent report, the absence of a "credible scientific explanation for the Patriots' halftime measurements tends to support a finding that human intervention accounted for the deflation of the Patriots' footballs." This finding is buttressed by the opinion of Professor Marlow, whom I found to be highly credible at the hearing, and who testified that he "was highly impressed with the level of detail, thought, planning and execution" of Exponent's work; that it was "really a first-class piece of work"; and that "the conclusions are correct." When viewed as part of the complete evidentiary record, Exponent's conclusions support my finding that the deflation of the footballs was the result of human tampering.

Neither Mr. Jastremski nor Mr. McNally appeared as a witness at the appeal hearing. At the close of the hearing, the parties were asked whether the record should be held open to permit testimony from these two individuals, so that I could directly evaluate their credibility, before making a decision on the appeal. Mr. Brady and the NFLPA disclaimed any need to do so, even though Mr. Brady described Mr. Jastremski as a "friend" and both would presumably have first-hand knowledge of the facts relating to Mr. Brady's denials and other aspects of his testimony.

Further, as noted in the Wells Report, there are important topics about which Mr. McNally has not been interviewed; had he testified, he could have addressed those subjects,

ROGER GOODELL
*Commissioner*

which include his characterization of himself as "the deflator." The Management Council has argued that an adverse inference should be drawn from the NFLPA's decision not to seek testimony from Mr. Jastremski and Mr. McNally. That is not necessary because, on the basis of the entire record, most of their statements to the investigators are not credible, as the Paul Weiss investigators found.

It is against the backdrop of these fundamental facts that I consider the arguments made by the NFLPA and Mr. Brady on appeal. In doing so, I have drawn upon my experience of more than thirty years with the National Football League, including nearly nine years as Commissioner.

## III.    The Governing Standards

Article 46, Section 1(a) of our Collective Bargaining Agreement addresses discipline for conduct by a player that is "detrimental to the integrity of, or public confidence in, the game of professional football." The CBA recognizes that the Commissioner has authority to decide what constitutes conduct detrimental, to determine whether a player has engaged in conduct detrimental, and to determine and impose appropriate discipline if he finds that a player has engaged in conduct detrimental. This has been true throughout the long history of collective bargaining between the NFL and the NFLPA, a period of more than four decades.

This is an appeal proceeding under Article 46. I serve as the hearing officer in this appeal pursuant to Section 2 of that Article. With respect to conduct detrimental proceedings involving issues relating to the integrity of the game, the Collective Bargaining Agreement reflects a decision by the NFLPA and the NFL to accept the Commissioner's judgment. This has also been true for decades, and has been reflected in every collective bargaining agreement between the parties.

In appeals of Commissioner discipline under Article 46, the hearing officer gives appropriate deference to the findings and disciplinary decision under review; that is so even when the Commissioner serves as hearing officer. For that reason, as I said publicly prior to the hearing, I was eager to hear any new information, including testimony from Mr. Brady, that might cause me to reconsider the discipline initially imposed. Insofar as I received at the hearing testimony or documentary evidence of which I had been previously unaware, that information was considered anew.

The underlying standard of proof for factual findings in Article 46 proceedings is "preponderance of the evidence," or, stated differently, "more probable than not." Without exception, my findings below more than satisfy that standard, especially taking into account the credibility of the witnesses, including Mr. Brady, which I had ample opportunity to evaluate at the hearing.

As always, I am bound, of course, by standards of fairness and consistency of treatment among players similarly situated, and I have had those standards in mind throughout my consideration of this appeal.

**ROGER GOODELL**
*Commissioner*

### IV.    The Issues Presented on Appeal

### A.    Was the decreased air pressure in the footballs the result of tampering or of natural environmental factors?

At the hearing, the NFLPA and Mr. Brady did not contest the findings of the Wells Report regarding the pre-game activities of Mr. McNally. Thus, it is undisputed that: (a) Mr. McNally informed the referee, Walt Anderson, of Mr. Brady's preferred level of inflation; (b) Mr. Anderson confirmed that the footballs were in fact inflated to that level; (c) prior to the start of the game, Mr. McNally removed the Patriots' footballs from the Officials' Locker Room without informing or receiving permission from any of the game officials; (d) after leaving the Officials' Locker Room with the footballs, Mr. McNally proceeded to a small restroom, locked himself inside and remained there for approximately one minute and forty seconds; and (e) Mr. McNally did so even though he had access to the men's room facilities in the Officials' Locker Room. The NFLPA and Mr. Brady also did not dispute the finding in the Wells Report that, based on experiments conducted by Exponent, this period was more than enough time for Mr. McNally to have released air from each of the Patriots' footballs.

Instead, the hearing focused on the reliability of the other scientific evidence discussed in the Wells Report and set forth in Appendix 1 to the report. The NFLPA and Mr. Brady submitted alternative scientific analyses (including, for example, the study published by economists from the American Enterprise Institute) and presented expert testimony from Dean Edward Snyder of the Yale School of Management, an economist who specializes in industrial organization. I have carefully considered Dean Snyder's testimony, along with that of three experts called by the Management Council, all of whom had been involved in the underlying scientific and engineering analysis reflected in the Wells Report: Dr. Robert Caligiuri of Exponent, an expert in mechanical and materials engineering; Dr. Duane Steffey of Exponent, an expert in statistics; and Professor Marlow of Princeton.

