# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

:
:
:   ECF Case

Plaintiff,

:
:   Civil Action No.

vs.

:   1:15-cv-05916-RMB
:

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION,

:   **ANSWER AND**
:   **COUNTERCLAIM**
:

Defendant-Counterclaimant.

:
:
:

---------------------------------------------------------------- x

Defendant-Counterclaimant National Football League Players Association ("NFLPA" or

"Union"), on its own behalf and on behalf of Tom Brady, hereby denies the claims in the

National Football League Management Council's (the "NFL" or League") Complaint, and

counterclaims, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185

("LMRA"), and Section 10 of the Federal Arbitration Act, 9 U.S.C § 10 ("FAA")[1], to vacate the

---

[1] Although this case arises under Section 301 of the LMRA, and not the FAA, because the
LMRA "does not articulate the substantive or procedural rules" for confirming or vacating
arbitral awards, this Court may resort to the FAA "for guidance about arbitration conducted
under section 301." *See NFLPA v. NFL*, 523 Fed.Appx. 756, 760 (2d Cir. 2013); *see also HRH
Constr., L.L.C. v. Local No. 1, Int'l Union of Elevator Constructors, AFL-CIO*, No. 03 Civ. 8944
(DC), 2005 WL 31948, at *4 (S.D.N.Y. Jan. 5, 2005) (collecting cases); *Otis Elevator Co. v.
Local 1, Int'l Union of Elevator Constructors*, No. 03 Civ. 8862 (DAB), 2005 WL 2385849, at
*4 (S.D.N.Y. Sept. 23, 2005) ("Particularly in the context of a petition to confirm or vacate an
arbitration award, '[t]he policies of [S]ection 301 and the FAA are analogous' .... As such, the
Court considers the instant case in light of the body of law developed under Section 301 and
draws on the FAA for guidance") (citations omitted); *Teamsters Local 814 Welfare Fund v.
Dahill Moving & Storage Co., Inc.*, 545 F. Supp. 2d 260, 263 n.3 (E.D.N.Y. 2008) ("Under the
FAA, parties to an arbitration agreement may make an application to a federal district court for
an order confirming an arbitration award.  In the present case, the FAA is not applicable since in
cases brought pursuant to Section 301 of the LMRA, the FAA does not apply.  However, 'federal
courts have often looked to the Act for guidance in labor arbitration cases'"), citing *United*

July 28, 2015 Arbitration Award ("Award") (NFLPA Ex. 210 hereto[2]) issued by NFL Commissioner Roger Goodell, sitting as arbitrator.

## INTRODUCTION

1.      Commissioner Goodell's Award denied the Union and Brady's arbitration appeal of an unprecedented four-game suspension for Tom Brady's purported "general awareness" that two New England Patriots equipment personnel allegedly deflated Patriots footballs prior to the 2015 AFC Championship Game.

2.      Through this Answer and Counterclaim, the NFLPA and Brady seek to vacate the Award, which defies the "law of the shop" and thus the essence of the parties' collective bargaining agreement ("CBA"), and violates fundamental arbitral principles concerning procedural fairness and arbitrator bias.

3.      In *NFLPA v. NFL (Adrian Peterson)*, slip op. at 12-14 (D. Minn. Feb. 26, 2015), *appeal docketed*, No. 15-1438 (8th Cir. Feb. 27, 2015) ("*Peterson*"), Senior Judge David S. Doty squarely held that the law of the shop under the CBA affords players advance notice of potential discipline. In applying the law of the shop, Judge Doty most prominently relied upon the recent decision of retired Southern District Judge Barbara S. Jones, who served as the CBA arbitrator in

---

*Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 41 n.9 (1987); *Am. Nursing Home v. Local 144 Hotel, Hosp., Nursing Home & Allied Servs. Union, SEIU*, 1992 WL 47553 (S.D.N.Y. Mar. 4, 1992) (applying Section 9 of the FAA in a Section 301 confirmation proceeding).

[2] Exhibit citations herein refer to the exhibits that will be filed along with the NFLPA's forthcoming Amended Answer and Counterclaim that will contain confidential information and will be filed under seal, if and when the NFLPA and Brady have the Court's permission to do so. Exhibit numbers 1-203 coincide with the numbers of the exhibits submitted by the NFLPA and Brady through the June 23, 2015 arbitration hearing in the underlying Article 46 arbitration proceeding before Commissioner Goodell which resulted in the issuance of the Award. Exhibit numbers 205-208 are the NFLPA and Brady's post-hearing brief and attendant exhibits, also submitted to Goodell. Exhibit number 204 is the full transcript from the June 23 arbitration before Commissioner Goodell.

the *Ray Rice* matter, where she rejected Goodell's arbitration testimony, vacated Goodell's suspension of NFL player Ray Rice as "arbitrary," and held that the CBA requires that players receive "proper notification" of the discipline that can be imposed on them.  Unlike in *Rice*, where Judge Jones vacated Goodell's discipline, in *Peterson*, the CBA arbitrator upheld Adrian Peterson's suspension even though it violated the law of the shop requirement of disciplinary notice.  Judge Doty, citing Judge Jones' award in *Rice*, vacated the *Peterson* arbitration award because it "simply disregarded the law of the shop" and therefore was contrary to the essence of the CBA.    The NFL appealed but did not obtain a stay of the *Peterson* decision, which collaterally estops the League from disputing the CBA law of the shop  requirement of notice in this case.

4.      Defying the *Peterson* order and *Rice*, Commissioner Goodell's Award upholds Brady's four-game suspension in its entirety despite the undisputed arbitration record of several egregious notice defects:  Brady had no notice of the disciplinary policies that would be applied to him, of the disciplinary standards, or of the potential penalties.

5.      The notice defects, which each independently require vacating the Award, are:  (i) Brady only had notice of the applicable Player Policies, which provide that "***First offenses will result in fines***" for any equipment tampering—not *suspensions*; (ii)  Brady had no notice of the Competitive Integrity Policy that was the source of the NFL's punishment, because that Policy, by its terms, applies only to Clubs (and is not part of the Player Policies); (iii) Brady had no notice that he, or any other player, could be suspended for claimed "general awareness" of alleged misconduct by other persons, a disciplinary standard contrary to the express terms of the CBA and never before applied to players in the history of the NFL; and (iv) Brady had no notice that he could be suspended for alleged non-cooperation, when a fine is the only penalty that has

ever been upheld in such circumstances, and the law of the shop specifically prohibits suspensions for non-cooperation or even obstruction of a League investigation.  By ignoring each one of these notice failures, the Award—as in *Peterson*—utterly disregards the CBA's law of the shop and express terms and must be vacated for defying the essence of the CBA.

6.      But the Award's legal defects do not stop there.   The Award ignores the undisputed law of the shop requirement of fair and consistent treatment by basing discipline on ball pressure "testing" that the NFL concedes did not generate reliable information because of the League's failure to implement any protocols for collecting such information.   Additionally, the Award is the product of a fundamentally unfair process, and was issued by an evidently partial arbitrator who put himself in the position of ruling on the legality of his own improper delegation of authority (a delegation which itself violated the express terms of the CBA).   Each of these grounds independently requires vacating the Award.

### SUMMARY OF ARBITRATION PROCEEDINGS

7.      Tom Brady quarterbacks the New England Patriots and is one of the most successful players—on and off the field—in NFL history.  This past February, he led the Patriots to their fourth Super Bowl championship during his tenure with the team, tying him for the most all-time Super Bowl victories by a quarterback.

8.      Following the 2015 AFC Championship Game, the NFL launched an investigation into whether the Patriots footballs were improperly deflated below the pressure range ("PSI") permitted by NFL rules.   Goodell commissioned one of the League's regular outside law firms, Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), led by partner Theodore Wells, to co-lead the "Deflate-gate" investigation along with NFL Executive Vice President and General Counsel Jeffrey Pash (the "Wells-Pash Investigation").   NFLPA Ex. 7,

Wells Report at 1. The League and Paul, Weiss have publicly touted the Wells-Pash Investigation as "independent."

9.       The investigation was conducted, and punishments imposed, under the NFL's Policy on Integrity of the Game & Enforcement of Competitive Rules ("Competitive Integrity Policy"). *Id.* However, by its own terms, the Competitive Integrity Policy applies to Clubs—*not* players. Accordingly, the Competitive Integrity Policy was never given to players as part of the Player Policies that are distributed to players before each season, and it is undisputed that Brady never saw the Competitive Integrity Policy prior to these proceedings. NFLPA Ex. 210, Award at 17 n.19.

10.      On May 6, many months and many millions of dollars in legal fees later, Paul, Weiss and the NFL issued the "Wells Report" summarizing the findings from their investigation. The NFL's General Counsel Jeffrey Pash reviewed and commented on the purportedly independent Wells Report before its public release. The Report concluded that it was "more probable than not" that two Patriots equipment employees—John Jastremski and Jim McNally— had violated the Competitive Integrity Policy by "participat[ing] in a deliberate effort to release air from Patriots game balls after the balls were examined by the referee" prior to the start of the AFC Championship Game. NFLPA Ex. 7, Wells Report at 2. The Wells Report reached this conclusion notwithstanding the denials of Jastremski and McNally and the absence of any other witness or document directly supporting the claims of ball deflation. Moreover, even though footballs are expected to naturally deflate when moving from a warm locker room to a cold-weather environment (like the AFC Championship Game), the Wells Report concluded that human intervention was "more probable than not" based on a statistical and scientific analysis. At the same time, however, the Wells Report conceded that this analysis rested on numerous

"assumptions"—because of the League's failure to record the necessary data—and that "varying the applicable assumptions can have a material impact upon the ultimate conclusions." *Id.* at 13.

11.     With respect to Brady's alleged role, the Wells Report findings were even more limited.  The Report concluded it was "more probable than not that Brady was at least ***generally aware***" of the alleged misconduct by McNally and Jastremski.  *Id.* at 17 (emphasis added).  The Wells Report did ***not*** find that Brady actually knew about any ball deflation at the AFC Championship Game; it did not find that Brady directed or authorized any ball deflation; nor did it find that Brady even had any knowledge of the Competitive Integrity Policy pursuant to which he was punished and the Wells-Pash Investigation was conducted.

12.     After the Wells Report was released, the Union and Brady waited to see what, if any, action Commissioner Goodell would take.  As the Commissioner, Goodell—and no one else—has the exclusive authority under the CBA to take certain disciplinary actions against players for conduct detrimental to the League.  But, in this case, Goodell improperly abdicated his CBA role and delegated his disciplinary authority to NFL Executive Vice President Troy Vincent.

13.     Vincent, invoking the Competitive Integrity Policy, and resting solely on the limited factual conclusions from the Wells Report about Brady's alleged "general awareness" suspended Brady for four games.  NFLPA Ex. 10.  The applicable League Policies for Players ("Player Policies") were not even mentioned in Vincent's disciplinary letter.  Vincent also based this punishment on Brady's purported failure to cooperate with the Wells-Pash Investigation.  *Id.* The full extent of the alleged "non-cooperation" found by Wells, and cited by Vincent, was Brady declining, on the advice of his agents who were also acting as his attorneys, to respond to Wells' requests to produce certain of his private text messages and e-mails.  *Id.*

14.     On May 14, 2015, Brady timely appealed his suspension.  Goodell decided to serve as the arbitrator.  Brady and the NFLPA moved for his recusal because, among other things, Goodell had directed the unlawful delegation of his CBA disciplinary authority to Vincent.  Thus, as arbitrator, Goodell would have to determine the facts and CBA legality of his own conduct.  Moreover, Goodell was an essential witness on the delegation issue and could not lawfully serve as both arbitrator and fact witness in the same proceeding.  NFLPA Ex. 11.  The Commissioner nonetheless rejected the recusal request.  NFLPA Exs. 157, 160.

