```
IN THE MATTER OF THE              )
ARBITRATION BETWEEN               )
                                  )
NATIONAL FOOTBALL LEAGUE          )
MANAGEMENT COUNCIL                )     OPINION AND AWARD
    On Behalf Of                  )
THE OAKLAND RAIDERS               )
                                  )
        and                       )     Grievance: ▉▉▉▉▉▉▉
                                  )            Fine Dispute
NATIONAL FOOTBALL LEAGUE          )
PLAYERS ASSOCIATION               )
    On Behalf Of                  )     Date:  July 16, 2010
▉▉▉▉▉▉▉▉▉▉▉▉                      )
_____ )
```

## OPINION AND AWARD OF THE ARBITRATOR

**Impartial Arbitrator**
    Michael H. Beck

**Appearances**
    For the National Football League Management Council:
    Brook F. Gardiner
    For the National Football League Players Association
    Todd Flanagan

**CONFIDENTIAL**                                                    NFLPA_BRADY002329

```
IN THE MATTER OF THE              )
ARBITRATION BETWEEN               )
                                  )
NATIONAL FOOTBALL LEAGUE          )
MANAGEMENT COUNCIL                )     OPINION AND AWARD
    On Behalf Of                  )
THE OAKLAND RAIDERS               )
                                  )
        and                       )     Grievance: ▮▮▮▮▮▮▮
                                  )              Fine Dispute
NATIONAL FOOTBALL LEAGUE          )
PLAYERS ASSOCIATION               )
    On Behalf Of                  )     Date:  July 16, 2010
    ▮▮▮▮▮▮▮▮▮▮                    )
_____)
```

## OPINION OF THE ARBITRATOR

**PROCEDURAL MATTERS**

The Arbitrator, Michael H. Beck, was selected by the parties pursuant to Article IX of the 2006-12 Collective Bargaining Agreement (Joint Exhibit No. 1) hereinafter referred to as the Agreement. The National Football League Management Council (NFLMC) on behalf of the Oakland Raiders was represented Brook F. Gardiner, Labor Relations Counsel. The National Football League Players Association (NFLPA) on behalf of ▮▮▮▮▮▮▮▮, was represented by Todd Flanagan, Staff Counsel.

The hearing in this matter was held on April 12, 2010. Pursuant to Article IX, Section 7, the hearing was held by telephone conference. The parties provided for a court

1

reporter and a verbatim transcript of the proceedings was provided to your Arbitrator for his use in reaching a decision in this case. The parties agreed, in this case, to provide the Arbitrator with a posthearing brief. The parties timely filed their briefs on July 2, 2010.

**ISSUE**

The parties did not provide the Arbitrator with a stipulated statement of the issue. After carefully considering the record in this case, I find that the following constitutes an appropriate statement of the issue:

> Did the Oakland Raiders (the Club) violate Article VIII of the agreement by fining ▓▓▓▓▓▓▓ (the Grievant) and if so, what is the appropriate remedy?

**RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT**

**ARTICLE VIII
CLUB DISCIPLINE**

**Section 1. Maximum Discipline:**
(a) For the 2006 League Year, the following maximum discipline schedule will be applicable:

\* \* \*

Unexcused late reporting for mandatory off-season minicamp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity— maximum fine of $1,500.

\* \* \*

Unexcused missed mandatory off-season minicamp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity – maximum fine of $8,000.

CONFIDENTIAL                                                                                   NFLPA_BRADY002331

* * *

    (b)    The amounts set forth in Section 1(a) above and Section 7 below shall be increased for the 2007 League Year, and each League Year thereafter during the term of the Agreement, at the rate of annual TR growth, up to a maximum of 10% per year.

**BACKGROUND**

The Grievant, ▬▬▬▬▬, signed with the Oakland Raiders in the spring of 2006 and has played for the Club during the 2006, 2007 and 2008 NFL seasons. In March of 2009 the Grievant again signed with the Oakland Raiders.

In a letter dated July 29, 2009 addressed to the Grievant, Head Coach Tom Cable stated that the Grievant had "violated the rules and regulations governing the proper player conduct and code of behavior of the Oakland Raiders. Further, the letter stated that the Grievant was being fined $9,079 for: "July 29, 2009 Missed Mandatory Weigh In 8:00 a.m." (Joint Exhibit No. 5.)