The principal issue addressed by the experts was whether the decline in pressure reflected in measurements of the Patriots' game balls at halftime could be explained by factors other than tampering. I find that the full extent of the decline in pressure cannot be explained by environmental, physical or other natural factors. Instead, at least a substantial part of the decline was the result of tampering.

In reaching this conclusion, I took into account Dean Snyder's opinion that the Exponent analysis had ignored timing, *i.e.*, the fact that the Patriots' footballs, which were tested first, had less time to warm at halftime than did the Colts' footballs. Dr. Caligiuri and Dr. Steffey, however, both explained how timing was, in fact, taken into account in both their experimental and statistical analysis; they concluded, based on physical experiments, that timing of the measurements did have an effect on the pressure, but that timing in and of itself could not account for the full extent of the pressure declines that the Patriots' game balls experienced. Dean Snyder, in contrast, performed no independent analysis or experiments; nor did he take issue with the results of the Exponent experimental work that incorporated considerations of timing and were addressed in detail in the testimony of Dr. Caligiuri and Dr. Steffey.

**ROGER GOODELL**
*Commissioner*

I also considered Dean Snyder's other two "key findings," as well as the arguments summarized in the NFLPA's post-hearing brief, including criticisms of the steps taken in the Officials' Locker Room at halftime to measure and record the pressure of the game balls.[1] I was more persuaded, however, by the testimony of Dr. Caligiuri, Dr. Steffey, and Professor Marlow and the fact that the conclusions of their statistical analysis were confirmed by the simulations and other experiments conducted by Exponent. Those simulations and other experiments were described by Professor Marlow as a "first-class piece of work."[2]

On these issues, the testimony of Professor Marlow, who had been retained by the Paul Weiss investigators to evaluate, critique and second-guess Exponent's work plan and conclusions, was especially persuasive and credible. Professor Marlow described his role as that of the "designated skeptic." His endorsement of Exponent's conclusions and his rebuttal of Dean Snyder's criticisms carried substantial weight.[3]

As the Exponent study notes, its findings were made "to a reasonable degree of scientific certainty." It bears emphasis, however, that my finding of tampering with the game balls is not based solely on the Exponent study and the testimony of the scientific experts, but instead on consideration of all of the evidence in the record, including the conduct, text messages, and other communications discussed in both the Wells Report and at the hearing. This full record establishes that the reduction in the pressure of the Patriots footballs was due at least in substantial part to tampering.

**B.    What role, if any, did Mr. Brady have in the scheme to tamper with the footballs?**

There is no dispute with the conclusion in the Wells Report that "it is unlikely that an equipment assistant and a locker room attendant would deflate game balls without Brady's knowledge and approval" and that Mr. McNally and Mr. Jastremski would not "personally and

---

[1] There was argument at the hearing about which of two pressure gauges Mr. Anderson used to measure the pressure in the game balls prior to the game. The NFLPA contended, and Dean Snyder opined, that Mr. Anderson had used the so-called logo gauge. On this issue, I find unassailable the logic of the Wells Report and Mr. Wells's testimony that the non-logo gauge was used because otherwise neither the Colts' balls nor the Patriots' balls, when tested by Mr. Anderson prior to the game, would have measured consistently with the pressures at which each team had set their footballs prior to delivery to the game officials, 13 and 12.5 psi, respectively. Mr. Wells's testimony was confirmed by that of Dr. Caligiuri and Professor Marlow. As Professor Marlow testified, "There's ample evidence that the non-logo gauge was used."

[2] For similar reasons, I reject the arguments advanced in the AEI Report. The testimony provided by the Exponent witnesses and Professor Marlow demonstrated that none of the arguments presented in that report diminish or undermine the reliability of Exponent's conclusions.

[3] Mr. Wells testified that Professor Marlow was expressly engaged as a "double-check" on the work performed by Exponent. He further testified, and Dr. Caligiuri confirmed, that all of the experts who participated in the investigation were instructed to act as if they were "court-appointed" experts and to provide "objective science."

**ROGER GOODELL**
*Commissioner*

unilaterally [have] engaged in such conduct in the absence of Brady's awareness and consent." Indeed, in response to my question, Mr. Brady confirmed at the hearing that the Patriots' equipment personnel would not do anything to a game ball that was inconsistent with what he wanted.

Mr. Brady denies having been involved in the scheme to deflate the footballs. But in considering the entire record, including Mr. Brady's testimony, the credibility of other witnesses and the documentary evidence, I cannot credit this denial for the following reasons.

Among other things, the unusual pattern of communication between Mr. Brady and Mr. Jastremski in the days following the AFC Championship Game cannot readily be explained as unrelated to conversations about the alleged tampering of the game balls.

The evidence reflects that, after having virtually no communications by cellphone for the entire regular season, on January 19, the day following the AFC Championship Game, Mr. Brady and Mr. Jastremski had four cellphone conversations, totaling more than 25 minutes, exchanged twelve text messages, and, at Mr. Brady's direction, met in the "QB room," which Mr. Jastremski had never visited before.[4] In one of the text messages, Mr. Jastremski told Mr. Brady that "Dave will be picking your brain later about it. He's not accusing me or anyone. Trying to get to the bottom of it. He knows it's unrealistic you did it yourself."[5] On the following day, January 20, Mr. Brady and Mr. Jastremski spoke twice, for a total of nearly ten minutes, and exchanged two text messages. On January 21, Mr. Brady and Mr. Jastremski again texted and then spoke twice for more than twenty minutes. The source for all of this information was Mr. Jastremski's cellphone.