15.     On June 23, 2015, Goodell held the arbitration.  *See* NFLPA Ex. 204.  The hearing defied any concept of fundamental fairness.  Prior to the hearing, Goodell had ruled that Brady and the Union could not question essential witnesses, denied them access to the investigative files underlying the Wells Report (which were nonetheless available to the NFL's counsel at the arbitration), and summarily rejected Brady's unlawful delegation argument without considering any evidence (other than "facts" decreed by Goodell himself in his decision).  At the hearing itself, Paul, Weiss—the purportedly "independent" law firm whose findings about Brady were being challenged—abandoned all pretense of objectivity, and actively participated as counsel for the NFL conducting direct and cross-examinations of witnesses (including Brady's).  A Paul, Weiss partner represented the NFL for most of the hearing, even though he was a signatory to the Wells Report and his law partner (Wells) was a fact witness at the same hearing.  Paul, Weiss also conducted the hearing while in possession of critical evidence—including interview summaries of key witnesses—that Brady had requested but the NFL refused to give him.

16.     In addition, the arbitration established that the NFL had no procedures whatsoever for collecting information essential to determining whether the Patriots balls had deflated due to

environmental factors or human intervention.  In fact, less than a week ago, the NFL let it be known that it is for the first time implementing procedures for ball pressure testing—a stark concession that it had no procedures in place when the data on which Brady's punishment was based was collected.  The League's admitted failure to timely implement any such data collection protocols caused the League's scientific and statistical consultants to make a multitude of unsupported assumptions and rendered their analysis utterly unreliable as a fair and consistent basis for imposing discipline.

17.     And, the hearing confirmed all of the undisputed facts about the lack of proper notice.

18.     On July 28, 2015, Commissioner Goodell issued the Award upholding Brady's suspension.  Goodell's Award is little more than a rehash of the Wells Report, plus new and unfounded and provocative attacks on Brady's integrity.  At the same time, the Award ignores the fundamental legal arguments presented by the Union which require that the Award be set aside.

19.     For example, the Award disregards the myriad defects in notice—contending that Brady's knowledge that, in the broadest sense, he could be suspended for "conduct detrimental" eliminated the need for the League to provide any notice about which policies could be applied, and what the potential penalties for violations of the applicable policies might be.  But this contention had already been rejected by the ruling in *Peterson* (which the Award also ignores), where the domestic violence conduct at issue constituted conduct detrimental under any policy, but where the punishment *had* to be vacated because it violated the essence of the CBA requirement that Peterson have advance notice of the *policy* and *penalties* to which he could be subjected.  NFLPA Ex. 153.

20.     Here, the applicable policy concerning equipment tampering was contained in the Player Policies, but the Award ignores the terms of those Policies because they provide only for fines for a first time offense—a punishment Goodell apparently deemed insufficient.  NFLPA Ex. 114 at 15.  The Award also ignores Vincent's application of a "generally aware" disciplinary standard that was pulled from whole cloth without notice and applied to a player for the first time in NFL history.

21.     The most the Award has to say about notice is to try to deny, in a single footnote, that neither the Competitive Integrity Policy nor any other policy was applied.  NFLPA Ex. 210, Award at 17, n.19.  Putting aside that this assertion belies the arbitration record that Vincent *did* apply the Competitive Integrity Policy to Brady and punished Brady for being generally aware that Patriots equipment personnel violated that policy, it does not save the Award from vacatur.  According to the Award, Brady was purportedly suspended for conduct detrimental without application of any particular policy.   But there is a *specific* Player Policy concerning player equipment violations, and that policy only provides notice of fines for violations of that policy, not of *suspensions* for being *generally aware* of someone else's violation.  This is just the type of blatant notice defect which resulted in vacatur in *Peterson*.   There, Peterson had notice of one version of the Personal Conduct Policy distributed to players, only to have the Commissioner retroactively apply a different version of the Personal Conduct Policy, with different rules and penalties, that was not promulgated until *after* the conduct at issue.

22.     The Award also makes much of Brady's purported non-cooperation, including a brand new, hyperbolic and baseless accusation—that played no part in the discipline imposed by Vincent—that Brady "destroyed" his cell phone after being advised by his agents-lawyers not to turn over private communications to the NFL's outside law firm.  This issue is a complete red

herring because the NFL already had all of the relevant text communications by Brady from other Patriots personnel—a fact established by Brady's telephone records, which were produced at the hearing, and which showed the time and date of every text and phone call to or from Brady and Patriots personnel (or anyone else) during the relevant period.  NFLPA Exs. 1, 3.

23.     But most importantly for purposes of this Answer and Counterclaim, Goodell's decision on the punishment for alleged non-cooperation yet *again* violated the CBA requirement of notice.  As his predecessor, Commissioner Paul Tagliabue, ruled when he served as a CBA arbitrator in the so-called "Bounty-gate" matter:

> ***There is no evidence of a record of past suspensions based purely on obstructing a League investigation.  In my forty years of association with the NFL, I am aware of many instances of denials in disciplinary proceedings that proved to be false, but I cannot recall any suspension for such fabrication.  There is no evidence of a record of past suspensions based purely on obstructing a League investigation***.

NFLPA Ex. 113, *Bounty*, slip op. at 13 (2012) (Tagliabue, Arb.).

24.     The Award further ignores the testimony of Wells himself that he never once told Brady that discipline could flow from declining to produce his personal text messages or e-mails.

25.     With respect to the other grounds for vacatur, the Award also turns a blind eye to the NFL's undisputed failure to implement procedures for testing the footballs at the AFC Championship Game such that there was no fair and consistent basis for the NFL to base any punishment on its consultants' "assumptions" about that testing; ignores the procedural defects depriving Brady of a fundamentally fair hearing; and says nothing about Goodell's evident partiality.

26.     In a public statement issued on July 29, Patriots Owner Robert Kraft summarized the Award as follows:

The decision handed down by the League yesterday is unfathomable to me. It is routine for discipline in the NFL to be reduced upon appeal.

In the vast majority of these cases, there is tangible and hard evidence of the infraction for which the discipline is being imposed, and still the initial penalty gets reduced. Six months removed from the AFC championship game, the League still has no hard evidence of anybody doing anything to tamper with the PSI levels of footballs. I continue to believe and unequivocally support Tom Brady….

The League's handling of this entire process has been extremely frustrating and disconcerting. I will never understand why an initial erroneous report regarding the PSI level of footballs was leaked by a source from the NFL a few days after the AFC championship game, [and] was never corrected by those who had the correct information. For four months, that report cast aspersions and shaped public opinion.

Yesterday's decision by Commissioner [Goodell] was released in a similar manner, under an erroneous headline that read, "Tom Brady destroyed his cellphone." This headline was designed to capture headlines across the country and obscure evidence regarding the tampering of air pressure in footballs. It intentionally implied nefarious behavior and minimized the acknowledgement that Tom provided the history of every number he texted during that relevant time frame….

Tom Brady is a person of great integrity, and is a great ambassador of the game, both on and off the field. Yet for reasons that I cannot comprehend, there are those in the League office who are more determined to prove that they were right rather than admit any culpability of their own or take any responsibility for the initiation of a process and ensuing investigation that was flawed. I have come to the conclusion that this was never about doing what was fair and just….

I was wrong to put my faith in the League. Given the facts, evidence, and laws of science that underscore this entire situation, it is completely incomprehensible to me that the League continues to take steps to disparage one of its all-time great players, and a man for whom I have the utmost respect. Personally, this is very sad and disappointing to me.[3]

---

[3] *See Florio:* Robert Kraft tees off on Brady ruling, ProFootballTalk.Com (July 29, 2015),

27.     As in *Peterson*, a Federal Court should again vacate the Award, which (i) violates the CBA law of the shop requirement of notice and express CBA terms, (ii) violates the CBA law of the shop requirement of fairness and consistency, (iii) is the product of fundamentally unfair proceedings, and (iv) was issued by an evidently partial arbitrator.

28.     Because the Award was issued on the eve of the 2015 NFL season, it will irreparably harm Brady if he misses games while the Court considers the merits of this dispute. The NFLPA and Brady will file motions seeking relief prior to September 4, 2015, when the Patriots begin final preparations for their first regular season game.

## PARTIES

29.     The NFLPA is a non-profit corporation duly organized and existing under the laws of the Commonwealth of Virginia and is the Union and exclusive collective bargaining representative of all present and future NFL players, including Brady. The NFLPA's offices are located at 1133 20th Street, N.W., Washington, D.C. 20036.

30.     Tom Brady is a professional football player and member of the NFLPA. He was selected by the New England Patriots in the 2000 NFL Draft and has spent his entire career with that Club. During that time, Brady has won four Super Bowls, been named Super Bowl Most Valuable Player three times, and been awarded the NFL's Most Valuable Player twice. Brady resides in Massachusetts.

31.     The NFL maintains its offices at 345 Park Avenue, New York, New York, 10154, and is an unincorporated association consisting of 32 separately owned and operated professional football franchises.

---

http://profootballtalk.nbcsports.com/2015/07/29/robert-kraft-tees-off-on/.

32.     The NFL Management Council is the exclusive bargaining representative of all present and future employer member franchises of the NFL.

### RELEVANT NON-PARTIES

33.     Roger Goodell is the Commissioner of the NFL, *i.e.*, the *de facto* chief executive officer.  He also served as the arbitrator in this case.

34.     Troy Vincent is the NFL Executive Vice President of Game Operations.  He imposed Brady's discipline.

35.     Theodore Wells, Jr. is a partner in the law firm of Paul, Weiss who serves as counsel to the NFL and declared that his firm was acting as "independent" counsel in investigating the Patriots and Brady for alleged improper ball deflation pursuant to the Competitive Integrity Policy.

36.     Jeffrey Pash is an Executive Vice President and General Counsel of the NFL.  He was identified by the NFL as the co-lead investigator, with Wells, in this matter.

### DETAILED STATEMENT OF ARBITRATION FACTS

### A.     COMMISSIONER DISCIPLINE OF PLAYERS UNDER THE CBA

37.     The parties are bound by the CBA negotiated between the NFLMC, on behalf of the NFL member teams, and the NFLPA, on behalf of all NFL players.  The current CBA was signed on August 4, 2011.

38.     Paragraph 15 of the collectively bargained standard form NFL Player Contract provides the Commissioner with the exclusive authority to impose discipline on NFL players who are "guilty" of "conduct detrimental to the League."  NFLPA Ex. 108, CBA App. A, ¶ 15. It says nothing about punishing players who are "generally aware" of conduct detrimental committed by other persons.

39.     Because Paragraph 15 of the Player Contract does not notify players of what constitutes conduct detrimental (beyond a few examples), and what the potential penalties for such conduct might be, prior to each season, the League distributes the Player Policies to all NFL players.  The Players Policies provide the required notice of what the Commissioner considers conduct detrimental and what punishments might ensue from such conduct.  NFLPA Ex. 114.[4] In total, the Player Policies contain fourteen different Policies, including the NFL's Personal Conduct Policy, the Substances of Abuse Policy, the Steroids Policy, the Gambling Policy, and the policy concerning equipment violations by players (which falls under the Game Related Player Conduct Rules).

40.     No one other than the Commissioner is authorized by the CBA to impose discipline on players for conduct detrimental to the League.  For example, Article 46 provides the "exclusive" procedures for conduct detrimental disciplinary appeals and refers only to "action taken against a player *by the Commissioner* for conduct detrimental to the integrity of, or public confidence in, the game of professional football."  NFLPA Ex. 107, CBA Art. 46, § 1(a) (emphasis added).