The Grievant reported to training camp as required on Tuesday, July 28, 2009. The Grievant testified that on that date he received, among other things, the schedule for the first week of training camp and a separate schedule setting forth the schedule for Tuesday July 28 and Wednesday July 29, 2009.[1]

The schedule for Tuesday, July 28 and Wednesday, July 29, 2009 contains the following relevant entries:

<u>**WEDNESDAY JULY 29, 2009**</u>

* * *

    7:00 – 8:00 A.M.    Mandatory Weigh In / Bod-Pod

---

[1] The Grievant received one or both of these schedules approximately two weeks prior to his reporting to training camp. His testimony is not clear on this point.

3

CONFIDENTIAL    NFLPA_BRADY002332

    **9:00 a.m.**     **Team Meeting**
(Club Exhibit No. 4)

With respect to the schedule for the first week of training camp, it contains the following relevant entries:

**29 – WEDNESDAY**

\* \* \*

7:00 – 8:00 am Mandatory

WEIGH IN / BOD-POD

9:00 am – Team Meeting
(Club Exhibit No. 3)

Additionally on Tuesday, July 28 the Grievant was given a copy of the 2009 Club Discipline Schedule which provided as follows:

2009 CLUB DISCIPLINE SCHEDULE

Section 1. Maximum Discipline:

 For the 2009 League Year, the following maximum discipline schedule will be applicable:

\* \* \*

 Unexcused late reporting for mandatory off-season minicamp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity—maximum fine of $1,701.

\* \* \*

 Unexcused missed mandatory off-season minicamp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity—maximum fine $9,079.
(Club Exhibit No. 2.)

CONFIDENTIAL                           NFLPA_BRADY002333

In a letter dated September 7, 2009 addressed to the Grievant, Head Coach Tom Cable reduced the amount of the fine stating the following:

> This letter serves as notice that the Oakland Raiders will be subtracting $4,539.50 (50%) of a missed weigh-in on July 29, 2009. (Joint Exhibit No. 6.)

The letter did not provide a reason for the 50% reduction in the fine.

**EVENTS LEADING TO THE IMPOSITION OF THE FINE**

Bradley P. Roll is the Club's Strength and Conditioning Coach and has been in that position for three years. Roll described the Bod Pod as:

> . . . [A] very accurate body measurement device that separates fat pounds from lean muscle pounds. And it's a huge tool in allowing us to get the most optimal body mass number for our players so that in the -- they're at their optimal level to perform on Sunday. (Tr. pg. 86.)

Coach Roll testified that players were required to report to training camp on Tuesday, July 28, 2009. He further testified that he stationed an intern in the registration tent to inform the players that they could do their Bod Pod weigh-in on Tuesday and get that task out of the way. In this regard, Roll testified that he kept the Bod Pod open from noon Tuesday until approximately 10:00 p.m. that night.[2]

The Grievant testified that at dinner on Tuesday night he talked with Coach Roll who gave him the option of doing the Bod Pod weigh-in that evening. The Grievant further testified that he told Roll that he always did the Bod Pod after having breakfast in his system so he could rule out as many variables as possible regarding the percentage of

---

[2] Neither the two day (July 28-29, 2009) schedule nor the schedule for the first week of training camp referenced weigh-in or Bod Pod with respect to Tuesday, July 28.

5

CONFIDENTIAL NFLPA_BRADY002334

muscle or fat in his body. In this regard, the Grievant testified that to be a successful linebacker in the NFL he wanted to stay roughly around 10% to 13% body fat and he wanted as accurate a portrayal as possible. Thus, he stated he always liked to weigh-in after having one meal in his stomach. The Grievant testified that Coach Roll told him to just come in for the Bod Pod weigh-in the next morning "before the team meeting." (Tr. pgs. 52, 72.)

Roll testified that he did not recall a conversation with the Grievant on Tuesday night and that his first memory of speaking with the Grievant was at breakfast on Wednesday, the 29th. However, he testified that he was not saying "it couldn't have happened." (Tr. pg. 104.) Additionally, Roll confirmed that he understood that the Grievant had a routine he followed in connection with Bod Pod weigh-in.