Mr. Brady testified that he was unable to recall any specifics of those discussions and he suggested that their principal subject was preparation of game balls for the Super Bowl.[6] But the need for such frequent communication beginning on January 19 is difficult to square with or the fact that there apparently was no need to communicate by cellphone with Mr. Jastremski or to

---

[4] The Wells Report indicates that, as of January 19, 2015, the most recent prior cellphone communication between Mr. Brady and Mr. Jastremski that the investigators could identify from the materials provided to them had occurred on July 4, 2014; that Mr. Jastremski was not sure if he had communicated by cellphone or text with Mr. Brady between July 2014 and December 2014, and that at most they had done so fewer than three times during that entire period; and that Mr. Brady did not recall if he had communicated by cellphone or text with Mr. Jastremski in 2014. Mr. Brady's phone bills, provided by his agent shortly before the hearing, indicate two short calls (3 minutes duration in total) between Mr. Brady and Mr. Jastremski on October 11, 2014.

[5] In context, it is clear that "Dave" was Dave Schoenfeld, the Patriots' Equipment Manager. I understand from the Wells Report that, in his interview with the investigators, Mr. Jastremski denied that "it" in the last sentence of the text message referred to deflation of footballs. But given the context of the text messages exchanged that day, it is very hard to believe that denial.

[6] In response to the question, "Why were you talking to Mr. Jastremski in those two weeks?," Mr. Brady responded, in sum: "I think most of the conversations centered around breaking in the balls." For the reasons noted, I do not fully credit that testimony.

**ROGER GOODELL**
*Commissioner*

meet personally with him in the "QB room" during the preceding twenty weeks of the regular season and post-season prior to the AFC Championship Game. This was true even though, as Mr. Brady testified, there were occasions (such as the game against the New York Jets on October 16, 2014) when he was plainly dissatisfied with the preparation of the footballs, including their inflation level, and even though, only two days prior to the AFC Championship Game, he and Mr. Jastremski had decided to use an entirely new method to prepare the game balls that involved much less use of a particular conditioner called Lexol and much more intensive "gloving" of the footballs. (Tr. 68–69 ("I asked John to make up 24 brand new balls without putting any Lexol on them.").)

The sharp contrast between the almost complete absence of communications through the AFC Championship Game and the extraordinary volume of communications during the three days following the AFC Championship Game undermines any suggestion that the communications addressed only preparation of footballs for the Super Bowl rather than the tampering allegations and their anticipated responses to inquiries about the tampering.

In addition, throughout the period in which Mr. Brady and Mr. Jastremski were having such frequent communications, Mr. Jastremski was in frequent communication with Mr. McNally. On January 19, only six minutes after his first conversation with Mr. Brady, Mr. Jastremski called Mr. McNally; they spoke for nearly ten minutes. They spoke multiple additional times throughout the remainder of the day for a total of 22 minutes; their conversations included Mr. McNally's giving Mr. Jastremski a "heads up" that the latter's name had been mentioned in the former's interview by NFL Security. There were multiple, lengthy phone conversations between Mr. McNally and Mr. Jastremski over the next several days.

The frequent and lengthy conversations between Mr. Brady and Mr. Jastremski and, in turn, between Mr. Jastremski and Mr. McNally, are important in numerous respects. Text messages exchanged during the latter half of the 2014 regular season that were recovered from Mr. Jastremski's cellphone reveal that Mr. Jastremski and Mr. McNally had discussed Mr. Brady's views about the pressure of game balls and made multiple references to Mr. Jastremski's providing a "needle" for Mr. McNally's use. Those texts included Mr. Jastremski's statement to Mr McNally, in the context of an exchange about the pressure of game balls, that Mr. Brady "actually brought you up and said you must have a lot of stress trying to get them done."

I agree with the Wells Report and reject as implausible Mr. McNally's interpretation of the quoted text message—*i.e.*, that it referred to someone other than Mr. Brady and that the "stress" referred to Mr. McNally's efforts to resell his Patriots game tickets. The text messages immediately before and after that message (all within a range of about two and a half minutes) plainly refer to Mr. Brady, and the context of their exchange plainly involves the inflation levels of footballs. Given that there is no dispute that Mr. McNally's only assigned responsibility with respect to the game balls was to deliver them, I find that "trying to get them done" referred to tampering with the inflation level of the balls. No credible alternative explanation for that

9

message has been offered by Mr. McNally, Mr. Jastremski or Mr. Brady and the decision not to seek Mr. McNally's testimony at the hearing has foreclosed any other conclusion.[7]

Furthermore, there is another text message in which Mr. McNally, expressing anger with Mr. Brady, states that "the only thing deflating sun[day] is his passing rating." Equally, if not more telling, is a text message earlier in 2014, in which Mr. McNally referred to himself as "the deflator," and, a short time later, stated that he was "not going to espn ... yet." Again, the absence of Mr. McNally from the hearing leaves these text messages unexplained by the person who sent them.