41.     As Judge Jones held in *Rice*:

> [The] Commissioner has always had sole discretion to determine what constitutes conduct detrimental to the integrity of, or public confidence in, the game of football. . . .  The use of the word "exclusively" demonstrates the parties' intent that the Commissioner, and only the Commissioner, will make the determination of such conduct detrimental.

NFLPA Ex. 124*, Rice*, slip op. at 15 (quoting *Bounty*, NFLPA Ex. 113).

---

[4] Certain of the Player Policies—like the Personal Conduct Policy—are unilaterally promulgated by the Commissioner, and the NFLPA does not concede the propriety of, and reserves all rights with respect to, the terms of the various Player Policies.  The point here is that, by distributing the Player Policies each year to players, the NFL is trying to comply with the CBA requirement of advance notice.

42.     Moreover, whereas Article 46 expressly provides for the Commissioner to delegate his authority to serve as Hearing Officer in player *appeals*, it provides for no such delegation of his exclusive disciplinary authority in the first instance.  NFLPA Ex. 107, CBA Art. 46, § 2(a).

43.     Although the NFLPA agreed that the Commissioner or his designee could serve as the arbitrator for Article 46 disciplinary appeals, the NFLPA did not agree that the Commissioner could do so under unique circumstances where, as here, the Commissioner's own conduct is at issue.

44.     Accordingly, in two recent prior arbitrations in which the Commissioner's own conduct and statements were at issue—*Rice* and *Bounty*—Commissioner Goodell concluded that he had to recuse himself, and appointed Judge Jones and former Commissioner Tagliabue, respectively, to serve as the arbitrators.  *See* NFLPA Exs. 113, 124.

45.     Additionally, in a similar situation involving Tagliabue when he was the NFL Commissioner, a New York court held that he could not lawfully serve as arbitrator over a player dispute—even though the NFLPA had previously agreed to Commissioner arbitration—because the proceeding put at issue Commissioner Tagliabue's own conduct.  *See Morris v. N.Y. Football Giants*, 575 N.Y.S.2d 1013, 1016-17 (N.Y. Sup. Ct. 1991); *see also Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 716, 719 (E.D.N.Y. 1972) (disqualifying Commissioner from sitting as arbitrator due to circumstances presented by particular dispute, despite parties' prior arbitration agreement), *aff'd*, 468 F.2d 1064 (2d Cir. 1972).

**B.     THE CBA LAW OF THE SHOP REQUIRES THAT PLAYERS BE AFFORDED ADVANCE NOTICE OF POTENTIAL DISCIPLINE**

46.     A longstanding jurisprudence of NFL arbitrations—the law of the shop under the CBA—provides that NFL players may not be subject to discipline without advance notice of

what conduct might result in such discipline, and what the disciplinary consequences might be. *See, e.g.,* NFLPA Ex. 113, *Bounty*, slip op. at 6 (former Commissioner Tagliabue vacating Commissioner Goodell's discipline of four New Orleans Saints players for, among other things, lack of notice, and holding that "a sharp change in . . . discipline can often be seen as arbitrary and as an impediment rather than an instrument of change"); NFLPA Ex. 91, *Reggie Langhorne*, slip op. at 25 (1994) (Kasher, Arb.) (setting aside fine and suspension because player "was entitled at some time to be placed on notice as to what consequences would flow from his refusal to [abide by the rules].  Any disciplinary program requires that individuals subject to that program understand, with reasonable certainty, what results will occur if they breach established rules."); NFLPA Ex. 101, *Ricky Brown*, slip op. (2010) (Beck, Arb.) (vacating team discipline because player did not receive notice of rule he was accused of violating); NFLPA Ex. 99, *Laveranues Coles*, slip op. (2009) (Townley, Arb.) (same).

47.    As discussed above and below, the CBA law of the shop requirement of notice has been most recently confirmed by Judge Jones in *Rice*, Judge Doty in *Peterson*, and CBA Arbitrator Harold Henderson in *Hardy.*

48.    Goodell himself testified in *Rice* that he could not retroactively discipline Rice under the NFL's then-newly enacted Personal Conduct Policy (the "New Policy") because the NFL is "***required to give proper notification***" of player discipline.  NFLPA Ex. 122, *Rice* Tr. 100:13-14 (emphasis added); *see also id.* 101:7-13; NFLPA Ex. 124, *Rice*, slip op. at 7 (quoting Goodell testimony).

## C.    THE CBA LAW OF THE SHOP ALSO REQUIRES "FAIR AND CONSISTENT" DISCIPLINE

49.    A long line of CBA precedents holds that discipline under Article 46 must be "fair and consistent."  NFLPA Ex. 124, *Rice*, slip op. at 8.  "Where the imposition of discipline is not

fair or consistent, an abuse of discretion has occurred" and the discipline must be overturned. *Id.*; *see also id.* at 16 ("the Commissioner needed to be fair and consistent in his imposition of discipline"). No less an authority than Commissioner Tagliabue has held, serving as arbitrator in *Bounty*, that the role of the Article 46 Hearing Officer is to "review[] the discipline for consistency of treatment, uniformity of standards for parties similarly situated and patent unfairness or selectivity." NFLPA Ex. 113, *Bounty*, slip op. at 4.

50.     Indeed, Goodell acknowledged in his testimony in *Rice* that he is bound by this CBA requirement "to be consistent with consistent circumstances, and so if there are consistent circumstances, I think that's about fairness, and fairness would be you should be as consistent as possible in your discipline." NFLPA Ex. 122, *Rice* Tr. 164:18-165:6; *see also* NFLPA Ex. 124, *Rice*, slip op. at 5-6 (quoting Goodell).

> ### D. THE NFL'S RECENT HISTORY OF IMPOSING PLAYER DISCIPLINE THAT VIOLATES CBA REQUIREMENTS AND IS SUBSEQUENTLY OVERTURNED

51.     ***"Bounty."***  In 2012, Commissioner Goodell issued an arbitration award which affirmed his unprecedented suspensions on four New Orleans Saints players for allegedly engaging in a "bounty" program encouraging violent in-game hits.  *See* NFLPA Ex. 113.  The NFLPA was left with no choice but to file a Petition for Vacatur because Goodell's award cast aside the suspended players' CBA rights, including the CBA requirement of notice.  The *Bounty* federal court litigation eventually led to Goodell agreeing to recuse himself from a subsequent arbitration of the players' discipline because his conduct (public statements prejudging the outcome of the arbitration) was at issue.  Goodell appointed former NFL Commissioner Paul Tagliabue to hear the new arbitration of the players' disciplinary appeals.

52.     Commissioner Tagliabue vacated the four players' suspensions in their entirety for, among other reasons, lack of required notice of the discipline imposed.  In doing so,

Commissioner Tagliabue held that Goodell's punishments had been "selective, ad hoc, or inconsistent," and therefore "arbitrary and . . . an impediment rather than an instrument of change." *Id.* at 6.

53. **Ray Rice.** In July 2014, the NFL initially suspended running back Ray Rice for two games without pay for the widely-publicized incident in which he struck his fiancé in an elevator. The incident was captured on video, and shortly after it happened, a video of Rice emerging from the elevator became public. Intense public criticism ensued that the punishment was not sufficiently harsh. However, at the time, a two-game suspension was the historical CBA maximum punishment for a first time incident of domestic violence under the Personal Conduct Policy, and Goodell recognized that he needed to be fair and consistent in his discipline by adhering to this precedent. NFLPA Ex. 124*, Rice*, slip op. at 5 n.3.

54. However, Commissioner Goodell subsequently responded to the criticism on August 28, 2014 by promulgating a new version of his Personal Conduct Policy (the "New Policy") which elevated the presumptive discipline for a first-time domestic violence offender to a six-game suspension. But, critically here, Goodell did not initially try to apply the New Policy to Rice. As he testified: the NFL is "***required to give proper notification***" of player discipline. NFLPA Ex. 122, *Rice* Tr. 100:13-14 (emphasis added); *see also id.* 101:7-13. As Judge Jones held: *"**even under the broad deference afforded to [Goodell] through Article 46 [of the CBA], he could not retroactively apply the new presumptive penalty to Rice**."* NFLPA Ex. 124*, Rice*, slip op. at 16.

55. After announcing the New Policy, a second video of the incident was released, showing what had taken place "inside the elevator," *i.e.*, a graphic depiction of Rice striking his fiancé. In response to a renewed wave of public criticism, Goodell suspended Rice a second

time, this time indefinitely.   To justify elevating Rice's original and final punishment, Goodell

accused Rice of having provided "a starkly different sequence of events" than what the video

showed when Goodell and Rice had a discussion about the incident, prior to the imposition of the

original discipline.  *Id.* at 9.

56.     Because Goodell's own conduct and testimony was at issue, *i.e.*, his version of the

facts about the meeting with Rice, he recused himself, and appointed Judge Jones to serve as

arbitrator.  Judge Jones heard the Rice appeal on November 5-6, 2014.

57.     On November 28, 2014, Judge Jones vacated Rice's indefinite suspension.  Ex.

124.  She rejected Goodell's testimony and his version of events about what had transpired in the

meeting with Rice, instead crediting the testimony of Rice and his NFLPA lawyer.  *Id.* at 9-16.

She concluded that Goodell's "imposition of the indefinite suspension was arbitrary" and

"therefore vacate[d] the second penalty imposed on Rice."  *Id.* at 17.

58.     ***Adrian Peterson***.  Just days after testifying in *Rice* that the NFL was "required to

give proper notification" of player discipline, Goodell did an about face.  On November 18,

2014, Goodell suspended Minnesota Vikings running back Adrian Peterson under the New

Policy even though Peterson's conduct had occurred long before that Policy was announced.

NFLPA Ex. 153, *Peterson*, slip op. at 6-7.  This retroactive application of the New Policy was

directly contrary to Judge Jones' ruling that "even under the broad deference afforded to him

through Article 46, [Goodell] could not retroactively apply the new presumptive penalty"

without advance notice.  NFLPA Ex. 124*, Rice*, slip op. at 16.  The NFLPA and Peterson

appealed.

59.     This time, Goodell refused to appoint a neutral arbitrator, and instead appointed

former NFL executive Harold Henderson, who worked directly for the League Office from 1991

through 2012 and spent sixteen years as the NFL's Executive Vice President for Labor Relations and as Chairman of Respondent NFLMC's Executive Committee.

60.     The NFLPA argued at the arbitration that Goodell's retroactive punishment of Peterson defied the CBA law of the shop requiring advance notice of discipline and prohibiting retroactivity.   Henderson rejected these arguments and, on December 12, 2014, he upheld Peterson's six-game suspension under the New Policy.   The NFLPA thereafter filed a Petition to Vacate.

61.     On February 26, 2015, Judge Doty vacated Henderson's award.   He held that the award violated the essence of the CBA and that Henderson had exceeded his authority as arbitrator.   As to the former point, Judge Doty ruled that the award disregarded the CBA's "well-recognized bar against" imposing player discipline without notice.   NFLPA Ex. 153, *Peterson*, slip op. at 12-14.   More specifically, Judge Doty held that the "law of the shop"—including Judge Jones' ruling in *Rice*—prohibited retroactive application of the New Policy to Peterson's conduct, and thus the award violated the essence of the CBA.   *Id.*   Judge Doty further held that Henderson had "exceeded his authority by adjudicating the hypothetical question of whether Peterson's discipline could be sustained under the previous Policy."   *Id.* at 14.   In other words, the arbitrator did not have the CBA authority to affirm discipline on grounds that did not form the basis of the discipline when it was imposed.   *Id.*

62.     ***Greg Hardy***.   On April 22, 2015, even *after* the ruling in *Peterson,* Goodell punished yet another NFL player retroactively under the standards of the New Policy and thus without the required advance notice.   Specifically, he suspended Dallas Cowboys defensive end Greg Hardy for ten games under the New Policy even though, just like Peterson, Hardy's alleged

20

conduct had occurred prior to the announcement of the New Policy and its presumptive six-game suspension for first-time offenders like Hardy was alleged to be.