Roll testified that the first time he recalled seeing the Grievant during training camp was on Wednesday morning, July 29 between 6:30 and 7:00 a.m. at breakfast. Roll testified that ▓▓▓▓ was the first person at breakfast other than himself. He testified that he mentioned to the Grievant that he (the Grievant) had not had his Pod reading yet and asked him, "[A]re you going to come over this morning?" According to Roll, the Grievant answered that he "would be over." (Tr. pg. 93.) Roll further testified that it was his understanding that the designated time for the Bod Pod weigh-in was 7:00 to 8:00 a.m.

The Grievant in his testimony made no mention of having a conversation with Coach Roll at breakfast on Wednesday morning. Rather, he testified that he did not talk to any Club official until he went for his Bod Pod weigh-in after breakfast.

CONFIDENTIAL

NFLPA_BRADY002335

Tom Jones is the Assistant to the Head Coach. His duties include helping Coach Cable with the day-to-day operations as well as overseeing the calendar for the year, and he also facilitates communication between the Club's departments. Jones testified that on a daily basis the schedule is written on a dry erase white board by a Club intern. Jones further testified that since the schedule for Tuesday only contained meal times, the schedule for Tuesday, July 28 and Wednesday, July 29 were both placed on the white board on July 28. At the end of the day on Tuesday, the Tuesday schedule was erased and the Wednesday schedule remained. Jones testified that on Tuesday he saw listed on the white board for Wednesday the following: "7:00 to 8:00 [a.m.] mandatory weigh-in bod pod." (Tr. pg. 37.)

During training camp the white board was located just outside the team meeting room. Jones testified that changes to the daily schedule are reflected on the white board. However, he testified that no change would be made without Head Coach Cable first talking to the players at a practice. Jones further testified that at about 9:00 a.m. on Wednesday morning Head Coach Cable pointed out to him additional language with respect to the mandatory weigh-in on the white board. Jones testified that the white board at this time stated, "7:00 to 8:00 a.m. mandatory weigh-in/bod pod." The additional language was "before team meeting." (Tr. 47-48.) There was no practice before 7:00 a.m. on Wednesday, July 29.

The Grievant testified that at about 6:30 a.m., he left his room on the second floor of the hotel and walked down to breakfast which was located on the first floor. He further testified that as he was walking through the meeting area to go to breakfast he saw the white board and saw the additional language of "before team meeting." The Grievant

7

testified that the white board is used during the season as well as training camp and adjustments to the schedule are placed on the white board at the direction of Head Coach Cable. The Grievant testified that he has been told that players are expected to check the white board each morning and to follow any changes in the schedule reflected on the white board, and that failure to do so, could subject a player to a fine.

Coach Jones testified that Head Coach Cable told him to call the weigh-in room to make sure that everyone had weighed in. Jones testified that he did call the weight room ". . . shortly after 8:00 a.m. Probably about 8:15, something like that." (Tr. pg. 37.) He talked to one of the strength coach assistants and asked who had not weighed in. He learned that four players, including the Grievant, had not weighed in.

Strength Coach Roll testified that he heard the phone ring at approximately 8:02 a.m. and that his assistant answered the phone. Roll learned from his assistant that the call was from Coach Jones who wanted to know which players had not weighed in. Roll gave his assistant the names of four players, including the Grievant. Roll also testified that there were other players who were in the weigh-in room waiting to use the Bod Pod prior to the phone call. He did not list these players as not having weighed in. In this regard, Coach Roll testified that he did not monitor or keep track of those who arrived prior to 8:00 a.m. and those who arrived after 8:00 a.m. Therefore, he considered all of those in the weigh-in room at the time of the phone call as having weighed in.

The Grievant was in the Bod Pod at 8:17 a.m. and finished his weigh-in at about 8:20 a.m. The last player to weigh in did so at 8:27 a.m. and that player was not in the weigh-in room prior to the phone call.

8

CONFIDENTIAL NFLPA_BRADY002337

Coach Jones testified that after learning of the four players who had not weighed in, he typed up four fine letters, showed them to Head Coach Cable, who signed them. All four players received the maximum fine of $9,079.