These exchanges must be considered in the context of demands from Mr. McNally, communicated to and through Mr. Jastremski, for consideration from Mr. Brady. There are multiple requests by Mr. McNally for footballs "for Tom to sign," apparel, and shoes. And in response to a text message from Mr. Jastremski in which he says "I have a big needle for you this week," Mr. McNally responds: "Better be surrounded by cash and newkicks ... or it's a rugby sunday."[8] Finally, about a week before the AFC Championship Game, Mr. Jastremski told Mr. McNally that it would be a "big autograph day for you," and several days later, in the Patriots' equipment room, Mr. Brady (i) autographed two footballs and handed them to Mr. McNally and (ii) signed a Brady game-worn jersey for Mr. McNally.

In short, the available electronic evidence, coupled with information compiled in the investigators' interviews, leads me to conclude that Mr. Brady knew about, approved of, consented to, and provided inducements and rewards in support of a scheme by which, with Mr. Jastremski's support, Mr. McNally tampered with the game balls. The result was to undermine, if

---

[7] The NFLPA and the Management Council were asked to address in their post-hearing briefs whether, before deciding this appeal, I should hear directly from Mr. Jastremski and Mr. McNally, each of whom has been suspended by the Patriots. The NFLPA took the position that because both witnesses had denied any scheme to deflate the Patriots' game balls, there was "no need to call them as witnesses. Brady sought to confront his accusers, not those who have already provided exculpatory evidence." The Management Council noted that, based on their interviews with the investigators and NFL Security, the Wells Report contained numerous findings with respect to Mr. McNally's and Mr. Jastremski's conduct and credibility and argued that to the extent that Mr. Brady and the NFLPA wished to contest these findings, it was incumbent on them to call both witnesses. The Management Council also argued that in light of the findings in the Wells Report with respect to their conduct and credibility, I should draw an adverse inference—that "their testimony would have confirmed Brady's involvement"—from the NFLPA's failure to call them as witnesses. While I am permitted to do so, I decline to draw any such adverse inference from Mr. Brady's decision not to seek the testimony of either witness. However, there is no question, based on the Wells Report, the NFL Security interviews, and other record evidence, that any "exculpatory evidence" offered by Mr. Jastremski or Mr. McNally to the investigators, including their denials of a tampering scheme, is not credible.

[8] When asked about this message by the investigators, Mr. McNally acknowledged that the reference to "rugby" meant a football that was over-inflated. In context, it is plain that the word "newkicks" referred to shoes.

**ROGER GOODELL**
*Commissioner*

not vitiate, the game officials' efforts to ensure that the game balls used by the Patriots complied with league rules.[9]

### C.    Did Mr. Brady refuse to cooperate with the investigation?

There is no question that Mr. Brady declined to make available to investigators electronic information, including text messages and emails, related to the subject of the investigation.[10] He did so despite repeated requests for such information and notwithstanding the investigators' offer to allow his counsel to select the responsive communications so that the privacy of his personal communications could be maintained.

The evidence that was produced in connection with the hearing reinforces this conclusion. On the eve of the hearing, the NFLPA submitted a declaration from a forensic expert, Brad Maryman, who had been engaged to review Mr. Brady's cellphones for responsive information *after* the discipline letter had been issued and months after the information was first requested. Mr. Maryman's review was extremely limited. It consisted of a review of two cellphones used by Mr. Brady, one from the spring of 2014 through November 5, 2014 and another from March 6, 2015 through April 8, 2015. Because Mr. Maryman believed that the period of use for the second cellphone was outside the scope of the investigation, he conducted no analysis of its contents. With respect to the first phone, Mr. Maryman conducted only a limited review, searching available SMS and MMS messages for a select number of names and telephone numbers, rather than for all communications falling within the categories of information sought by the investigators.

---

[9] Even accepting Mr. Brady's testimony that his focus with respect to game balls is on a ball's "feel," rather than its inflation level, there is ample evidence that the inflation level of the ball does matter to him. That evidence starts with his testimony that he wanted his game balls inflated to the lowest level permissible under the rules, and includes what Mr. McNally told the investigators, including for example that he (Mr. McNally) had told referee Anderson about Mr. Brady's inflation-level preferences. Mr. Brady's claim that he does not focus on inflation levels is also inconsistent with his reaction to what he thought were over-inflated footballs used in a 2014 game. There are also multiple public statements by Mr. Brady, including his having described 12.5 psi as "the perfect grip for me" and his statement in a prior season that "I like the deflated ball" (after it had been spiked by one of his teammates), a statement that, even if made in a joking manner, indicates a preference for less-inflated footballs.

[10] Specifically, the investigative team asked for the production of "documents and email/text messages (including on [Mr. Brady's] phone)" during the period from September 1, 2014 to the present that fell within specified "categories of information," including "non-privileged communications concerning the preparation of game balls, … the ball preparation process, inflation of balls, deflation of balls, providing balls to game officials and the movement of footballs between the officials' locker room and the playing field." In addition, investigators requested the production of "text messages or other communications between Mr. Brady, John Jastremski, Dave Schoenfeld and Jim McNally from September 1, 2014 to the present regardless of subject, as well as a log of the above calls between Mr. Brady and those individuals since January 17, 2015."