63.     Again, Henderson was appointed as arbitrator.  This time, however, having seen his prior ruling in Peterson vacated in court, Henderson more than halved Goodell's suspension to four games because of the lack of notice.  Henderson ruled that:  "[A ten-game suspension] is simply too much, in my view, of an increase over prior cases *without notice such as was done last year, when the 'baseline' for discipline in domestic violence or sexual assault cases was announced as a six-game suspension*."  *Greg Hardy*, slip op. at 12 (2015) (Henderson, Arb.).

64.     Commissioner Goodell's arbitrary disciplinary actions accordingly have been rejected by, among others, (a) the former Commissioner of the NFL, Paul Tagliabue; (b) a retired federal district court judge from this District; (c) a sitting federal district court judge who presided over disputes between the parties for more than 25 years; and (d) the NFL's former Executive Vice President for Labor Relations.

### E.     THE NFL INVESTIGATES THE PATRIOTS' ALLEGED DEFLATION OF FOOTBALLS IN THE AFC CHAMPIONSHIP GAME

#### 1.     The NFL Implements No Protocols for Collecting Information About Football Deflation Prior to the AFC Championship Game

65.     On the night before the AFC Championship Game, Indianapolis Colts General Manager Ryan Grigson sent an e-mail to NFL operations accusing the Patriots of attempting to gain a competitive advantage by using underinflated footballs.  NFLPA Ex. 152; NFLPA Ex. 7, Wells Report at 44-45.  The NFL did not take this complaint very seriously and did not inform the Patriots before the game that there was any issue with ball deflation.  NFLPA Ex. 7, Wells Report at 46 n.25.

66.     Nor, despite the Colts' complaint, did the NFL implement any procedures for measuring the air pressure ("PSI") of footballs and collecting other necessary information, such

as temperature, timing and wetness, that would be essential to fairly and consistently assessing changes in PSI because such changes can occur naturally due to environmental conditions.  It is undisputed that the NFL officials in charge of game day operations did not know that natural forces of temperature, timing, and wetness could cause balls to lose pressure after being tested and set by officials before the game.

67.    More specifically, no one at the NFL knew there was something called the Ideal Gas Law explaining that balls would naturally deflate when brought from a warm environment (*i.e.*, the officials' locker room) to a cold environment (*i.e.*, the field).  As a result, the NFL did not know how to instruct the referees in terms of what testing to conduct and what data to record other than simply taking PSI readings.  NFLPA Ex. 7, Wells Report at 51-52; NFLPA Ex. 8, Exponent Report at 2, 48.  Indeed, the NFL had no established procedures at all for testing balls during games, at halftime, or after games.

68.    Although each team's footballs were measured by the game day officials prior to the game, the PSI measurements were not recorded, the gauge used to measure (and set) PSI was not recorded, and none of the environmental factors (such as the temperature in the locker room and on the field and the wetness of the balls) were recorded.  NFLPA Ex. 7, Wells Report at 51-52, 116.

69.    During the first half of the game, the Colts examined a ball intercepted from the Patriots and made a further complaint to the NFL.  In response, the NFL decided to ask the referees to measure the air pressure in both teams' game balls at halftime.  NFLPA Ex. 7, Wells Report at 63-66.

70.    Because of the absence of any protocols or basic understanding of what factors are relevant to football deflation, the data collection was a disaster.  None of the following was

22

recorded:  the temperature on the field; the temperature in the officials' locker room where the balls were tested; the specific gauge used to conduct the testing of different balls (where, as here, multiple gauges were used and each had very different calibrations and yielded different readings); whether the balls were wet or dry (and how wet or dry); and the sequence and timing of the halftime measurements (this was the most critical factor, because both teams' balls would warm and gain pressure minute-by-minute after being returned from the cold and wet field to the warm and dry locker room, yet the balls were measured at different times).  Wells even believes that the PSI measurements of the eleven Patriots balls and four Colts balls that were measured— the only data that *was* recorded—contain a transcription error.  NFLPA Ex. 7, Wells Report at 69 n.41.

71.    After the game, officials tested the pressure level of four footballs from each team.  Once again, however, none of the critical information necessary to determine the meaning of the PSI readings was recorded.  *Id.* at 72-73.

72.    The data collection was so deeply flawed that even Wells and the NFL's consultants concluded that it was unreliable:

> Our scientific consultants informed us that the data alone did not provide a basis for them to determine with absolute certainty whether there was or was not tampering, as the analysis of such data is ultimately dependent upon assumptions and information that is uncertain.

NFLPA Ex. 7, Wells Report at 12.

73.    Less than a week ago, the NFL made it known that it is finally going to implement procedures for testing ball pressure during the upcoming NFL Season—a year too late to make a fair and consistent determination of discipline with respect to Brady.[5]

---

[5] *See Pereira: NFL informs officials of new procedures for game balls*, FoxSports.com (July 26, 2015), http://www.foxsports.com/nfl/story/deflategate-new-england-patriots-mike-pereira-

### 2.    The NFL Misunderstands the Halftime Data and Proceeds to Commission the Wells-Pash Investigation

74.    Unaware of the Ideal Gas Law, which predicts that the Patriots (and Colts) balls would naturally drop in pressure after they were brought from a warm locker room to a cold field, NFL Senior Vice President of Football Operations David Gardi sent a letter to Patriots owner Robert Kraft on January 19, 2015, informing him that the NFL was launching an investigation based solely on the PSI measurements taken at halftime of the AFC Championship Game indicating that the Patriots balls had lost pressure during the first half of the game. NFLPA Ex. 136; NFLPA Ex. 7, Wells Report at 100-101.

75.    Not only did this letter fail to acknowledge the fundamental flaw in the NFL's premise that any drop in ball pressure suggested tampering, or the absence of critical data from which to assess the cause of any reduction in pressure, the letter got the PSI measurements wrong.  Gardi wrote that one of the Patriots balls had measured at 10.1 PSI when in fact *none* of the Patriots balls had measured at such a low pressure.  NFLPA Ex. 136 at 2; NFLPA Ex. 7, Wells Report at 100-101.

76.    On January 23, 2015, the NFL announced that it had retained Wells and his firm, Paul, Weiss, to co-lead the investigation along with Pash.  NFLPA Ex. 181; NFLPA Ex. 7, Wells Report at 1.  In recent years, Paul, Weiss has represented the NFL in a number of important legal matters.  For example, the NFL paid Paul, Weiss more than $7 million to defend the League in a recently settled class action related to concussion liability.[6]  NFLPA Ex. 184, *Judge Approves Deal in N.F.L. Concussion Suit* at 4.  With respect to the Wells-Pash Investigation alone, as

---

changes-to-game-balls-072615?vid=492992067892.

[6] *In re Nat'l Football League Players' Concussion Injury Litig.*, 12-md-02323 (E.D. Pa.).

Wells stated publicly, Paul, Weiss had already billed the NFL millions of dollars for its services at the time of the hearing.

77.     Despite its close ties to the Paul, Weiss firm, the NFL touted the purported "independence" of the law firm in conducting the investigation:  "Wells and his firm bring additional expertise and *a valuable independent perspective*."  NFLPA Ex. 181 (emphasis added).  Wells publicly declared Paul, Weiss to be "independent" of the NFL.  NFLPA Ex. 189 at 1, 3.

78.     Adding to the circus-like atmosphere of the proceedings, Wells' partner Lorin Reisner (who signed the Wells Report's cover page) sat at counsel table for the NFL at the arbitration, conducted the vast majority of witness examinations (including Brady's), and otherwise defended Brady's discipline even though his personal work on the Wells Report was being reviewed, and even though his law partner Wells testified at the hearing.  And, as the Award acknowledges, Wells asserted attorney-client privilege over his communications with the NFL in connection with the Wells-Pash Investigation.  NFLPA Ex. 210, Award at 19 n.21.

79.     Moreover, Pash—the NFL's General Counsel—had an opportunity to comment on a draft of the Wells Report before it was issued.  NFLPA Ex. 210, Award at 19 n.21.

80.     As part of the Wells-Pash Investigation, Wells, Reisner, and the Paul, Weiss team interviewed a number of individuals from the League, the Colts, and the Patriots, including Brady.  NFLPA Ex. 7, Wells Report at 24-27.  It is undisputed that Brady was interviewed for seven hours and answered every question that Paul, Weiss put to him.  Hr'g Tr. 340:24-341:9 (Wells); *id.* 89:17-23 (Brady).

81.     The only Paul, Weiss request that Brady declined was to look for and produce certain private text messages and e-mails.  NFLPA Ex. 155.  As Brady testified, he declined

Paul, Weiss' request for his electronic information solely on the advice of his agents-lawyers. Hr'g Tr. 84:18-85:9.  But Wells admitted that he never informed Brady that there could be *any* disciplinary consequences if he did not comply with the request for e-mails and texts.  Brady, on the other hand, testified that if anyone had told him he could be suspended (let alone for four games) for declining to produce the private communications from his personal phone, he would have produced them—notwithstanding the advice of his agents-lawyers.  *Id.* 86:8-20 (Brady).

82.     Prior to the appeal hearing, Brady voluntarily produced all of the requested communications in his possession.  The NFL does not dispute that these communications contain absolutely no incriminating information.  Instead, the NFL complains that they do not include all of the requested text messages because Brady disposed of his phone (consistent with his practice over many years), but Brady produced all of his phone records (showing *whom* he texted with and *when*) and testified at the hearing—just as he had told Wells months before at his interview—that there never were any incriminating e-mails or text messages for the simple reason that he had nothing to do with any ball deflation.  Hr'g Tr. 85:13-86:1, 86:21-23, 89:24-90:9.  While the Award makes much of the discarded phone, Brady's phone records *confirm* that the League had access to any text messages between Brady and Jastremski and Schoenfeld (Jastremski's boss) because the League had access to *their* phones, and Brady simply had no phone or electronic communications of any kind with McNally.  NFLPA Ex. 1.

**3.     The Wells Report Concludes That There Is No Direct Evidence Implicating Brady but Nonetheless Finds That He Was "Generally Aware" of Misconduct by Others**

83.     On May 6, 2015, Paul, Weiss and the NFL released the Wells Report (after receiving comments on a draft from Pash, the NFL's General Counsel and publicly proclaimed co-lead investigator).  The Report concluded that it was "more probable than not" that Patriots employees Jastremski and McNally tampered with footballs in violation of the Competitive

Integrity Policy.  NFLPA Ex. 7, Wells Report at 2.  It reached this conclusion despite finding no direct evidence of misconduct, and despite the absence of necessary data collection and ball testing procedures that rendered the report's statistical and scientific analysis admittedly "uncertain."  *Id*. at 12, 17.

84.     The Wells Report also concluded that although its four-month investigation had not yielded any "direct evidence linking Brady" to this alleged ball tampering, it was nonetheless "more probable than not that Brady was at least generally aware" of the alleged misconduct of others violating the Competitive Integrity Policy.  *Id.* at 17.  Even this very narrow factual conclusion regarding Brady was entirely inferential because everyone interviewed—including Brady—denied any ball tampering or knowledge of ball tampering.