The Grievant testified that he received the letter imposing the fine when he received his first paycheck, which he believed was approximately 10 days to two weeks after the beginning of training camp. The Grievant went to Coach Roll, told him of the fine and of his belief that he had done nothing wrong since he had weighed in before the team meeting. Coach Roll told him to talk to Head Coach Cable. The Grievant set up a meeting with Coach Cable which was held a few days later. The Grievant testified that he told Head Coach Cable that he disagreed with the fine in view of what was written on the white board, and that Cable told him he would think about the matter. Head Coach Cable did not testify at the hearing. Coach Jones testified that Head Coach Cable did tell him to reduce by 50% the fines assessed against the Grievant and the three other players who had been fined.[3]

**DISCUSSION**

After carefully considering the record in this case, I find for the reasons set forth below that the Oakland Raiders violated Article VIII of the Agreement by fining the Grievant, ▮▮▮▮▮▮. Both the NFLMC and the NFLPA agree in their briefs that the appropriate standard of review in this case is that of clear and convincing evidence. Thus, the parties agree that the burden is on the Club to establish by clear and convincing

---

[3] As I understand it, none of the other three players who were fined filed a grievance.

9

CONFIDENTIAL                                                                          NFLPA_BRADY002338

evidence that the charged conduct occurred, that is that the Grievant missed a mandatory weigh-in.

The NFLPA contends, inter alia, that the Grievant did not have adequate notice of the Club rule for which he was fined. Furthermore, the NFLPA contends that "adequate notice is the fundamental concept in discipline cases. . . ." (NFLPA brief, pg. 10.) In this regard, Professors Elkouri in How Arbitration Works[4] conclude:

> **Knowledge of Rules**
>
> One of the two most commonly recognized principles in the arbitration of discipline cases is that there must be reasonable rules or standards, consistently applied and enforced and widely disseminated. Concerning notice of rules, one arbitrator stated: "An employee can hardly be expected to abide by the 'rules of the game' if the employer has not communicated those rules, and it is unrealistic to think that, after the fact, an arbitrator will uphold a penalty for conduct that an employee did not know was prohibited. (Footnote citing cases omitted.)

I also note the following conclusion in Discipline and Discharge in Arbitration:[5]

> Clarity of Rules
>
> A rule must clearly and unambiguously establish the scope of prohibited conduct, as well as the consequences of violations, in order to be enforceable. Work rules my not be enforced if they are vague. Arbitrary rules have also been overturned, as have overbroad rules. Arbitrators have found rules to be unreasonable where they provide no clear guidance as to what is expected of employees. (Footnotes citing cases omitted.)

Additionally, in sustaining a grievance of a player regarding a fine imposed by the New York Jets for missing mandatory weigh-ins, before and after practice, at the

---

[4] Elkouri and Elkouri, How Arbitration Works, Sixth Edition, Alan Miles Ruben, Editor-in-Chief, Bureau of National Affairs, Inc., Washington DC (2003) at pg. 990.

[5] Discipline and Discharge in Arbitration, Second Edition, Norman Brand and Melissa H. Biren, Editors-in-Chief, BNA Books, a Division of BNA, Arlington, Virginia (2008) at pgs. 94-5.

10

CONFIDENTIAL

NFLPA_BRADY002339

beginning of training camp, Arbitrator Rosemary A. Townley provided in her Award as follows:[6]

> The NFLMC/Club did not prove by clear and convincing evidence that Laveranues Coles was provided with adequate notice of the final 2006 Club Rules, pursuant to Article VIII, Section 2 of the CBA.

The Grievant testified that until he saw the white board at breakfast on Wednesday, July 29 he understood that he was required to make himself available for the Bod Pod weigh-in prior to 8:00 a.m. However, he testified that when he saw the additional language, "before team meeting" on the white board, his understanding of what was required changed. Namely, that it was permissible for him to weigh-in prior to the team meeting, which was scheduled for 9:00 a.m.

The NFLMC points outs in its brief that the addition of the words "before team meeting" should not have changed the Grievant's understanding since the words "7:00 – 8:00 am mandatory weigh-in/Bod Pod" appeared immediately prior to the additional language of "before team meeting." Thus, as the NFLMC reads the entire phrase, there is no inconsistency or ambiguity because the additional language merely reinforces that there is to be a team meeting after the Bod Pod weigh-in session. In the view of the NFLMC it was "much more reasonable to believe that ▮▮▮▮ would read the two phrases ("before team meeting" and "7:00 – 8:00 am") as consistent with each other. . . ." (NFLMC brief at pg. 7.)