**ROGER GOODELL**
*Commissioner*

More importantly, Mr. Maryman was *not* given access to the cellphone that Mr. Brady had used between November 6, 2014 and March 5 or 6, 2015, the period that included the AFC Championship Game, its immediate aftermath, and the first six weeks of the investigation. As a result, the substance of relevant text messages on that cellphone was not, and could not be, reviewed. All we know is that Mr. Brady exchanged nearly 10,000 text messages with many individuals over this period of approximately four months.[11]

As I have previously noted, Mr. Brady's agent explained, and Mr. Brady confirmed in his testimony, (a) that his ordinary practice, when he gets a new cellphone, is to give the old cellphone to his assistant for destruction and (b) that he followed that ordinary practice with the cellphone that he used from November 6, 2014 until early March 2015. But he offered no explanation of why, on March 5 or 6, 2015, he replaced the cellphone that he had been using since November 6, 2014. (Mr. Brady testified that he did not have a schedule for periodically changing cellphones.)

Mr. Brady explained that when he changes cellphones, he gives his old cellphone to an assistant with the instruction "to destroy the phone so that no one can ever, you know, reset it or do something where the information is available to anyone." But this conflicts with the fact that the cellphone that he had used prior to November 6, 2014 was, in fact, available for Mr. Maryman's review. Had Mr. Brady followed what he and his attorneys called his "ordinary practice," one would expect that the cellphone that he had used prior to November 6, 2014 would have been destroyed long before Mr. Maryman was hired. No explanation was provided for this anomaly.

The evidence and testimony presented at the hearing demonstrate that Mr. Brady gave the cellphone that he had used since November 6, 2014 to his assistant for destruction on either March 5 or, more likely, March 6, the first date of active use of the second cellphone given to Mr. Maryman for review. That date of the cellphone's destruction—on or about March 6, 2015—is very significant. March 6 was the date on which Mr. Brady was interviewed by Mr. Wells and his team. (The date of that meeting was confirmed on March 3, 2015, several days before the cellphone was destroyed.) The investigators' request for access to information recorded in Mr. Brady's cellphone, which had been communicated several weeks before, was renewed on February 28, 2015, a week before the interview, in an email to Mr. Brady's lawyers. That request was addressed at length during the interview, but at no time did Mr. Brady ever suggest that the cellphone had been (or would soon be) destroyed. Moreover, Mr. Brady

---

[11] After the hearing and after the submission of post-hearing briefs, Mr. Brady's certified agents offered to provide a spreadsheet that would identify all of the individuals with whom Mr. Brady had exchanged text messages during that period; the agents suggested that the League could contact those individuals and request production of any relevant text messages that they retained. Aside from the fact that, under Article 46, Section 2(f) of the CBA, such information could and should have been provided long before the hearing, the approach suggested in the agents' letter—which would require tracking down numerous individuals and seeking consent from each to retrieve from their cellphones detailed information about their text message communications during the relevant period—is simply not practical.

**ROGER GOODELL**
*Commissioner*

admitted in his testimony that he was personally aware, prior to March 6, 2015, of the investigators' request for information from his cellphone.

Mr. Brady's direction that his cellphone (and its relevant evidence) be destroyed on or about March 6 is very troubling. Rather than simply failing to cooperate, Mr. Brady made a deliberate effort to ensure that investigators would never have access to information that he had been asked to produce. Put differently, there was an affirmative effort by Mr. Brady to conceal potentially relevant evidence and to undermine the investigation. Mr. Brady's conduct gives rise to an inference that information from his cellphone, if it were available, would further demonstrate his direct knowledge of and involvement with the scheme to tamper with the game balls prior to the AFC Championship Game.[12] Mr. Brady's affirmative action to ensure that this information would not be available leads me to conclude that he was attempting to conceal evidence of his personal involvement in the tampering scheme, just as he concealed for months the fact that he had destroyed the cellphone requested by the investigators.

Mr. Brady's failure to cooperate and his destruction of potentially relevant evidence are significant because the ability to conduct an investigation—whether by NFL staff or by independent parties retained by the NFL—ultimately depends on cooperation. Neither the NFL nor any NFL member club has subpoena power or other means to compel production of relevant materials or testimony. Nonetheless, the NFL is entitled to expect and insist upon the cooperation of owners, League employees, club employees and players in a workplace investigation and to impose sanctions when such cooperation is not forthcoming, when evidence is hidden, fabricated, or destroyed, when witnesses are intimidated or not produced upon reasonable request, or when individuals do not provide truthful information. Moreover, in such cases, there is no question that the Hearing Officer may draw an adverse inference from the lack of cooperation and may reasonably interpret available evidence in a manner that supports findings of misconduct.

            *                    *                    *

The evidence fully supports my findings that (1) Mr. Brady participated in a scheme to tamper with the game balls after they had been approved by the game officials for use in the AFC Championship Game and (2) Mr. Brady willfully obstructed the investigation by, among other things, affirmatively arranging for destruction of his cellphone knowing that it contained potentially relevant information that had been requested by the investigators. All of this indisputably constitutes conduct detrimental to the integrity of, and public confidence in, the game of professional football.

---

[12] I do not accept the argument, advanced by NFLPA counsel on Mr. Brady's behalf, that in failing to provide information from his phones to the investigators, Mr. Brady was acting on the advice of counsel. Even if I were inclined to accept that argument, there is no evidence that Mr. Brady's counsel advised him to *destroy* his phone and thereby preclude recovery of potentially relevant electronic information exchanged during the key time period.