85.     To reach the conclusion that Brady was "generally aware" of alleged ball tampering by Jastremski and McNally, Wells drew an adverse inference from the fact that Brady would not respond to the request for his texts and e-mails.  But it is undisputed that Wells never warned Brady that an adverse inference or any other penalty could result from a refusal to produce personal communications on the advice of his agents-lawyers.

86.     After the Wells Report was released, Commissioner Goodell publicly praised its findings and work.  NFLPA Ex. 157 at 7.  By doing so, he made it impossible to serve as arbitrator in any proceeding challenging the conclusions of the Wells Report.  And, unsurprisingly, his eventual Award declared the Wells Report unassailable in every respect.

87.     Although Goodell's Award disregards the extremely limited nature of the "generally aware" finding, that is all that the Wells Report concludes and that is all that Mr. Vincent relied upon in imposing the discipline on Brady.  NFLPA Ex. 10.

### 4.   Goodell Improperly Delegates His Exclusive Conduct Detrimental Disciplinary Authority to Vincent

88.      Commissioner Goodell announced to the world that he had decided to delegate to Vincent the job of determining the discipline for Brady.  NFLPA Ex. 185 at 4.  He did so without citing any authority under the CBA for such a delegation.

89.      On May 11, 2015, Vincent imposed a four-game suspension on Brady.  NFLPA Ex. 10.  Significantly, he did so based solely on the Wells Report finding that Brady was "generally aware" of the alleged ball deflation.  *Id.* at 1.

90.      Vincent also advised Brady in his ruling that his discipline was being imposed in part for his alleged "failure to cooperate" with the Wells-Pash Investigation (*id.*), which had been conducted pursuant to the Competitive Integrity Policy.  NFLPA Ex. 7, Wells Report at 1 ("The investigation was conducted pursuant to the [Competitive Integrity Policy].").

### 5.   Brady Appeals His Suspension and Moves for Goodell's Recusal

91.      On May 14, 2015, Brady and the NFLPA appealed the unprecedented suspension levied by Vincent.  NFLPA Ex. 11.  In filing the appeal, the NFLPA and Brady objected to Goodell or his designees serving as arbitrator, explaining "that neither Commissioner Goodell nor anyone with close ties to the NFL c[ould] serve as arbitrator in Brady's appeal under governing legal standards" because, among other things, the improper delegation conduct of Goodell himself was going to be at issue, and testimony from Goodell and Vincent would be required to adjudicate this critical point.  *Id.* at 2-3.

92.      After receiving no response from the League to their request for appointment of a neutral arbitrator, and after media reports indicated that Goodell intended to serve as the Hearing Officer, the NFLPA and Brady formally moved for Goodell's recusal.  NFLPA Ex. 157.

93.     On June 2, 2015, Goodell denied the recusal motion.   NFLPA Ex. 160.

Moreover, he peremptorily declared in that same ruling that he was rejecting Brady's improper

delegation argument based on the Commissioner's own recitation of the facts and his conclusion

that his own conduct was permitted by the CBA.  *Id.*  All of this happened without any discovery

or even a hearing.

94.     Goodell never gave the NFLPA or Brady any opportunity to challenge the

purported "fact" that he did not delegate his disciplinary authority to Vincent and that, allegedly,

Goodell merely concurred in Vincent's recommendation and authorized him to communicate the

discipline to Brady.  Nor did Goodell hear Brady or the Union on any other aspect of this issue.

He just rejected the argument out of hand without any evidence.

### 6.     The Arbitration Before Commissioner Goodell

95.     On June 23, 2015, Commissioner Goodell presided over Brady's arbitration

hearing.  *See* NFLPA Ex. 204 (transcript of proceedings).  Prior to the hearing, Goodell stated

that he "look[ed] forward to hearing directly from Tom.  If there [was] new information or there

[was] information in helping [the NFL] get this right, [he] want[ed] to hear directly from Tom on

that."  NFLPA Ex. 191 at 3418; NFLPA Ex. 160 at 3.  Brady complied, not only by testifying for

hours (Hr'g Tr. 47:11-148:7), but also by producing evidence demonstrating that each purported

basis for his discipline was without any basis.

96.     For example, Brady refuted the Wells Report's conclusion that it was "more

probable than not that Brady was at least generally aware" of the alleged misconduct.   At

Brady's request, the proceedings were conducted under oath.  And Brady testified that he knew

nothing about anyone deflating footballs in the AFC Championship Game or any other game he

played in.  Hr'g Tr. 50:21-51:16, 75:4-25, 95:12-97:11.  Further, he went through *all* of the text

29

communications cited with reference to him in the Wells Report in order to demonstrate that not a single one indicated he had knowledge of ball tampering.  *Id*. 61:18-63:16, 91:10-96:7, 140:9-141:19.

97.     In addition, the hearing confirmed that only three witnesses interviewed by League investigators could address whether Brady was "generally aware" of ball tampering (McNally, Jastremski, and Brady), and that each of these individuals categorically denied Brady's knowledge of any tampering.

98.     Brady also showed that the Wells Report had improperly concluded that Brady's involvement, in 2006, in efforts to change a League rule to allow a visiting team to prepare its own footballs evidenced his knowledge or concern about the pressure level of game balls. NFLPA Ex. 7, Wells Report at 129.  Brady produced a copy of the rule-change petition itself, as well as the Competition Committee report on the change, which has nothing to do with PSI levels, contrary to the suggestion in the Wells Report.  *See* NFLPA Ex. 203.

99.     Brady further demonstrated that he had not been withholding any incriminating evidence.  To refute the improper adverse inference drawn against him, Brady produced all of the responsive e-mails within his possession, along with his phone records, showing all of his phone calls and text messages during the relevant time period.  NFLPA Exs. 1-3.  Not one email was relevant to, much less evidence of, deflation.  Moreover, consistent with what Brady had told NFL investigators and testified at the arbitration, Brady's phone records demonstrated that he had never had a single phone call or text message with McNally.  *See* Hr'g Tr. 81:21-82:7, 139:19-140:8 (Brady) (explaining that he did not know or communicate with McNally); *see also* NFLPA Ex. 1 (reflecting no phone communication with McNally).  Further, the phone records demonstrated that virtually all of Brady's communications with Jastremski during the relevant

time period were already cited by Wells in his Report, because Wells had taken possession of Jastremski's phone and thus had access to all of the texts with Brady.  *See* NFLPA Ex. 7, Wells Report at 30 n.5.

100.   At the hearing, Brady explained that it was impossible for him to produce copies of the text messages that had been requested (which the League already had from the phones of Jastremski and Schoenfeld) because of his regular and long-standing practice of recycling phones in order to protect his family's and friends' privacy.  Hr'g Tr. 87:7-88:6, 90:11-91:9.  This is what Goodell cynically refers to in the Award as Brady "destroying" his phone (an accusation that was not a basis for the discipline imposed by Vincent and thus legally irrelevant to the arbitration).  In any event, the hearing established—through Brady's phone records, testimony, and the absence of any NFL evidence to the contrary—that virtually all of the communications between Brady and Jastremski are discussed in the Wells Report, confirming that Paul, Weiss already had those text messages from other sources.    NFLPA  Ex. 3.    For  the  few communications with Jastremski reflected on Brady's phone records but not referenced in the Wells Report, that is presumably because the Wells Report found those communications to be irrelevant, and Brady testified that such communications had nothing to do with the alleged ball tampering, and no incriminating documents were withheld.  Hr'g Tr. 85:13-86:1, 140:9-141:19.  Indeed, the Wells Report confirms that the NFL had full access to the phones from Jastremski and Schoenfeld so that any text messages from Brady would have been available to the NFL from those sources.  NFLPA Ex. 7, Wells Report at 30 n.5.  As for McNally, Brady's phone records confirm they had no text or email or other phone communications.  The shrill emphasis placed by Goodell on Brady discarding an old phone is an attempt to obfuscate and divert attention from the glaring flaws in the Award, the arbitration process, and the discipline imposed.

When the substance of the electronic records and documents is reviewed, it is clear the phone had no impact on the Wells-Pash Investigation whatsoever and is a classic red herring.

101.   In addition, Brady presented the declaration of Patriots owner Robert Kraft, attesting to Brady's credibility in denying any awareness of ball tampering.

102.   The hearing was also filled with numerous admissions by NFL witnesses about the League's lack of procedures to record the necessary information to determine whether the drop in pressure measured in Patriots balls by halftime was caused by environmental factors or tampering.  Exponent, the League's expert consultants who analyzed the results of the halftime testing, admitted to this lack of essential information in their report, appended to the Wells Report.  *See, e.g.,* NFLPA Ex. 8, Exponent Report at XIV ("In sum, the data did not provide a basis for us to determine with absolute certainty whether there was or was not tampering as the analysis of such data ultimately is dependent upon assumptions and information that is not certain.").

103.   The NFLPA and Brady also presented the testimony of Dr. Edward A. Snyder, Dean of the Yale School of Management, an expert on statistics, who had led a team of experts affiliated with the Analysis Group in reviewing Exponent's work and studying the testing data from the AFC Championship Game.  As Dean Snyder and the Analysis Group demonstrated, the failure of the NFL to collect the proper data made it impossible for anyone to draw reliable conclusions based on the recorded PSI measurements.  In fact, substituting even a few of the NFL's legions of assumptions with plausible alternatives turned the Wells Report's and Exponent's conclusions on their head.  *Id.* 158:11-159:17, 179:15-23, 183:16-23, 194:1-13 (Snyder).  Dean Snyder thus established that there was no basis for the NFL to reliably—or

consistently and fairly—conclude that the Patriots balls were tampered with, let alone that Brady was "generally aware" of such tampering.

104.    Finally, *all* witnesses at the hearing agreed that the Competitive Integrity Policy does not apply to players, that there was no notice of (or precedent for) a disciplinary standard of "general awareness" under *any* NFL policy, that no player in the history of the NFL had ever been disciplined for ball tampering, and that no player in the history of the NFL had ever served a suspension for an alleged lack of cooperation with, or even obstruction of, a League investigation.

### F.    THE COMMISSIONER ISSUES THE AWARD AFFIRMING BRADY'S SUSPENSION

105.    On July 28, 2015, Commissioner Goodell issued the Award upholding Brady's discipline in its entirety.

### COUNTERCLAIM—GROUNDS FOR VACATUR

### I.    THE AWARD VIOLATES THE ESSENCE OF THE CBA AS SET FORTH IN THE LAW OF THE SHOP REQUIREMENT OF NOTICE

106.    In affirming Brady's discipline, the Award disregards the CBA law of the shop requirement that players receive advance notice of potential discipline for the following separate and independent reasons.

### A.    Under the Player Policies, Brady Had Notice Only of Fines—Not Suspensions—For Player Equipment Violations Designed to Gain a Competitive Advantage

107.    As the Award concedes, "no player may have been suspended before for tampering with game footballs."  NFLPA Ex. 210, Award at 14.  This is because the Player Policies actually given out and made applicable to players provide notice only for *fines* for first-time equipment violation offenses, including those aimed at obtaining a competitive advantage.

108.    Specifically, the Player Policies, under the Game Related Player Conduct Rules, provide that "[a] player may not use unauthorized foreign substances (*e.g.*, stickum or slippery compounds) on his body or uniform" because "such a violation **affects the integrity of the competition and can give a team an unfair advantage** . . . ."  NFLPA Ex. 114 at 15.  Although this provision does not specifically deal with ball tampering, the Player Policies also contain a catchall provision for "Other Uniform/Equipment Violations."  *Id.*

109.    The Policy provides that:  ***"First offenses will result in fines."***  *Id.* (bolded and italicized text in original).