However, the question before your Arbitrator is not whose interpretation of the language in question here is more reasonable, but whether, as was noted in Discipline and

---

[6] Laveranues Coles and the National Football League Players Association, and the New York Jets and the National Football League Management Council (January 21, 2009) at pg. 27.

CONFIDENTIAL                                                                                                              NFLPA_BRADY002340

Discharge in Arbitration, supra, the language on the white board "clearly and unambiguously established the scope of prohibited conduct" in this case and whether that language provided "clear guidance as to what was expected of employees."[7] In other words, did the Employer establish by clear and convincing evidence that the language on the white board did put the Grievant on notice that his "conduct . . . was prohibited."[8]

The NFLMC contention in this regard would rest on firmer ground if, in fact, all of the notifications received by the Grievant had had the additional phrase "before team meeting." Here, the Employer by adding the additional phrase "before team meeting" for the first time on the white board could reasonably have caused a player, such as the Grievant, to understand that the Club had changed the timeframe regarding the Bod Pod weigh-in. In this regard, I note that both Coach Jones and Coach Roll testified that the white board is used to alert players to schedule changes and that players are expected to follow the changes set forth on the white board.

Furthermore, the evidence indicates that Head Coach Cable reduced by one half the fine that had been assessed against the Grievant and the three other players because of his understanding that there was some confusion due to the language set forth on the white board. In this regard, the Grievant testified:

> Q. Did you tell him [Coach Cable] why you disagreed with the fine?
> A. Did I tell him why I disagreed with the fine? The reason why I told him that I disagreed with it was just because I saw it on the dry erase board and I didn't -- and I didn't think I did anything wrong. I followed the board.
> Q. Did he have any response?
> A. He agreed with what I said about seeing -- seeing the "weigh-in before team meeting" on the dry erase board. But then he -- but then he said that it was a camp intern that had written that on the board, and he said that he would think about it later. (Tr. pg. 58.)

---

[7] Discipline and Discharge in Arbitration, supra, at pages 94 and 95.

[8] How Arbitration Works, supra, at page 990.

12

CONFIDENTIAL

NFLPA_BRADY002341

Coach Jones testified regarding Head Coach Cable's decision to reduce the Grievant's fine by 50% as follows:

> A. I wasn't there for the conversation between him and ▬▬▬. But they came to the agreement that because of the issue he was having with the information he was given that I would reduce it by 50 percent. ( Tr. pg. 39.)

The NFLMC contends in its brief that:

> . . . [O]f the eighty players at training camp, only 4 players failed to make it to the weigh-in prior to the 8:00 a m. deadline. . . . Obviously, the 76 players who attended the mandatory 7:00 – 8:00 a.m. weigh-in were not confused or misled by information on the white-board. See John Broussard v. Jacksonville Jaguars, at 11 (Townley, 2009) (considering other players' attendance at a mandatory session to be evidence that appropriate notice was conveyed to grievant.) (Employer brief, pg. 8.)

Before discussing the Broussard case, it would be helpful to review what occurred during the mandatory weigh-in from 7:00 to 8:00 a.m. Coach Roll testified that it takes about a minute to calibrate the Bod Pod and then two separate tests are performed which take roughly 40 seconds to one minute each. The median between 40 seconds and one minute is 50 seconds. Fifty seconds plus 50 seconds is one minute and 40 seconds. Adding the one minute calibration, the total time to perform a Bod Pod weigh-in on each player is approximately two minutes and 40 seconds. Eighty players times two minutes and 40 seconds comes to approximately three and one-half hours. Additionally, this calculation does not count the time it takes for one player to leave the Bod Pod and the second player to enter the Bod Pod.