**ROGER GOODELL**
Commissioner

### V.    The Discipline

As noted above, I am very much aware of, and believe in, the need for consistency in discipline for similarly situated players. The NFLPA is wrong, however, to suggest that because no player may have been suspended before for tampering with game footballs or obstructing an investigation, a suspension cannot be issued here. Under the CBA, the law of the shop is clear, as explained by Hearing Officer Henderson in the *Tony McDaniel* appeal:

> Each case is unique in its facts and circumstances. While it is important that similar cases be treated similarly for discipline purposes, differences are not always apparent, and it is often difficult to see those distinctions long after decisions are made. Reliance on past decisions, without benefit of all the factors considered, is misplaced.[13]

No prior conduct detrimental proceeding is directly comparable to this one. Here we have a player's uncoerced participation in a scheme to violate a competitive rule that goes to the integrity of the game. Unlike any other conduct detrimental proceeding of which I am aware, and certainly unlike any cited by either party, this scheme involved undermining efforts by game officials to ensure compliance with League rules.

The scheme, which sought to secure a competitive advantage on the playing field, was coupled with not only (i) a failure to cooperate with the League's investigation, but also (ii) destruction of potentially relevant evidence with knowledge that the evidence had been sought in the investigation.

The conduct at issue here is therefore fundamentally different from that of the players who were found to have engaged in conduct detrimental in the *Bounty* proceeding. Commissioner Tagliabue there placed great emphasis on his view that the misconduct of the Saints' players was in large part the result of pressure from coaches and other management representatives, resulting in the players' "not hav[ing] much choice but to 'go along'." The bounty program was largely developed and administered by the coaches, and the pressure on the players extended to "obstruction of the original investigation [which was] directed by Saints' officials." There is no evidence of any such pressure on Mr. Brady here.[14]

---

[13] In the *Hardy* opinion, Hearing Officer Henderson went on to say: "The Commissioner's authority and discretion in deciding appropriate discipline is not circumscribed or limited by the CBA, and he is not forever bound to hold discipline at the same level. In my experience as a hearing officer I have seen, and upheld, increases in the level of discipline without prior notice, not surprising with a policy which is unilaterally promulgated by the league without negotiation." As I further explain below, here there is no "usual level of discipline" because the conduct detrimental at issue in this proceeding is fundamentally different from the conduct detrimental at issue in any other proceeding.

[14] Even with respect to similar behavior, Commissioner Tagliabue in his *Bounty* decision made clear that "this case should not be considered a precedent for whether similar behavior in the

**ROGER GOODELL**
*Commissioner*

14

To the contrary, the Wells Report documented that the Patriots' ownership, executives, coaching staff, and the head equipment manager, Mr. Schoenfeld, had no knowledge of or participation in the scheme. Those findings are not challenged on appeal. Nor was there a challenge to the record evidence that Mr. Jastremski and Mr. McNally sought to hide their actions from Mr. Schoenfeld, and that Mr. Jastremski warned Mr. Brady that Mr. Schoenfeld would be asking him about the condition of the footballs that had been used in the AFC Championship Game.

The conduct at issue here is also very different from that which led to the discipline imposed on Brett Favre, who was investigated for a violation of League workplace policies. The conduct alleged there (which the League was unable to prove) was of a kind that reflects poorly on the League but does not go to the integrity of the competition on the field. In Mr. Favre's case, I found that he had not been "fully candid" with the NFL staff in several respects that resulted in a longer and more costly review than might otherwise have been required; on that basis I imposed a fine. My findings with regard to Mr. Brady's conduct, including his involvement with the tampering scheme and his destruction of relevant evidence, are fundamentally different.[15]

The conduct at issue here is also very different from the ball-warming incident in Minnesota last year, in which a *Carolina Panthers* ball attendant was observed warming a ball on the *Vikings'* sideline; there was no evidence of any intentional attempt to violate or circumvent the rules, no player involvement, and no effort to conceal the ball attendant's conduct. As Mr. Vincent testified, the ball never got into the game and the matter "was addressed immediately."

The conduct at issue here is also very different from the incident involving the Jets' equipment staff member who "attempted to use" unapproved equipment in plain view of the officials to prepare kicking balls prior to a 2009 game against the Patriots. There was no evidence of any player involvement. However, it bears mention that the Jets' employee was suspended from his regular game-day duties for a period longer than the suspension under review here.[16]

---

future merits player suspensions or fines" because his over-riding objective there was to bring closure to the entire *Bounty*-related set of issues.

[15] Nor do the statements attributed to Aaron Rodgers, who (according to a third party) was reported to have commented that he liked to push the limit in terms of inflating balls to see if the officials took air out of the balls when they were measured prior to the game, present a comparable situation. Here, the balls were tampered with *after* the officials had approved them for use in the game.

[16] That suspension itself disproves the NFLPA's argument that any discipline here must be limited to a fine of $25,000, an amount that would be a substantial punishment for a game-day employee, but a mere token for any player. Indeed, the language from the Game Operations Manual upon which the NFLPA relies for that argument expressly states that discipline "is *not*

**ROGER GOODELL**
*Commissioner*

In terms of the appropriate level of discipline, the closest parallel of which I am aware is the collectively bargained discipline imposed for a first violation of the policy governing performance enhancing drugs; steroid use reflects an improper effort to secure a competitive advantage in, and threatens the integrity of, the game. Since the advent of our testing for steroid use in the 1980s and now, pursuant to our Collective Bargaining Agreement, the first positive test for the use of performance enhancing drugs has resulted in a four-game suspension without the need for any finding of actual competitive effect.