110.    There is thus no notice provided that a player could be suspended for a first offense of an equipment violation (much less general awareness of someone else's equipment violation), and, according to the NFL, no player has ever been suspended for ball tampering, period.  NFLPA Ex. 210, Award at 14.  This is despite the fact that, as the Player Policies expressly provide, "a violation affects the integrity of competition and can give a team an unfair advantage."  NFLPA Ex. 114 at 15.

111.    These Player Policies notice limitations were ignored by Vincent in his letter imposing discipline and then ignored again by Goodell in his Award.

112.    Vincent may have chosen not to apply the Player Policies to Brady because a fine would not have quenched the NFL's thirst to suspend Brady.  But the NFL was not at liberty to disregard the specified provision that "***First offenses will result in fines***."  No other policy applicable to players for equipment violations involving competitive advantage was ever provided to Brady or any other player.

**B.    Brady Had No Notice of the Policy Under Which He *Was* Disciplined**

113.    Instead of applying the Player Policies, Vincent punished Brady pursuant to, and for being generally aware of, violations of the Competitive Integrity Policy, which is only

incorporated into the Game Operations Manual and provided to teams and team executives. NFLPA Ex. 115, Game Operations Manual at A2.  The policy is not given to players, is not part of the annual Player Policies handed out to all players, and does not apply to them.  This was undisputed by the NFL's witnesses at the hearing.

114.   Indeed, Brady testified he has no recollection of ever seeing or receiving the Competitive Integrity Policy.  *Id.* 98:8-99:15 (Brady).  And, although the Wells Report states on its face that the investigation was conducted pursuant to the Competitive Integrity Policy (NFLPA Ex. 7, Wells Report at 1), it is undisputed that Wells did not know or investigate whether the Competitive Integrity Policy was given to players.

115.   Because the Competitive Integrity Policy has never been given to players, no player in NFL history has ever been disciplined—or even investigated—for violating this Policy, let alone for being generally aware of someone else's violation of this Policy.  Rather, only Clubs and Club personnel have been subject to discipline thereunder.  For example, in 2009, the NFL suspended a member of the New York Jets equipment staff, after he "attempted to use unapproved equipment to prep the K[icking] Balls prior to" a Jets game against the New England Patriots.  NFLPA Ex. 209 at 1.  According to the NFL in imposing the discipline, the Jets equipment personnel's "attempt to use unapproved materials to prep the K[icking] Balls could [have] easily be[en] interpreted as an attempt to gain a competitive advantage."  *Id.*  However, the Jets' kicker—the *player w*ho could have benefitted from the alleged "attempt to gain a competitive advantage" (*id.*)—was not investigated, let alone disciplined.  Hr'g Tr. 250:7-12 (Vincent).  This was perfectly consistent with the Competitive Integrity Policy's application to Clubs, not players, as well as the fact that even if the Jets kicker was "generally aware" of the infraction, general awareness is not a basis for discipline.[7]

116.    The only other two incidents concerning potential ball tampering in recent years similarly resulted in no player investigation or player discipline.  On November 30, 2014, during a game between the Minnesota Vikings and Carolina Panthers, ball boys were caught on national television using heaters to warm Vikings footballs in sub-zero temperatures, *i.e.*, tampering with the balls.  NFLPA Ex. 174.  The NFL sent a warning **to the Club** and publicly stated that Clubs "can't do anything with the footballs in terms of any artificial [sic], whether you're heating them up, whether it's a regular game ball or kicking ball, you can't do anything to the football."  *Id.* at 1; NFLPA Ex. 175.  No Vikings players were either investigated or punished.  Hr'g Tr. 247:3-9 (Vincent).  This too was consistent with the Competitive Integrity Policy's application to Clubs and the lack of any "general awareness" disciplinary standard.[8]

117.    Additionally, on that same day during the 2014 season, Green Bay Packers quarterback Aaron Rodgers stated publicly that he "like[s] to push the limit to how much air we can put in the football, even go over what they allow you to do and see if the officials take air out of it."  NFLPA Ex. 177.  Despite this public statement, no investigation or punishment of Rodgers ensued.  Hr'g Tr. 248:13-16 (Vincent).

118.    Having no response to the defects in notice, Goodell asserts in his Award that "[t]he [Competitive Integrity] Policy was not the source or the basis for the discipline imposed here."  NFLPA Ex. 210, Award at 17 n.19.  That claim is belied by the undisputed arbitration record of Vincent's discipline, which was based exclusively on the Wells Report finding that

---

[7] The Award states that "[t]here was no evidence of any player involvement" in this situation, NFLPA Ex. 210, Award at 15, but fails to acknowledge that there was also no League investigation of any player involvement.

[8] Similar to the Jets incident, the Award disingenuously states that "[t]here was no evidence of any intentional attempt to violate or circumvent the rules, no player involvement, and no effort to conceal the ball attendant's conduct."  NFLPA Ex. 210, Award at 15.  But, again, there was no League investigation of player conduct and it is self-evident that the Vikings Quarterback would have been "generally aware" that the balls felt warm despite the frigid cold.

Brady was generally aware of Patriots personnel misconduct (which was punished pursuant to the Competitive Integrity Policy). NFLPA Ex. 10 (imposing discipline on Brady for his alleged "general[] aware[ness]" of ball deflation). And it is a *post hoc* argument that even the NFL's own lawyers did not make at the arbitration hearing. More fundamentally, however, this assertion does nothing to justify ignoring the CBA's law of the shop notice requirement, which *Peterson* estops the NFL from disputing here. Punishing Brady with a four-game suspension for conduct detrimental pursuant to *no* policy—when the Player Policies cover the subject of player equipment tampering—is exactly the type of lack of notice that is prohibited by the law of the shop and Judge Doty's decision in *Peterson*.

### C.   Brady Had No Notice That a Player Could Ever Be Disciplined for Mere "General Awareness" of Another Person's Conduct

119.   As Vincent's discipline letter states, Brady was suspended for being "generally aware of the actions of the Patriots employees involved in the deflation of the footballs"—not for any alleged ball deflation committed or directed or even authorized by Brady himself. NFLPA Ex. 10; NFLPA Ex. 7, Wells Report at 2 ("Brady . . . was at least generally aware of the inappropriate activities of McNally and Jastremski.").

120.   Yet no NFL policy or precedent notifies players that they might be disciplined for general awareness of misconduct by other people. For example, no player in NFL history has ever been suspended for being "generally aware" that another player was taking steroids or committing any other type of policy violation.

121.   Rather, recent precedent confirms that the NFL has historically *refrained* from disciplining players for being "generally aware" of alleged conduct detrimental by others. For example, in the New Orleans Saints *Bounty* case, Goodell did not discipline the entire Saints defense where they would all have been "generally aware" of the alleged "bounty" program.

Instead, Goodell only imposed discipline on four Saints defenders based on their specifically alleged **_participation_** in the program—and even those suspensions were subsequently vacated by Commissioner Tagliabue because of, among other things, lack of adequate notice.  NFLPA Ex. 113, *Bounty*, slip op. at 3, 6, 13-15, 18.

122.     Similarly, in the Richie Incognito bullying investigation conducted by Wells and Paul, Weiss, Wells concluded that several members of the Miami Dolphins' offensive line were generally aware of Incognito's bullying of teammate Jonathan Martin, which constituted conduct detrimental.[9]  Yet, consistent with every situation in NFL history other than Brady's, none of these other players were disciplined for "general awareness" of Incognito's alleged misconduct.

123.     Even the NFL's Game and Field Equipment Policy ("Equipment Policy")—which is incorporated into the NFL's Policy Manual for Member Clubs-Game Operations ("Game Operations Manual") and thus, like the Competitive Integrity Policy, is not provided to, nor applicable to, players—sets forth the standard for imposing discipline for ball tampering by Club personnel other than players and makes clear that a person cannot be disciplined for general awareness of an infraction.

124.     The application to Brady of an unprecedented "general awareness" disciplinary standard—pulled from whole cloth without warning—warrants vacating the Award.  The Award tries to obfuscate that notice defect by ignoring the fact that Vincent's discipline was based solely on the Wells Report finding of a general awareness violation.  Instead, Goodell purports to sustain the suspension on factual conclusions that Brady participated in ball tampering—but

---

[9] *See* NFLPA Ex. 206, Miami Dolphins Investigative Report at 3 ("Martin was indeed harassed by Incognito, who can fairly be described as the main instigator, and by Jerry and Pouncey, who tended to follow Incognito's lead."); *id.* at 32 ("A few offensive linemen, however, said that Martin was bothered, especially by the taunts about his sister."); *id.* at 72-73 ("One player, whom we found credible, said that Incognito and others routinely mocked Martin's sister and described the taunting as 'an everyday constant thing.'").

those factual conclusions appear nowhere in the Wells Report and were not the basis for the discipline imposed by Vincent.  Judge Doty's ruling in *Peterson* makes clear that an Article 46 arbitrator lacks CBA authority to determine discipline *de novo*, and exceeds his authority by trying to justify discipline on a basis not found in the discipline being appealed.  NFLPA Ex. 153, *Peterson*, slip op. at 14.  This was a second and independent ground for Judge Doty's vacatur decision.

### D.  Brady Had No Notice That a Player Could Be Suspended for a Failure to Cooperate or Even Obstruct and NFL Investigation

125.   No player suspension in NFL history has been sustained for an alleged failure to cooperate with, or even for obstructing, an NFL investigation.  The Award acknowledges this, too.  NFLPA Ex. 210, Award at 14.  Rather, before Brady, players had been subject only to limited fines for such conduct.

126.   For example, Goodell merely fined former NFL quarterback Brett Favre $50,000 after finding that Favre "was not candid in several respects during the [NFL's sexual harassment] investigation."  NFLPA Ex. 170, *Favre fined $50,000 for lack of cooperation in investigation*.

127.   Two years later, faced with a public relations disaster in "Bounty-gate," Goodell made an about face and, for the first time in NFL history, tried to suspend a player for non-cooperation and obstruction.  Specifically, he suspended former New Orleans Saints player Anthony Hargrove for allegedly obstructing the League's investigation into the Saints' bounty program.  Former Commissioner Tagliabue, serving as arbitrator, resoundingly rejected Goodell's overreaching, holding that suspending a player for non-cooperation defied the CBA requirement of notice of discipline:

> In December 2010, the NFL fined Brett Favre $50,000—but did not suspend him—for obstruction of a League sexual harassment investigation.  Although not entirely comparable to the present matter, this illustrates the NFL's practice of fining, not suspending

39

players, for serious violations of this type.  ***There is no evidence of a record of past suspensions based purely on obstructing a League investigation.  In my forty years of association with the NFL, I am aware of many instances of denials in disciplinary proceedings that proved to be false, but I cannot recall any suspension for such fabrication.  There is no evidence of a record of past suspensions based purely on obstructing a League investigation***.

NFLPA Ex. 113, *Bounty*, slip op. at 13 (emphasis added).  Perhaps no one has a broader perspective on the NFL's disciplinary history than Commissioner Tagliabue, and in his "forty years of association with the NFL," he could not recall *any* suspension based on non-cooperation or obstruction and concluded that they were not permitted by the CBA.  *Id*.  Accordingly, if the League wants the right to suspend a player for obstructing an investigation, it has to bargain for this right and obtain it from the Union.  It cannot just decide to do this unilaterally, without notice.