13

In view of the foregoing, it is clear that 76 players could not have completed the Bod Pod weigh-in during the one hour period 7:00 – 8:00 a.m. In this regard, I note that Coach Roll testified that more players did the Bod Pod weigh-in on Tuesday than did so during 7:00 and 8:00 a.m. on Wednesday. Additionally, Coach Roll testified that some players may have arrived after 8:00 a.m. but before the phone call from Coach Jones and these players were tested after 8:00 a.m. Thus, contrary to the NFLMC's brief, I cannot find that there were "76 players who attended the mandatory 7:00 – 8:00 a.m. weigh-in [who] were not confused or mislead by information on the white-board." (Pg. 8.)

It is true, as the NFLMC points out in its brief, that Arbitrator Townley in the <u>Broussard</u> case, <u>supra</u>, in finding that Broussard did receive adequate notice of his medical appointment, did rely on the fact that the other players who received the same notice as Broussard understood the notice and complied with it. However, this finding by Arbitrator Townley was only one of more than 10 factors she listed in deciding that Broussard had received adequate notice of a scheduled medical appointment. Furthermore, Arbitrator Townley specifically found Grievant Broussard not to be credible.

In the instant case, I find that the Grievant was credible. In this regard, I note the testimony of Coach Roll who has been the Strength and Conditioning Coach for three seasons with the Raiders. Coach Roll testified that the Grievant was "very self-motivated." (Tr. pg. 101.) Immediately after that statement, Coach Roll was asked the following questions and gave the following answers:

> Q. Have you ever had a problem with ▬ being late?
> A. No.
> Q. So he gets to where he's supposed to get on time?
> A. Yes.

CONFIDENTIAL

NFLPA_BRADY002343

> Q. Does what he's supposed to do?
> A. Yes.
>
> * * *
>
> Q. Now ▇ has testified that the white board on the morning of the 29th said that the bod pod needed to be completed prior to the team meeting which was at 9:00. Based on your I guess history and opinion of ▇, do you think he missed the 7:00 to 8:00 a m. testing period because he just didn't care about getting there on time?
> A. No. (Tr. pgs. 102-03.)

The NFLMC pointed to the following testimony by the Grievant on cross-examination as evidence of the real reason he did not go to the weigh-in room prior to 8:00 a.m.:

> Q. And do you know what time breakfast opened on July 29th, 2009?
> A. Breakfast was at 6:30. From 6:30 to 9:00.
> Q. So you had time; you could have gotten the meal at breakfast and then gone to the bod pod reading before 8:00 if you wanted to; is that correct?
> A. Yes. Yeah, I could have. But there would have been a very long line, and I just didn't want to sit around with a bunch of rookies. (Tr. pg. 67.)

However, I also note the following questions asked the Grievant on redirect examination and his answers, which make clear that the Grievant did not come to the weigh-in room after 8:00 a.m. in order to avoid waiting in line with a bunch of rookies.

> Q. When you reported to camp the night of the 28th, what time did you think you had to complete the bod pod?
> A. Between 7:00 and 8:00 or I could have done it that Tuesday the 28th after -- in the afternoon or in the evening.
> Q. Did your understanding of the time period for the bod pod change?
> A. Yes.
> Q. What caused your understanding to change?
> A. Walking down to breakfast and seeing the white board.
> Q. If the white board was silent on the matter or simply restated what was on your printed itinerary, what would you have done?
> A. I would have gotten in there between 7:00 and 8:00 and waited with the rest of the rookies.
> Q. Do you try to comply with the club rules?
> A. Absolutely.

CONFIDENTIAL

NFLPA_BRADY002344

Q. Why is that?
A. Because I'm a professional and I want the Raiders to have as much respect for me as I have for the game of football and that organization. (Tr. pgs. 81-2.)

Based on all of the foregoing, I find that the Grievant did not receive adequate notice that he had to be in the weigh-in Bod Pod room prior to 8:00 a.m. on Wednesday, July 29.

## AWARD OF THE ARBITRATOR

It is the Award of the Arbitrator that for the reasons set forth in the attached Opinion, the Oakland Raiders violated Article VIII of the Agreement by fining ▮▮▮▮▮ $4,539.50. The Oakland Raiders shall return to the Grievant the sum of $4,539.50 in accordance with Article IX, Section 12 of the Agreement.

Dated: July 16, 2010

Seattle, Washington

S/MICHAEL H. BECK
_____
Michael H. Beck, Arbitrator