In our most recent Collective Bargaining Agreement, the parties (a) agreed to continue that level of a discipline for a first violation and (b) further agreed that a player found to have used both a performance enhancing drug and a masking agent would receive a six-game suspension. The four-game suspension imposed on Mr. Brady is fully consistent with, if not more lenient than, the discipline ordinarily imposed for the most comparable effort by a player to secure an improper competitive advantage and (by using a masking agent) to cover up the underlying violation.[17]

## VI.   Notice and Other Legal Issues Advanced on Appeal

Contrary to the NFLPA's arguments, I find that Mr. Brady had more than adequate notice that he could be subject to "conduct detrimental" discipline, including suspension, for the conduct at issue here.

*First*, despite the union's arguments to the contrary, the record is undisputed that prior to January 18, 2015, the date of the AFC Championship Game, Mr. Brady was fully aware of the rule expressly regulating the permissible inflation range for game balls. Mr. Brady testified about his knowledge of that rule and that he had taken steps in the past to call the relevant provision to the attention of game officials.

*Second*, the CBA does not require itemization of specific categories of misconduct that may be deemed "conduct detrimental" and subject to discipline. As the CBA-prescribed standard

limited" to such a fine, and I decline to adopt an interpretation of that passage that disregards its plain meaning.

[17] The four-game suspension is also consistent with the suspension recently imposed on the General Manager of the Cleveland Browns for a first violation of a league rule intended to maintain fair competition and the integrity of the game. The length of that suspension reflected, and was explicitly mitigated by, the General Manager's self-reporting and transparency in acknowledging wrongdoing. There are no such mitigating factors here.

There are similar examples of discipline imposed on coaches for conduct detrimental that bears on the integrity of the game, including the one-year suspension of Sean Payton and the six-game suspension of Joe Vitt imposed in connection with the Saints' pay-for-performance bounty program. I do not rely on those examples to determine the discipline imposed on Mr. Brady, but they reinforce my conclusion, based principally on the penalties associated with violations of the steroid policy, that the discipline imposed on Mr. Brady is not excessive or without precedent, and is in fact fair and reasonable.

**ROGER GOODELL**
*Commissioner*

NFL Player Contract makes clear, such determinations are left to the "reasonabl[e] judg[ment]" of the Commissioner. Mr. Brady had knowledge and notice of that fact.

Tampering with the game balls after they have been approved by the game officials—an effort to undermine the game officials' responsibility to ensure that game balls are in compliance with League rules—is plainly within the scope of matters that may reasonably be judged by the Commissioner to affect the integrity of, and public confidence in, the game of professional football. Mr. Brady knows that players are subject to suspension for violations of the Playing Rules and had no reason to believe that a suspension could not be imposed for the conduct at issue here.[18]

The same principle undermines the NFLPA's contention that Mr. Brady was unaware that he could be disciplined for "declining to respond to the Wells discovery requests" or "failing to cooperate" with the investigation. As a threshold matter, there is no disagreement about the obligation of club employees, including players, to cooperate with a proper League investigation. Moreover, the conduct at issue here—specifically the willful destruction of potentially relevant evidence—goes well beyond Mr. Brady's failure to respond to or fully cooperate with the investigation.

In the CBA-prescribed standard NFL Player Contract itself, each player "recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players." Such conduct includes "any ... form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football." Even without regard to the arbitration precedents cited by the Management Council in its post-hearing brief (at pages 8–9), Mr. Brady's conduct during the investigation falls squarely within the scope of conduct that may be reasonably judged by the Commissioner to be "conduct detrimental" to the League. There should be no question in anyone's mind that active obstruction of a conduct detrimental investigation may and will itself be deemed conduct detrimental and subject to discipline, as the standard Player Contract provides, by a fine in a reasonable amount, by suspension for a period certain or indefinitely, or by termination of the player's contract.[19]

_____

[18] As Commissioner Tagliabue observed in the *Bounty* decision, "The matters that can affect such integrity and public confidence [in the game of professional football] evolve and change over time depending on developments within and external to the League, and the parties to the CBAs have agreed not to operate with a static or frozen definition of conduct detrimental."

[19] The NFLPA's argument about the NFL's Policy on Integrity of the Game & Enforcement of Competitive Rules is misplaced. That Policy imposes certification and reporting requirements on clubs and certain senior club executives, thereby providing an additional means of *enforcing* rules that ensure fair competition; it also prescribes protocols for investigations of competitive violations by clubs. (Inasmuch as the investigation addressed conduct by the Patriots, it is not surprising that the Wells Report cited this Policy.)

The Policy was not the source or basis for the discipline imposed here. The bar on conduct detrimental to the integrity of and public confidence in the game of professional football is instead reflected in the standard form, collectively bargained Player Contract, among other

**ROGER GOODELL**
*Commissioner*

Indeed, a player of Mr. Brady's tenure in the league and sophistication, and who was represented by highly experienced counsel (both personal and NFLPA-engaged), cannot credibly contend that he believed that he could, without consequences, destroy his cellphone on or about the day of his interview with the investigators when he knew in advance of the interview that the investigators were seeking the cellphone for the evidence that it contained. And the belated attempt by his representatives to remedy this failure to cooperate—ultimately by asking the NFL to track down nearly 10,000 text messages sent to or received from a substantial number of other individuals—is simply insufficient. The NFLPA and Mr. Brady's representatives have identified no instance in or outside the NFL in which such conduct has been deemed satisfactory cooperation with an investigation.