128.    Moreover, although the Competitive Integrity Policy imposes a duty upon Clubs to cooperate with investigations under that Policy (NFLPA Ex. 115 at A3), as set forth above, the Policy does not apply to players and makes no reference to suspensions for Policy violations, let alone for failures to cooperate in investigations under the Policy.  *Id.* at A2.  This lack of notice stands in contrast to the notice players *do* receive that they might be fined (not suspended) for failing to cooperate with investigations under the NFL Personal Conduct Policy, which is provided to players as part of the Player Policies.  *See* NFLPA Ex. 125, Personal Conduct Policy at 4.

129.    If all of this were not enough, the arbitration record also indisputably establishes that no one—including Wells—notified Brady that he could be punished for declining to produce his personal communications on his personal device to the NFL's outside law firm as part of its Competitive Integrity Policy investigation.  This undisputed evidence eviscerates Goodell's

attempt—in his Award—to distinguish Brady's alleged non-cooperation from that of other players who were merely fined.  The undisputed fact is that Brady had no notice he could be suspended for following his agent-lawyers' advice and not turning over his private communications on his personal phone to the NFL's outside law firm.

130.   Although the absence of notice is dispositive, it bears mention that Brady testified that if anyone had notified him that he could be suspended for failing to turn over his electronic communications, he would have done so notwithstanding his agent-lawyers' advice.  *Id.* 86:16-20 (Brady).

131.   The disciplinary consequence of Brady's decision not to produce his personal communications cannot be overstated.  The Wells Report's central conclusion regarding Brady—that he was "generally aware" of inappropriate conduct by others—was inextricably tied to the adverse inference drawn from Brady's decision not to produce his personal communications to Paul, Weiss.  The upshot—as the Award lays bare—is that the improper adverse inference based upon Brady's purported lack of cooperation infected the entirety of the suspension—yet, as the *Bounty* decision makes clear, the CBA requirement of notice precludes ***any*** player suspension on the ground of non-cooperation or obstructing a League investigation.

132.   Finally, the Award's vitriol over Brady discarding his phone pursuant to his long-standing practice has no legal significance because the discipline imposed by Vincent was not based on this at all and the arbitrator's CBA authority, as Judge Doty held in *Peterson*, is only to review the discipline actually imposed, not to determine new discipline on new grounds. *Peterson*, slip op. at 14-16 (arbitrator exceeded his authority by considering discipline that was not actually imposed and violated the essence of the CBA).

II.     **THE AWARD ALSO VIOLATES THE ESSENCE OF THE CBA BECAUSE THE LAW OF THE SHOP REQUIRES FAIR AND CONSISTENT TREATMENT IN ALL PLAYER DISCIPLINARY DETERMINATIONS**

133.    The Wells Report concluded—based on the work of Exponent, the League's scientific and statistical consultants—that the purported "absence of a credible scientific explanation for the Patriots [footballs] halftime measurements tends to support a finding that human intervention may account for the additional loss of pressure exhibited by the Patriots balls."  NFLPA Ex. 7, Wells Report at 13.  In his Award, Goodell parrots the Wells Report to reach the same exact conclusion.  NFLPA Ex. 210, Award at 6.

134.    But imposing a four-game suspension and tarnishing the legacy of an iconic NFL player on the basis of concededly unreliable evidence—due to the League's failure to implement testing procedures—is not a "fair and consistent" basis for imposing player discipline and therefore contravenes the CBA law of the shop.

135.    The absence of testing procedures is undisputed.  The consequence is that any conclusions from the *ad hoc* testing that was conducted at the AFC Championship Game could vary wildly based on which assumptions were applied to make up for not knowing the actual facts.

136.    It is undisputed that, prior to the AFC Championship Game, the League had no collection and testing procedures for assessing changes in football pressure.  As a consequence, the officials did not know to—and therefore did not—record critical information such as the temperature of the locker room where the footballs were tested, the specific gauge used to conduct the testing (here, multiple gauges were used with different calibrations), whether each of the balls was wet or dry (and how wet or dry), or the sequence or timing of the measurements (which was critical, as the balls heated up inside the room but were each measured at different times).

137.   Indeed, the NFL announced less than one week ago—long after the conclusion of the AFC Championship Game and the Wells-Pash Investigation—that it is finally implementing procedures for testing the pressure of footballs.[10]  It is hard to imagine a starker concession about the incurable flaws in the NFL's failure to collect the necessary data concerning ball deflation at the AFC Championship Game so that no fair and consistent determination of player discipline could be made on the basis of such information.

138.   Even the pressure at which the Patriots and Colts footballs began the game is not reliably known.  The Wells Report found that although Referee Walt Anderson tested both teams' balls before the game, he failed to record the PSI measurements or which of his two gauges he used to test and set the footballs—a failure of great significance because the two gauges measured PSI very differently.   Drawing conclusions based on the halftime measurements is rendered even less reliable by the fact that the Wells Report and Exponent decided to assume the *opposite* of what Referee Anderson stated was his "best recollection" of which gauge he used, despite accepting at face value everything else that Anderson had purportedly told the League's investigators.  *See, e.g.*, NFLPA Ex. 7, Wells Report at 51-52; NFLPA Ex. 8, Exponent Report at 2.

139.   The undisputed reason for this failure to conduct proper ball pressure testing was that, prior to the Wells-Pash Investigation, League officials had no understanding of the Ideal Gas Law and the fact that balls would naturally deflate when taken from a warm, dry locker room to a cold, wet field.  For example, it is undisputed that there was no appreciation among the referees and witnesses interviewed of the Ideal Gas Law and the impact that it might have on ball

---

[10] *See Pereira: NFL informs officials of new procedures for game balls*, FoxSports.com (July 26, 2015), http://www.foxsports.com/nfl/story/deflategate-new-england-patriots-mike-pereira-changes-to-game-balls-072615?vid=492992067892.

pressure.  For this reason, the various factors that impact natural deflation—such as timing and temperature and wetness—were not recorded.

140.    Dean Snyder, retained by the NFLPA and Brady, testified that when even a few of Exponent's assumptions were replaced with plausible alternatives, the purported evidence of tampering disappears.  *See, e.g.*, *id.* 158:11-159:17, 179:15-23, 183:16-23, 194:1-13.  There was thus no basis for anyone, including the NFL, to make a reliable or fair and consistent conclusion about alleged ball tampering based on the PSI measurements taken at the AFC Championship Game.  As Dean Snyder testified: "It's important for me as a researcher and evaluator of data when I see alternatives, if the findings change, then the results are not reliable. . . .  When I evaluate alternative assumptions, their findings change, so the bottom line is their results are simply not reliable."  *Id*. 157:10-158:16.

141.    Even the Wells Report acknowledges that Exponent's work is inherently unreliable:  "[W]e are mindful that the analyses performed by our scientific consultants necessarily rely on reasoned assumptions and that varying the applicable assumptions can have a material impact on the ultimate conclusions."  NFLPA Ex. 7, Wells Report at 13.  Goodell's Award, by contrast, contains no such qualification, failing to acknowledge the limited probative value of Exponent's work, which even Wells acknowledged.  NFLPA Ex. 210, Award at 6-7.

142.    For Goodell to sustain unprecedented discipline on admittedly unreliable conclusions resting on mountains of unsupported assumptions—because the NFL failed to collect or record the necessary data—is not a fair or consistent basis to impose player discipline and is thus contrary to the CBA law of the shop.  Only when proper procedures for testing are implemented by the League can it make fair and consistent disciplinary determinations about the causes of ball deflation.

143.    No one would claim the NFL could impose penalties on players for steroid use without having established procedures for reliably testing to avoid "false positives" and other errors.  Nor can the Award sustaining player discipline stand when it is based on *ad hoc* ball pressure testing without any reliable procedures to ensure that the necessary data is collected.

## III.    THE AWARD IS THE PRODUCT OF A FUNDAMENTALLY UNFAIR ARBITRATION PROCEEDING

### A.    Goodell Summarily Denies the "Improper Delegation" Ground for Appeal Without Any Fair Process

144.    Under the CBA, the Commissioner has the *exclusive* authority to impose conduct detrimental discipline on NFL players.  NFLPA Ex. 107, CBA Art. 46, § 1(a); NFLPA Ex. 108, CBA App. A, ¶ 15.  The NFL has zealously guarded this responsibility as the Commissioner's— and the Commissioner's alone—for decades.

145.    Recently, however, Goodell publicly stated his desire to abdicate his disciplinary role and "allow a new individual to make the initial [Article 46] disciplinary decision."[11]  That is exactly what Goodell did here.  As Vincent's letter disciplining Brady makes crystal clear, Goodell delegated to Vincent his exclusive CBA authority to impose conduct detrimental discipline on Brady.  NFLPA Ex. 10.

146.    The CBA does not allow this.  In fact, the NFLPA brought a CBA grievance against the NFL, challenging the Commissioner's unilateral decision to delegate away his conduct detrimental powers.  This grievance is pending, and the *merits* of any Commissioner delegation are not before this Court.  However, the Commissioner's failure to provide for fair

---

[11] *See, e.g. NFL Commissioner Roger Goodell & EVP Jeff Pash League Meeting Press Conference – December 10, 2014*, NFL.com (Dec. 10, 2014), http://nflcommunications.com/2014/12/10/nfl-commissioner-roger-goodell-evp-jeff-pash-league-meeting-press-conference-december-10-2014/.

*procedures* for adjudicating the delegation issue *is* appropriate for judicial review here as it requires that the Award be vacated.

147.    Improper delegation was the first ground identified in Brady's disciplinary appeal. NFLPA Ex. 11 at 1; NFLPA Ex. 157 at 2-5.   Goodell rejected it out of hand, *before* the arbitration, with *no* evidentiary record, denying the NFLPA and Brady the opportunity to try to develop a record through document discovery and witness examination.   *See* NFLPA Ex. 160; NFLPA Ex. 208, June 22 Goodell Order on Discovery and Hearing Witnesses ("June 22 Order").

148.    In doing so, the Commissioner not only unfairly denied Brady the ability to present an issue central to his appeal, Goodell simply declared as gospel his own version of the "facts."   Specifically, the Commissioner proclaimed that he did not delegate his disciplinary authority to Vincent, as if by royal decree.   He then repeats his own factual proffer in the Award as a basis for upholding the discipline.   NFLPA Ex. 210, Award at 18-19.   But the purpose of the arbitration was for the NFLPA and Brady to *challenge* the League's version of the facts—not for the Commissioner (the arbitrator) simply to assume his own conclusion.

149.    Following the denial of their Recusal Motion, the NFLPA and Brady moved to compel the testimony of Goodell and Vincent in order to develop a factual record for Brady's improper delegation ground for appeal.   NFLPA Ex. 166 at 2-4.   Goodell denied this motion too, stating that he had already decided that there was no improper delegation.   NFLPA Ex. 208, June 22 Order.

150.    Not only was this denial of Brady's right to confront witnesses fundamentally unfair, it also contravened established law of the shop precedent that an Article 46 hearing officer has the duty to compel the testimony of relevant NFL witnesses.   For example, in *Rice*, Judge Jones compelled Goodell and other NFL executives to testify, so that the player and the

Union could ask about their roles in the discipline.  *See, e.g.*, NFLPA Ex. 166E, *Rice* Order on Discovery and Hearing Witnesses at 2 ("*Rice* Discovery Order").   And, in *Bounty*, former Commissioner Tagliabue—serving as arbitrator—compelled numerous League and Club personnel to testify (including Vincent) so that the NFLPA and the four Saints players appealing the discipline would have the ability to develop the arbitration record and to confront their accusers.  NFLPA Ex. 166F, *Bounty* Pre-Hr'g Conference Tr. 220:14-221:3; NFLPA Ex. 166G, *Bounty* Pre-Hr'g Order No. 1.