Finally, the CBA-mandated standard NFL Player Contract, which Mr. Brady signed, makes clear and provides notice that, in the event of a finding of conduct detrimental, the Commissioner may "suspend Player for a period certain or indefinitely."

In sum, Mr. Brady had notice, and in fact was fully aware of, the established rule governing the pressure of NFL game balls; he had notice and ample reason to expect that a violation of that rule, especially one that sought to undermine the efforts of game officials to ensure that game balls were in compliance with League rules, would be deemed conduct detrimental; he had notice and ample reason to expect that false or misleading statements and/or destruction of evidence requested for use in an investigation of conduct detrimental would itself be deemed conduct detrimental; and he had notice and ample reason to expect that such conduct detrimental could lead to his suspension.

\*                              \*                              \*

Finally, the NFLPA and Mr. Brady have argued that I improperly delegated my "conduct detrimental" authority and that the Paul Weiss investigation was not independent. Neither argument has merit.

First, as made clear in my opinion of June 22, 2015, I did not delegate my authority as Commissioner to determine conduct detrimental or to impose appropriate discipline. I was directly involved in the assessment of Mr. Brady's conduct that led to his suspension and in determination of the suspension itself; I concurred in Troy Vincent's recommendation and authorized him to communicate to the club and to Mr. Brady the discipline imposed under my authority as Commissioner. Second, there was no delegation of any authority to the investigators.

---

documents, and it was in place long before the Policy was issued. As the discipline letter makes clear, Mr. Brady was suspended for conduct detrimental to the integrity of and public confidence in the game of professional football, not for a violation of the Policy.

The fact that he claimed to be unaware of the Policy is therefore irrelevant to any issue in this appeal, including the issue of notice. In any event, the record demonstrates that at the very least, Mr. Brady had constructive notice of that Policy, which in response to his counsel's request, was provided to his counsel by the Paul Weiss team on March 3, two or three days before Mr. Brady destroyed his cellphone.

**ROGER GOODELL**
*Commissioner*

To the contrary, I reviewed the facts set forth in the Wells Report to determine, whether in my own judgment, the identified conduct constituted "conduct detrimental."

Nor is there any basis for the NFLPA's suggestion that the Wells Report was not the product of an independent investigation.[20] The Report itself makes clear, and the hearing testimony of Mr. Wells confirmed, that the investigation and report represent solely and entirely the findings and conclusions of the Wells investigatory team.[21]

## CONCLUSION

I entered into the appeal process open to reevaluating my assessment of Mr. Brady's conduct and the associated discipline. Especially in light of the new evidence introduced at the hearing—evidence demonstrating that he arranged for the destruction of potentially relevant evidence that had been specifically requested by the investigators—my findings and conclusions have not changed in a manner that would benefit Mr. Brady.

Notwithstanding my enormous respect for his accomplishments on the field and for his contributions and role in the community, I find that, with respect to the game balls used in the

---

[20] The NFLPA takes the position that because the NFL asserted attorney-client privilege for certain of its communications with Paul, Weiss and because a Paul, Weiss attorney asked questions of witnesses at the appeal hearing, the investigation was not "independent." For the reasons stated in the text, among others, I disagree. But this disagreement does not matter: If the entire investigation had been conducted by in-house NFL employees instead of an outside law firm, I would still view it as a thorough and reliable basis for my findings and conclusions and a thorough and detailed means of providing Mr. Brady and the NFLPA notice of the conduct detrimental for which the suspension was imposed.

[21] Asserting that Mr. Brady was denied a fundamentally fair hearing, the NFLPA's post-hearing brief raises again issues resolved in my pre-hearing rulings, including the denial of the NFLPA's request to question NFL General Counsel Jeff Pash and the denial of the NFLPA's request for access to Paul, Weiss' internal records. With one exception, those issues were addressed in pre-hearing opinions (or above) and will not be addressed again here.

The exception relates to the NFLPA's argument that NFL General Counsel Jeff Pash played a significant role in the investigation and should have been required to testify at the hearing. I reject that argument for several reasons, including those set forth in my Decision on Hearing Witnesses. The NFLPA's premise—that Mr. Pash played a significant role in the investigation—is simply incorrect, as Mr. Wells confirmed at the hearing. He testified that "Jeff Pash did not attend any witness interviews. I did not … involve him [in] my deliberations with respect to my assessment of those interviews. Mr. Pash played no substantive role in the investigation … and [any comments that he may have provided on a draft of the report] did not impact in any substantive fashion the conclusions with respect to my findings with respect to" Mr. Brady. In any event, the NFLPA waived this argument by not seeking at the hearing reconsideration of my decision denying its motion to compel Mr. Pash's testimony. (See Decision on Hearing Witnesses and Testimony, June 22, 2015, at 3.)

**ROGER GOODELL**
*Commissioner*

AFC Championship Game and the subsequent investigation, Mr. Brady engaged in conduct detrimental to the integrity of, and public confidence in, the game of professional football.

The four-game suspension is confirmed. In response to a concern raised by the NFLPA, this will confirm that compensation for the intervening bye week will be paid to Mr. Brady in equal installments over the remainder of the season once he returns from his suspension.

ROGER GOODELL

20

**ROGER GOODELL**
*Commissioner*