### B.   Commissioner Goodell Denies the NFLPA and Brady Equal Access to the League's Investigative Files

151.    In both *Bounty* and *Rice*, Article 46 arbitrators compelled the League to produce the investigative files underlying its factual conclusions so that the players being disciplined would have a fundamentally fair hearing.  *See* NFLPA Ex. 166L, Bounty Tr. 633-34, 889, 891 (ordering production of NFL investigative reports); NFLPA Ex. 122, *Rice* Tr. 150:10-151:22 (reviewing security report produced by NFL).  This precedent became the law of the shop.

152.    Yet, here, Goodell ignored the law of the shop set by Judge Jones and former Commissioner Tagliabue and denied the Union's motion to compel production of the investigative files.  NFLPA Ex. 208, June 22 Order at 4-5.

153.    The NFL argued that the Paul, Weiss interview notes played no role in the disciplinary decisions, which were based solely on the Wells Report.  But it was precisely because the Wells Report's conclusions formed the sole factual basis for the discipline that it was critical for Brady to have access to the investigative files in order to challenge the underlying facts.

154.    Compounding the fundamental unfairness was the fact that Paul, Weiss—which acted as defense counsel for the NFL at the arbitration—*did* have access to the investigative files.

Indeed, Paul, Weiss partner Lorin Reisner—who conducted most of the witness examinations at the hearing, including Brady's—was the co-lead partner in the investigation with Wells, and he, and his team, sat at counsel table for the NFL during the arbitration and were able to utilize the very information denied to Brady.  This was a clear violation of Brady's right to a fundamentally fair hearing.  The Award makes no mention of the issue at all.

### C.   Commissioner Goodell Refused to Compel the Testimony of Co-Lead Investigator Jeff Pash

155.    Judge Jones and Commissioner Tagliabue also set CBA precedents conclusively establishing that players have a fundamental procedural right, in Article 46 appeal arbitrations, to confront the investigators whose work forms the basis for discipline.  *See, e.g.*, NFLPA Ex. 166D, *Bounty* Pre-Hr'g Order No. 4; *cf.* NFLPA Ex. 166E, *Rice* Discovery & Witnesses Order at 2.

156.    The NFL publicly declared that NFL Executive Vice President and General Counsel Jeff Pash was the co-lead investigator on the Wells-Pash Investigation.  NFLPA Ex. 181 (NFL Press Release stating: "The investigation is being led jointly by NFL Executive Vice President Jeff Pash and Ted Wells . . . .").

157.    Accordingly, the NFLPA and Brady moved to compel the testimony of co-lead investigators Wells and Pash at Brady's appeal hearing (the NFL refused to voluntarily make either witness available).  NFLPA Ex. 166 at 5-6.  Although Goodell granted the NFLPA's motion to compel the testimony of Wells, NFLPA Ex. 208, June 22 Order at 2, the Commissioner denied the motion as to Pash, claiming that he did not play a significant role in the investigation.

158.    As the Award acknowledges, however, Pash reviewed a draft of the Wells Report and provided Paul, Weiss with comments prior to the Report's public release.  Award at 19 n.21.

Given the NFL's claim that the Wells Report findings were "independent," and that Pash played no substantive role in the investigation, it was fundamentally unfair to deny Brady the opportunity to confront Pash about his changes to the Wells Report and his overall involvement as co-lead investigator.

159.    If Pash truly had no substantive role, then he simply could have so testified.  Of course, such testimony would beg the question of why the NFL's General Counsel would then be editing a supposedly independent investigative report.  Cognizant of this dilemma, Goodell simply precluded the NFLPA and Brady from asking Pash any questions at the arbitration.[12]

160.    The combination of all the actions set forth above rendered Brady's appeal hearing a kangaroo court proceeding, bereft of fundamentally fair procedures, requiring that the Award be set aside.

## IV.    COMMISSIONER GOODELL WAS EVIDENTLY PARTIAL

161.    Neither the CBA nor the LMRA sanctions arbitration awards issued by evidently partial arbitrators.

162.    Here, as described above, a central ground of Brady's appeal was the issue of Goodell improperly delegating to Vincent his exclusive authority to discipline players for conduct detrimental to the NFL.  Goodell and Vincent were thus essential fact witnesses at the arbitration, and any arbitrator hearing Brady's appeal would have to consider the facts and adjudicate the legality of the Commissioner's delegation.

---

[12] The Award states that the NFLPA has waived this argument by not seeking at the hearing "*re*consideration of [Goodell's] decision denying [the NFLPA's] motion to compel Mr. Pash's testimony."  NFLPA Ex. 210, Award at 19 n.21.  But the NFLPA preserved the argument by making a formal motion to compel Pash's testimony which Goodell denied because of Pash's purported lack of any "significant" role—a finding undermined by Wells' testimony.  *Id.*

163.     It is hard to imagine any person in Goodell's position even attempting to serve as arbitrator under these circumstances, but that is exactly what he did.  He denied the NFLPA's Recusal Motion and simultaneously (and summarily) rejected the delegation argument—trying to pave his own path to stay on as arbitrator of Brady's appeal.  This conduct shows not merely evident partiality but actual bias, rendering Goodell unfit to serve as arbitrator under any standard.

164.     Further, prior to serving as hearing officer, the Commissioner publicly lauded the reliability of the Wells Report—the issue at the very heart of Brady's appeal:

> I want to express my appreciation to Ted Wells and his colleagues for performing a thorough and independent investigation, the findings and conclusions of which are set forth in today's comprehensive report.

NFLPA Ex. 157 at 7 (citation omitted).  Goodell's choice to make these public comments locked him into supporting the Wells Report and rendered him incapable of reaching a contrary conclusion in Brady's appeal, as doing so would undermine his own competency as Commissioner.  The Award itself proves this point—it is just a recycling of the conclusions of the Wells Report.

165.     Applicable labor law and arbitral standards simply do not permit an arbitrator to publicly comment on the very subject matter he has been called upon to arbitrate and to then continue to serve as arbitrator.

166.     Sports League Commissioners are not somehow above this standard.  The case law, including that in the Second Circuit, is that even when a League Commissioner has specifically been delegated to serve as arbitrator of parties' disputes, the Commissioner may not arbitrate a particular dispute in which his own conduct and actions are called into question.  *See Morris*, 575 N.Y.S.2d at 1016-17 (removing NFL Commissioner as arbitrator because of  his

"evident partiality and bias . . . with respect to this specific matter"); *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 716, 719 (E.D.N.Y. 1972) (disqualifying Commissioner from sitting as arbitrator due to his relationship to the specific dispute), *aff'd*, 468 F.2d 1064 (2d Cir. 1972); *see also State ex rel. Hewitt v. Kerr*, No. SC 93846, 2015 WL 2061986, at *10 (Mo. Apr. 28, 2015) (en banc) (examining facts of case and determining that NFL Commissioner's "position of bias" required court to remove him as arbitrator).   These courts analyzed the Commissioner's fitness to serve as arbitrator in the specific facts of these cases and found him impermissibly evidently partial in each one despite being designated arbitrator in the relevant arbitration provisions.  The same result is warranted here.

## PRAYER FOR RELIEF

### VACATUR OF ARBITRATION AWARD

167.   The NFLPA and Brady repeat and re-allege Paragraphs 1-166 as if set forth fully herein.

168.   The Award must be vacated because it fails to draw its essence from the parties' CBA:

    a.    Commissioner Goodell, serving as arbitrator, disregarded the law of the shop and Judge Doty's binding ruling in *Peterson* that the CBA requires that NFL players have advance notice of potential discipline, and

    b.    Commissioner Goodell, serving as arbitrator, disregarded the CBA law of the shop that conduct detrimental discipline must be fair and consistent.

169.   The Award must also be vacated because Commissioner Goodell denied Brady access to evidence and witnesses central to his appeal, and otherwise deprived Brady of his right to a fundamentally fair hearing.

170.    Finally, the Award must be set aside for the independent reason that the circumstances of Brady's discipline and appeal rendered Commissioner Goodell an evidently partial arbitrator and the NFLPA did not agree that Goodell could serve as arbitrator under such circumstances.

171.    WHEREFORE, in light of the foregoing, and in accordance with Section 301 of the LMRA and Section 10 of the FAA, the NFLPA and Brady respectfully request that the Court vacate the Award.

## ANSWER

The NFLPA hereby answers the Complaint filed by Plaintiffs on July 28, 2015, ECF No. 4 as follows:

172.    The NFLPA admits the allegations of Paragraph 1.

173.    The NFLPA admits the allegations of Paragraph 2.

174.    The NFLPA admits the allegations of Paragraph 3.

175.    The NFLPA admits the allegations of Paragraph 4.

176.    The NFLPA admits the allegations of Paragraph 5.

177.    The NFLPA admits the allegations of Paragraph 6.

178.    The NFLPA admits that Paragraph 15 of the standard NFL Player Contract, which is part of the CBA, is the source of the Commissioner's authority to discipline players for engaging in conduct detrimental, and that the Commissioner's disciplinary authority includes suspensions where all CBA requirements are satisfied.   Except as expressly admitted, the NFLPA denies the allegations of Paragraph 7.

179.     The NFLPA admits that all disputes over discipline imposed by the Commissioner for conduct detrimental to the league must be resolved in accordance with the CBA, including the procedures set forth in Article 46, and that players have a right to appeal their discipline at a hearing over which the Commissioner may preside when not inconsistent with governing principles of labor and arbitration law.  Except as expressly admitted, the NFLPA denies the allegations of Paragraph 8.

180.     The NFLPA admits that on May 11, 2015, Troy Vincent notified Brady that he would be suspended without pay for the first four games of the 2015 NFL regular season. Except as expressly admitted, the NFLPA denies the allegations of Paragraph 9.

181.     The NFLPA admits that on May 14, 2015 the NFLPA appealed Brady's suspension.  Except as expressly admitted, the NFLPA denies the allegations of Paragraph 10.

182.     The NFLPA admits the allegations of Paragraph 11.

183.     The NFLPA admits that on July 28, 2015 the Commissioner issued a written decision on the NFLPA and Brady's appeal of the suspension.  Except as expressly admitted, the NFLPA denies the allegations of Paragraph 12.

184.     The NFLPA admits the allegations of Paragraph 13.

185.     The NFLPA admits that that the quoted language appears in Article 46, Section 2(d) of the CBA.   Except as expressly admitted, the NFLPA denies the allegations of Paragraph 14.

Dated: July 31, 2015                              Respectfully Submitted,

                                                  s/Jeffrey L. Kessler
                                                  WINSTON & STRAWN LLP
                                                     Jeffrey L. Kessler
                                                     David L. Greenspan
                                                     Benjamin Sokoly
                                                     Jonathan J. Amoona (*pro hac vice* pending)

200 Park Ave.
New York, NY 10166
Tel: 212-294-6700
Fax: 212-294-4700
jkessler@winston.com
dgreenspan@winston.com
bsokoly@winston.com
jamoona@winston.com

NATIONAL FOOTBALL LEAGUE
  PLAYERS ASSOCIATION
  DeMaurice F. Smith (*pro hac vice* pending)
  1133 20th Street, N.W.
  Washington, DC 20036
  Tel:  202-756-9136
  demaurice.smith@nflplayers.com

  *Attorneys for the NFLPA and Brady*

GIBSON, DUNN & CRUTCHER LLP
  Andrew S. Tulumello (*pro hac vice* pending)
  1050 Connecticut Avenue, N.W.
  Washington, DC 20036
  Tel: 202-955-8657
  Fax: 202-530-9678
  atulumello@gibsondunn.com

  *Attorneys for Brady*