# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

NATIONAL FOOTBALL LEAGUE         :
MANAGEMENT COUNCIL,         :
        :
        Plaintiff,         :   Case No. 15-cv-5916 (RMB)(JCF)
        :
        -v.-         :
        :
        :
NATIONAL FOOTBALL LEAGUE         :
PLAYERS ASSOCIATION,         :
        :
        Defendant-Counterclaimant.  :
        :

----------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE
## ARBITRATION AWARD

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ............................................................................................................. 2

I.      THE   AWARD   VIOLATES   THE   ESSENCE   OF   THE   CBA   BY
        DISREGARDING THE LAW OF THE SHOP REQUIREMENT OF NOTICE
        OF DISCIPLINE ............................................................................................... 2

        A.      Brady Did Not Have Notice of Any Applicable Disciplinary Penalty for
                Equipment Tampering Other than a Possible Fine ................................ 5

        B.      Brady Had No Notice of the Policy Under Which He *Was* Disciplined ............... 6

        C.      Brady Had No Notice of a "Generally Aware" Disciplinary Standard ................ 8

        D.      Brady Had No Notice He Could Be Suspended for Initially Declining to
                Turn Over His Personal Communications ............................................. 9

II.     THE AWARD VIOLATES THE CBA REQUIREMENT OF "FAIRNESS AND
        CONSISTENCY" ............................................................................................. 10

III.    THE PROCEEDINGS DEFIED FUNDAMENTAL FAIRNESS ................... 12

        A.      The Commissioner Refused to Hear Brady's Delegation Challenge .................... 13

        B.      Goodell Denied Brady Access to Investigative Files Available to NFL
                Counsel ............................................................................................... 13

        C.      Goodell Denied Brady the Right to Question Co-Lead Investigator Pash ............ 14

IV.     GOODELL WAS AN EVIDENTLY PARTIAL ARBITRATOR .................... 14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Am. La France, A Div. of Figgie Int'l, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers Local Lodge No. 421*,
  559 F. Supp. 23 (W.D.N.Y. 1983) ....................................................................3

*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*,
  492 F.3d 132 (2d Cir. 2007)...........................................................................14

*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
  393 U.S. 145 (1968).......................................................................................14

*Erving v. Virginia Squires Basketball Club*,
  349 F. Supp. 716 (E.D.N.Y. 1972), *aff'd*, 468 F.2d 1064 (2d Cir. 1972)..............15

*Grieve v. Tamerin*,
  269 F.3d 149 (2d Cir. 2001).............................................................................5

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*,
  552 U.S. 576 (2008).........................................................................................5

*Home Indem. Co. v. Affiliated Food Distribs.*,
  1997 WL 773712 (S.D.N.Y. Dec. 12, 1997) ........................................................13

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*,
  763 F.2d 34 (1st Cir. 1985)............................................................................12

*In re Marine Pollution Serv., Inc.*,
  857 F.2d 91 (2d Cir. 1988)...............................................................................3

*Kaplan v. Alfred Dunhill of London, Inc.*,
  1996 WL 640901 (S.D.N.Y. Nov. 4, 1996)..........................................................12

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
  729 F.3d 99 (2d Cir. 2013).............................................................................14

*Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*,
  916 F.2d 63 (2d Cir. 1990)...............................................................................2

*Local Union No. 135 of United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Dunlop Tire & Rubber Corp. of Buffalo, N. Y.*,
  391 F.2d 897 (2d Cir. 1968).............................................................................3

*Matter of New York Hotel & Motel Trades Council, AFL-CIO v. Hotel Ass'n of New York City, Inc.*,
   1993 WL 485560 (S.D.N.Y. Nov. 24, 1993) ......................................................................... 3

*Morris v. N.Y. Football Giants*,
   575 N.Y.S.2d 1013 (N.Y. Sup. Ct. 1991) ......................................................................... 15

*NFLPA v. NFL (Peterson)*,
   slip op. (D. Minn. Feb. 26, 2015), *appeal docketed*, No. 15-1438 (8th Cir. Feb. 27, 2015) ................................................................................................................... passim

*NHLPA v. Bettman*,
   1994 WL 738835 (S.D.N.Y. Nov. 9, 1994) ....................................................................... 15

*NYC v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.*,
   2015 WL 1938148 (RMB) (S.D.N.Y. Apr. 27, 2015) .......................................................... 3

*Pasha v. Janseshki*,
   597 F. App'x 25 (2d Cir. 2015) ......................................................................................... 5

*Schwartz v. Merrill Lynch & Co.*,
   665 F.3d 444 (2d Cir. 2011) .............................................................................................. 5

*Silvercup Bakers, Inc. v. Fink Baking Corp.*,
   273 F. Supp. 159 (S.D.N.Y. 1967) .................................................................................... 3

*State ex rel. Hewitt v. Kerr*,
   2015 WL 2061986 (Mo. Apr. 28, 2015) ........................................................................... 15

*Tempo Shain Corp. v. Bertek, Inc.*,
   120 F.3d 16 (2d Cir. 1997) ....................................................................................... 12, 14

*Trailways Lines, Inc. v. Trailways, Inc. Joint Council*,
   807 F.2d 1416 (8th Cir. 1986) ........................................................................................... 3

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
   162 F.3d 724 (2d Cir. 1998) .............................................................................................. 5

*United Paperworkers Int'l Union v. Misco, Inc.*,
   484 U.S. 29 (1987) ............................................................................................................. 2

*United Steelworkers v. Enter. Wheel & Car Corp.*,
   363 U.S. 593 (1960) ........................................................................................................... 3

*United Steelworkers v. Warrior & Gulf Nav. Co.*,
   363 U.S. 574 (1960) ........................................................................................................... 3

*Williams v. NFL (Starcaps)*,
    582 F.3d 863 (8th Cir. 2009) ................................................................................14

**OTHER AUTHORITIES**

Elkouri & Elkouri, *How Arbitration Works* 11 (Kenneth May et al. eds., 7th ed. 2012) ...............3

# PRELIMINARY STATEMENT[1]

Commissioner Roger Goodell's Arbitration Award ("Award") upholding the four-game suspension of Tom Brady should be vacated as a matter of law. *First*, the Award fails to draw its essence from the parties' collective bargaining agreement ("CBA") because it ignores the established "law of the shop" that players must have advance notice of the disciplinary policies, standards, and penalties to be imposed. A District Court has already ruled on this very point and vacated a similar NFL arbitration award because it too violated these CBA requirements. *See NFLPA v. NFL* ("*Peterson*"), slip op. (D. Minn. Feb. 26, 2015), *appeal docketed*, No. 15-1438 (8th Cir. Feb. 27, 2015) (Ex. 153). The NFL is now collaterally estopped from arguing otherwise, and the Award offers no legal justification for affirming Brady's suspension given the undisputed fact that he had no notice of the policies, standards, or penalties imposed.

*Second*, Goodell concedes that, under the law of the shop, conduct detrimental discipline must be "fair and consistent," but his Award defies this CBA requirement in myriad ways. In addition to rubber-stamping an unprecedented punishment for alleged ball tampering without any notice that players could be suspended for such conduct, the Award concludes that there was tampering based on arbitrary *assumptions*—not evidence. It is undisputed that the NFL had ***no*** protocols for properly testing air pressure, nor for recording the factors essential to any determination of whether a drop in air pressure was merely caused by natural forces. The Award nonetheless ignores the NFL's failure to collect the necessary data and instead sustains Brady's unprecedented suspension based on mountains of unreliable assumptions, which render it impossible for the discipline to meet the CBA's "fair and consistent" requirement.

*Third*, Goodell presided over a fundamentally unfair arbitration process. Among other

---

[1] The NFLPA incorporates by reference its Amended Answer and Counterclaim ("Answer").

1

things, Goodell summarily rejected Brady's delegation ground for appeal even *before* the hearing on *no* evidentiary record, denied Brady access to critical documents and witnesses which were available to the NFL's counsel, and relied wholesale on the Wells Report because of its purported "independence" even though the same law firm that prepared the Report represented the NFL at the arbitration to defend the discipline.

*Finally*, Goodell was an evidently partial arbitrator who denied the NFLPA's recusal motion, proceeded to "find" himself credible in declaring the facts of his delegating the determination of Brady's discipline to someone else, and then ruled on the CBA propriety of his own delegation.  Neither the CBA nor labor law permits Goodell to arbitrate his own conduct.

## <u>ARGUMENT</u>[2]

This Court's review of an arbitrator's award is narrowly circumscribed and deferential. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38 (1987).  However, deference "is not the equivalent of a grant of limitless power.  An arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers."  *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990).  "Arbitration awards…are not inviolate, and the court need not merely rubber stamp the arbitrator's interpretations and decisions."  *Peterson* 10.

## I.    THE AWARD VIOLATES THE ESSENCE OF THE CBA BY DISREGARDING THE LAW OF THE SHOP REQUIREMENT OF NOTICE OF DISCIPLINE

"[An] award is legitimate only so long as it draws its essence from the [CBA].  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse

---

[2] Unless otherwise indicated, emphasis is added and internal citations are omitted throughout. All exhibit cites are to those submitted with the NFLPA's Amended Answer and Counterclaim or the Declaration of David L. Greenspan ("Greenspan Decl.," submitted herewith).

enforcement of the award."[3]  The essence of the CBA includes not just the express terms of the agreement but also prior arbitral decisions and extrinsic evidence of the custom and practice of the parties, *i.e.*, the "law of the shop."  *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 580-82 (1960).[4]  Accordingly, arbitration awards that violate express terms of the CBA or the binding law of the shop must be vacated.[5]

This is exactly what Senior Judge David S. Doty ruled in *Peterson*, where he recently vacated an arbitrator's award upholding Goodell's suspension of Adrian Peterson as contrary to the essence of the CBA.  *Peterson* 11-16.  Based on the long-standing CBA law of the shop requiring advance notice of discipline, Judge Doty, who has more than 25 years of experience hearing NFL CBA and other player disputes, ruled that an award sustaining retroactive application of newly-imposed disciplinary policies to Peterson, *i.e.*, new disciplinary standards and penalties imposed without notice, violated the essence of the CBA.  *Id.* 11-14.

In vacating the arbitration award, the *Peterson* court considered legions of binding CBA

---

[3] *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir. 1988); *NYC v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.*, 2015 WL 1938148, at *5 (S.D.N.Y. Apr. 27, 2015) (Berman, J.).

[4] *See also id.* 581-82 ("[T]he industrial common law—the practices of the industry and the shop—is equally a part of the [CBA] although not expressed in it."); *id.* 581 (the "processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement"); *Local Union No. 135 of United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Dunlop Tire & Rubber Corp. of Buffalo, N. Y.*, 391 F.2d 897, 900 (2d Cir. 1968); *Matter of New York Hotel & Motel Trades Council, AFL-CIO v. Hotel Ass'n of New York City, Inc.*, 1993 WL 485560, at *7 (S.D.N.Y. Nov. 24, 1993); *Silvercup Bakers, Inc. v. Fink Baking Corp.*, 273 F. Supp. 159, 161-62 (S.D.N.Y. 1967); Elkouri & Elkouri, *How Arbitration Works* 11-14 (Kenneth May et al. eds., 7th ed. 2012) (law of the shop decisions become binding parts of CBA to be followed by arbitrators thereafter).

[5] *Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1421 (8th Cir. 1986) ("[C]ourts have vacated awards solely because of the arbitrator's failure to consider [the law of the shop]."); *Am. La France, A Div. of Figgie Int'l, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers Local Lodge No. 421*, 559 F. Supp. 21, 22-23 (W.D.N.Y. 1983) (quoting *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 53 (1974)) (arbitrator "must interpret and apply [the CBA] in accordance with the industrial common law of the shop").

precedents on the requirement of notice,[6] including, most prominently, the *Ray Rice* arbitration in which retired Southern District of New York Judge Barbara S. Jones—sitting as CBA arbitrator—vacated Goodell's indefinite suspension of Ray Rice. Ex. 124, *Rice* 17. There, Judge Jones rejected Goodell's arbitration testimony that Rice had misled the Commissioner, *id.* 9-15, and held that Goodell's discipline—a reaction to "public criticism"—was "arbitrary." *Id.* 16-17. As for the notice issue, Judge Jones held that, although Goodell had enacted a new, more severe Personal Conduct Policy (the "New Policy") as a reaction to the public criticism, "***even under the broad deference afforded to [Goodell] through [the CBA], he could not retroactively apply the new presumptive penalty to Rice.***" *Id.* 16. This was because, as Goodell testified during the proceedings, under the CBA, the NFL is "***required to give proper notification***" of player discipline. Ex. 122, *Rice* Tr. 100:13-14; *Rice* 2 (New Policy was "forward looking").

In *Peterson*, Goodell made an about-face, defying Judge Jones' decision and applying the New Policy retroactively to Peterson (*i.e.*, without notice)—exactly what Judge Jones ruled he could not do. *Peterson* 12-13. Thereafter, Goodell's hand-picked CBA arbitrator summarily denied Peterson's disciplinary appeal. *Id.* 13-14. Judge Doty held that the arbitrator had "simply disregarded the law of the shop" on required notice, and, moreover, had exceeded his CBA

---

[6] *Peterson* 11-14 (citing Ex. 113, *Bounty* 6 (2012) (Tagliabue, Arb.) (vacating discipline because of lack of notice and holding that "a sharp change in…discipline can often be seen as arbitrary and as an impediment rather than an instrument of change"); Ex. 91, *Reggie Langhorne* 25 (1994) (Kasher, Arb.) (vacating discipline because player "was entitled at some time to be placed on notice as to what consequences would flow from his refusal to [abide by the rules]. Any disciplinary program requires that individuals subject to that program understand, with reasonable certainty, what results will occur if they breach established rules."); Ex. 101, *Ricky Brown* (2010) (Beck, Arb.) (vacating discipline because player did not receive notice of rule he allegedly violated); Ex. 99, *Laveranues Coles* (2009) (Townley, Arb.) (same)). Even the arbitrator whose award was vacated in *Peterson* recently reduced a player suspension from ten games to four because it violated the CBA requirement of advance notice that increased penalties would be applied. Greenspan Decl. Ex. A, *Hardy* 12 (2015).

authority by trying to justify the Commissioner's discipline on grounds different from those on which the discipline was based.  *Id.* 14-16.  Judge Doty's decision, which the NFL did not seek to stay, estops the NFL from contesting that the essence of the CBA requires notice.[7]  But, tellingly, the Award does not mention *Peterson,* in manifest disregard of that law.[8]

### A.    Brady Did Not Have Notice of Any Applicable Disciplinary Penalty for Equipment Tampering Other than a Possible Fine

The only disciplinary policies that the League distributes to players are contained in the aptly named Policies for Players ("Player Policies").  Ex. 114.  The Player Policies are distributed to players before each season and include, for example, the NFL's Personal Conduct Policy, the Substances of Abuse Policy, the Steroids Policy, the Gambling Policy, and the policy concerning equipment violations by players (which falls under the Game Related Player Conduct Rules).  The undisputed purpose of distributing the Player Policies is to provide notice.

Critically relevant here, those policies provide notice only for *fines* for first-time equipment offenses.  The Game Related Player Conduct Rules provide that "[a] player may not use unauthorized foreign substances (*e.g.*, stickum or slippery compounds) on his body or

---

[7] *See Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001) (collateral estoppel standards); *see also Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 730 (2d Cir. 1998) ("district court decision[s are] entitled to res judicata effect pending the…Circuit's decision on appeal").

[8] Goodell's refusal to apply—or even *cite*—the court's order in *Peterson* amounts to a manifest disregard of governing law, a ground for vacatur maintained by the Second Circuit even after *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008).  *See, e.g.*, *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011); *accord Pasha v. Janseshki*, 597 F. App'x 25, 26 (2d Cir. 2015).  The manifest disregard standard "requires a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it."  *Schwartz*, 665 F.2d at 452.  Here, *Peterson* was both well-defined and explicit, and its holding about the law of the shop requirement of disciplinary notice clearly applies to the facts of Brady's suspension.  Moreover, the NFLPA (i) submitted the *Peterson* decision to Goodell at Brady's arbitration, (ii) argued the dispositive effect of *Peterson* at the hearing, and (iii) devoted a significant portion of its post-hearing brief to explicating the same.  Exs. 153, 204-205.  Despite all of this, Goodell does not even acknowledge *Peterson* in the Award.

uniform" because "such a violation *affects the integrity of the competition and can give a team an unfair advantage*…." *Id.* 15. Although this provision does not specifically deal with ball tampering, the Player Policies also contain a catchall provision for "Other Uniform/Equipment Violations." *Id.* The Policy expressly provides that: *"First offenses will result in fines." Id.* (emphasis in original). Whatever the Commissioner's desire to *suspend* Brady, as a CBA arbitrator, he lacked authority to disregard the undisputed fact that Brady only had notice of a potential *fine* for a first-time equipment violation.

### B. Brady Had No Notice of the Policy Under Which He *Was* Disciplined

NFL Executive Vice President Troy Vincent disciplined Brady pursuant to the Competitive Integrity Policy, which is incorporated into the Game Operations Manual, Ex. 115 at A2.[9] By its terms, the Competitive Integrity Policy applies to "*Chief Executives, Club Presidents, General Managers, and Head Coaches*." And, Brady testified, and Vincent agreed, that he and other players were never provided with the Competitive Integrity Policy. Answer ¶ 115. In fact, Brady is the first *player* ever disciplined under this Policy for Club personnel.

For example, in 2009, the NFL suspended a New York Jets equipment staff member after he "attempted to use unapproved equipment to prep the K[icking] Balls prior to" a game against the Patriots. Ex. 209 at 1. The NFL concluded the Club employee's "attempt to use unapproved materials to prep the K[icking] Balls could [have] easily be[en] interpreted as an attempt to gain a competitive advantage." *Id.* Significantly, the Jets kicker—unlike the Club employee—was not investigated, let alone disciplined. Ex. 204, June 23 Hr'g Tr. 250:7-12 (Vincent).

The only other two incidents concerning potential ball tampering in recent years similarly

---

[9] The Wells Report—upon which Vincent's discipline was exclusively based—expressly states that "[t]he investigation was conducted pursuant to the [Competitive Integrity Policy]." Ex. 7 at 1; Answer ¶¶ 113-115.

resulted in no player investigation, much less player discipline:

- On November 30, 2014, during a game between the Minnesota Vikings and Carolina Panthers, ball boys were caught on television using heaters to warm Vikings footballs in sub-zero temperature in violation of the Game Operations Manual.  The NFL sent a warning *to the Club*, and stated publicly that teams "can't do anything with the footballs in terms of any artificial [sic], whether you're heating them up, whether it's a regular game ball or kicking ball, you can't do anything to the football."  Answer ¶ 117.[10]

- On November 30, 2014, Green Bay Packers quarterback Aaron Rodgers stated publicly that he "like[s] to push the limit to how much air we can put in the football, even go over what they allow you to do and see if the officials take air out of it."  Answer ¶ 118.

Having no response to the inapplicability to players of the Competitive Integrity Policy, the Award turns a blind eye to reality and blithely asserts that "[t]he Policy was not the source or the basis for the discipline imposed here."  Award 17 n.19.  But this assertion is belied by the undisputed arbitration record (*supra*).  Indeed, not even the NFL's lawyers denied this fact at the hearing.  *See* Hr'g Tr. 7:19-46:25 (opening statements).  More fundamentally, even if the Competitive Integrity Policy was not the source of Brady's discipline, the Award still punishes Brady pursuant to *no* policy—when the Player Policies cover the subject of equipment tampering—which is just as much a failure in notice as in *Peterson* and *Rice*, where applying a new iteration of an old policy without notice was held to violate the essence of the CBA.

The Award also asserts that Brady had notice because all Player Contracts provide that players may be suspended for conduct detrimental to the League.  *See* Award 16-18.  This too was rejected in *Peterson* and *Rice*.  Like Brady, Peterson and Rice knew from their Player Contracts that they could be punished for conduct detrimental, but Judge Doty and Judge Jones both ruled that players could not be subjected to a disciplinary policy when they only had notice

---

[10] The Award states that there was no evidence of any player involvement in the Jets or Vikings ball tampering incidents.  Award 15.  But there was also no investigation of players even though, *e.g.*, the Vikings quarterback would have been "generally aware" of a warm ball in cold weather.

of a prior version.  *Peterson* 12-14; *Rice* 16.  As Goodell testified, under the CBA, the NFL is "required to give proper notification" of player discipline.  Ex. 122, *Rice* Tr. 100:13-14.

### C.        Brady Had No Notice of a "Generally Aware" Disciplinary Standard

The basis for Brady's punishment was the very narrow finding in the Wells Report that he was, allegedly, "generally aware" of ball deflation by two members of the Patriots equipment staff.[11]  However, no NFL policy or precedent provided notice that a player could be subject to discipline for general awareness of another person's alleged misconduct.  To the contrary, it is undisputed that no player in NFL history has been disciplined on this basis (*e.g.*, no player has ever been suspended for general awareness that a teammate was taking steroids).

Before Brady, the NFL never previously tried to punish players for general awareness of others' misconduct.  In *Bounty*, for example, Goodell did not discipline the entire New Orleans Saints defense for their general awareness of the alleged "bounty" program; he punished only those players whom he found to have ***participated personally*** in the alleged misconduct (and those suspensions were subsequently vacated by former Commissioner Paul Tagliabue for lack of notice).  *Bounty* 2-3, 22.  Similarly, in the Richie Incognito "bullying" investigation, again led by the NFL's outside counsel Wells and Paul, Weiss, Wells found that several members of the Miami Dolphins were generally aware of Incognito's alleged bullying of teammate Jonathan Martin.  Answer ¶ 123.  Yet only Incognito was punished.

No prior notice of the "general awareness" standard dooms the Award.  Recognizing this, Goodell purports to sustain the suspension on conclusions that Brady "participated in a scheme"

---

[11] Answer ¶¶ 11, 90, 125.  Vincent's discipline letter says the same.  Ex. 10.  And Wells testified: "I'm hesitating about the word 'direct,' because what I do say in the report is I don't think they would have done it without his knowledge and awareness.  *Now, but I don't have a phrase, you are correct, where I say he directed them*.  What I say is I believe that they would not have done it unless they believed he wanted it done in substance."  Hr'g Tr. 274:20-275:2.

and "induce[d]" ball tampering (Award 10, 13)—but those contrived conclusions appear nowhere in the Wells Report and thus were not the basis for Brady's discipline. Ex. 10. Indeed, Vincent testified that he did no fact finding of his own and relied exclusively on the Wells Report as the basis for imposing discipline. Answer ¶¶ 90, 120. Judge Doty's ruling in *Peterson* makes clear that an Article 46 arbitrator, such as Goodell, exceeds his CBA authority by sustaining discipline on a different basis from that upon which it was imposed. *Peterson* 14.[12]

### D.   Brady Had No Notice He Could Be Suspended for Initially Declining to Turn Over His Personal Communications

The Award further violates the essence-of-the-CBA requirement of notice by affirming Brady's suspension, in part, for initially declining Wells' requests for Brady's private text messages and e-mails—a decision Brady made solely on the advice of his agents-lawyers. Answer ¶¶ 13, 22, 81. No player suspension in NFL history has been sustained for an alleged failure to cooperate with—or even allegedly obstructing—an NFL investigation. For example, Goodell suspended former Saints player Anthony Hargrove seven games for allegedly obstructing the NFL's investigation into the Saints' "bounty" program. Former Commissioner Tagliabue upheld Goodell's finding that Hargrove had obstructed the NFL's investigation but still vacated the suspension for lack of notice:

> *There is no evidence of a record of past suspensions based purely on obstructing a League investigation. In my forty years of association with the NFL, I am aware of many instances of denials in disciplinary proceedings that proved to be false, but I cannot recall any suspension for such fabrication.*[13]

---

[12] Goodell does not cite a single new piece of evidence from the hearing to support his attempt to manufacture "new" findings that Brady "participated" in ball tampering. And, Wells made it clear he found no such evidence in his investigation—the only factual basis for the discipline.

[13] *Bounty* 13. Goodell's Award attempts to distinguish Brady's case from *Bounty* because Brady, allegedly, "made a deliberate effort" to conceal evidence. Award 13. But that is exactly what Tagliabue concluded about Hargrove. *Bounty* 13.

Goodell also disregards the undisputed evidence that neither the NFL nor its investigators ever notified Brady that he might be punished for declining to produce his electronic communications.  As Wells testified:  "***I want to be clear—I did not tell Mr. Brady at any time that he would be subject to punishment for not giving—not turning over the documents.  I did not say anything like that.***"  Hr'g Tr. 336:15-23; *id.* 86:8-20 (Brady testifying that, if he had notice he could be suspended for not producing the communications, he would have done so).[14]

Nor did Brady have any notice that a failure to cooperate could be a basis for Wells to draw an adverse inference on *the underlying facts* of ball tampering.  Answer ¶¶ 85, 133.  Yet Wells testified that "[i]f those text messages did not exist, and all we had was a break in protocol and [McNally] goes into the bathroom and just the science, the result might very well be totally different."  Hr'g Tr. 317:2-5.  This admission means the entire discipline was infected by Wells' punitive decision to draw an adverse inference—one leading to a suspension—even though Brady had no notice he could be suspended for declining to produce personal communications.[15]

## II.    THE AWARD VIOLATES THE CBA REQUIREMENT OF "FAIRNESS AND CONSISTENCY"

It is undisputed that "discipline under [Article 46] must be fair and consistent."  *Rice* 8.  Yet the Award sustains Brady's suspension despite acknowledging that "no player may have been suspended before for tampering with game footballs or obstructing an investigation."

---

[14] Wells agreed that Brady had been very cooperative in every other respect.  *Id.* 340:24-341:9.

[15] To the extent the Award seeks to sustain the non-cooperation finding based on "new" grounds relating to Brady discarding his phone (Award 1, 12-13, 17-18), this exceeds the arbitrator's authority.  The court in *Peterson* ruled that under the essence of the CBA, the arbitrator only has the authority to review the stated basis for the discipline, not to sustain it on different grounds. *Peterson* 15.  Moreover, it is clear that Brady following his long-standing practice of discarding his phones had no adverse impact on the Wells-Pash Investigation as Brady's production of his phone bills and emails established that Wells already had all relevant communications from the phones of other Club employees.  Answer ¶¶ 22, 99-100.  The Award contains much sound and fury about Brady discarding his phone, but does not deny this fact.

10

Award 14.   The unfairness and inconsistency of Brady's unprecedented punishment is compounded by the myriad defects in notice described above.  But that is not all.

As the Wells Report explains, the Patriots footballs were expected to naturally deflate in accordance with the Ideal Gas Law.  *See, e.g.*, Ex. 7 at 111, 113.  It was thus essential for the NFL to determine whether the deflation of the Patriots balls as of halftime was due to natural causes or human intervention.  *Id.* 31.  The Award defies the CBA requirement of fairness and consistency by affirming the conclusion that the Patriots balls were tampered with (Award 6-7) despite the League's admission that it had no protocols for collecting the information essential to determining what actually caused the deflation reflected in the halftime measurements.  Answer ¶¶ 66-73.   In recognition of its lack of **any** testing protocols, the NFL—*just last week*—first implemented procedures for testing footballs at halftime (a year too late for Brady).  *Id.* ¶ 139.

Both Wells and Vincent admitted that: neither the NFL nor its referees had any appreciation of the Ideal Gas Law and the fact that some deflation was naturally expected (Answer ¶¶ 67, 141; Hr'g Tr. 238:14-18); no set procedures existed for testing balls at halftime or after the game (Answer ¶¶ 67, 102); and, as a result, the referees did not record critical information about the sequence and timing of the measurements, temperature, wetness, or which of two gauges was used.  *Id.* ¶ 138.  The consequence of all of this is that, as the NFL's experts testified, they had to make myriad "assumptions" about what the data might have shown, had it been collected, in order to do their *post-hoc* studies for the Wells Report.  *Id.* ¶¶ 102, 142.[16]

These unsupported assumptions included subjects as basic as which gauge had been used

---

[16] Everyone other than Goodell seems to recognize the limited probative value of the NFL's experts' work.  As Wells wrote in his report:  "Our scientific consultants informed us that the data alone did not provide a basis for them to determine with absolute certainty whether there was or was not tampering, as the analysis of such data is ultimately dependent upon assumptions and information that is uncertain."  Ex. 7 at 12.

to test the pressure in the footballs—a distinction of great significance because the two gauges had very different calibrations and thus yielded very different measurements. Ex. 7 at 116; Ex. 8 at 19-20; Answer ¶¶ 70, 140. And the Wells Report assumed the opposite of what referee Walt Anderson told Wells was his "best recollection" of the gauge he had used.[17] Dr. Edward Snyder, Dean of the Yale School of Management, testified that, when he applied reasonable alternatives to even a few of the NFL's experts' many assumptions, "their findings change, so the bottom line is their results are simply not reliable." Hr'g Tr. 158:7-16; Answer ¶¶ 103, 143; Ex. 192.

It is not news to the NFL that there must be proper testing protocols before a player can be subject to discipline. The Drug Program, for example, sets forth a comprehensive system of testing procedures to eliminate "false positives." Here, the PSI measurements from the AFC Championship Game provided no fair and consistent basis for any discipline under the CBA.

## III.   THE PROCEEDINGS DEFIED FUNDAMENTAL FAIRNESS

"Although an arbitrator is not required to comport with the strictures of formal court proceedings in conducting the arbitration hearing, he or she must nevertheless grant the parties a fundamentally fair hearing," which at a minimum requires that a party have an adequate opportunity to present its evidence and arguments and cross examine adverse witnesses.[18] Where, as here, the "arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the arbitration award may be set aside." *Kaplan*, 1996 WL 640901, at *5.

---

[17] The Wells Report acknowledged that Anderson's "best recollection is that he used the Logo Gauge." Ex. 7 at 52; *but see* Ex. 8 at IX.

[18] *Kaplan v. Alfred Dunhill of London, Inc.*, 1996 WL 640901, at *5 (S.D.N.Y. Nov. 4, 1996); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997) (vacating award because panel "excluded evidence…pertinent and material to the controversy"); *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39-40 (1st Cir. 1985) (vacating award where "the exclusion of relevant evidence so affect[ed] the rights of a party that it may be said that he was deprived of a fair hearing").

### A.    The Commissioner Refused to Hear Brady's Delegation Challenge

A principal ground for Brady's appeal was Goodell's improper delegation to Vincent of his *exclusive* CBA authority[19] to discipline conduct detrimental.  Ex. 11 at 1; Ex. 185 at 4.  Brady and the Union appealed this improper delegation, but Goodell summarily rejected the argument before the hearing.  He simply declared the facts as he preferred them, without any discovery or evidentiary record, and made a decision without a hearing.  Ex. 160 at 1-2.  Thereafter, Goodell refused to allow any witness (including himself) to be examined on the delegation issue.  Ex. 208, June 22 Order on Discovery and Hearing Witnesses 1-2.[20]  In the Award, he affirmed his unilateral, untested proclamation of the "facts."  Award 18-19.  This is not fundamental fairness.

### B.    Goodell Denied Brady Access to Investigative Files Available to NFL Counsel

The discipline imposed on Brady is based solely on the conclusions of the Wells Report, authored by Paul, Weiss partners Wells and Lorin Reisner.  Ex. 10.  In order to challenge those conclusions, the NFLPA and Brady sought the Paul, Weiss investigative files (*e.g.*, notes from witness interviews).  Ex. 159 at 2.  Goodell denied the request on the basis that "the Paul, Weiss interview notes played no role in the disciplinary decisions; the Wells Report was the basis for those decisions." Ex. 208 at 4.  But fundamental fairness does not force the NFLPA and Brady to take at face value the *conclusions* from the Wells Report—it entitles them to *test* those conclusions, by having access to the underlying investigative files.[21]  Compelling investigative

---

[19] *See* Ex. 107, CBA Art. 46, § 1(a); Ex. 108, CBA App. A, ¶ 15.

[20] This decision, in and of itself, violated Judge Jones' law of the shop ruling (among others) that the "key elements of a 'fundamentally fair hearing'" are a grievant's ability to "present evidence and cross examine witnesses."  Ex. 166E, *Rice* Order on Discovery and Hearing Witnesses at 1.

[21] *Home Indem. Co. v. Affiliated Food Distribs.*, 1997 WL 773712, *4 (S.D.N.Y. Dec. 12, 1997).

files is also the CBA law of the shop from *Bounty* and *Rice*.[22]   This denial of access was especially egregious considering that the NFL's counsel at the arbitration *did* have access to the files.   Although Goodell cites Paul, Weiss' "independence" as a basis for relying on the Wells Report (*e.g.*, Award 18-19), Wells testified that his firm was hired as NFL counsel to defend the discipline of Brady at the hearing.   Hr'g Tr. 267:15-20, 279:14-18.   In fact, Reisner—who had access to his own investigative files—conducted most of the NFL's witness examinations.

### C.   Goodell Denied Brady the Right to Question Co-Lead Investigator Pash

The NFLPA sought Pash's testimony because of his publicly declared role as co-lead investigator (Ex. 181; Ex. 7 at 1).   Exs. 159, 166.   Goodell denied the request, Ex. 208 at 2, asserting that Pash played no role in the investigation other than as a "facilitator."   But Wells admitted that Pash was privy to, and commented on, an early Wells Report draft.   Hr'g Tr. 268:17-25.   Fundamental fairness required that Brady have the chance to confront Pash about his investigative role and the edits he made to a purportedly "independent" investigative report that became the basis for Brady's discipline.   *Tempo Shain*, 120 F.3d at 20-21.

## IV.   GOODELL WAS AN EVIDENTLY PARTIAL ARBITRATOR

The Award must be vacated for the additional reason that Goodell is evidently partial. *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147, 150 (1968).   The governing evident partiality test is an objective one.[23]

As discussed above, Goodell's direct involvement in the issues to be arbitrated disqualified him from serving as arbitrator.   Rather than accepting this—as he did by recusing

---

[22] Ex. 166L, *Bounty* Tr. 633-34, 889, 891 (ordering production of NFL investigative reports); Ex. 122, *Rice* Tr. 150:10-151:22 (investigative report produced by NFL).

[23] *See Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013); *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007); *Williams v. NFL*, 582 F.3d 863, 885 (8th Cir. 2009).

himself in *Rice* and *Bounty* when his own conduct was at issue (Exs. 124, 113)—Goodell instead barred discovery on the delegation of his disciplinary authority to Vincent, held that neither he nor Vincent could be questioned on the subject (effectively judging his own credibility), and summarily rejected the challenge to his delegation conduct *before* the arbitration.  Answer ¶ 150. These facts not only demonstrate evident partiality, but actual bias.

The Commissioner was evidently partial for the additional reason that, after deciding to spend millions of dollars on the Wells Report (Hr'g Tr. 279:5-13 (Wells)), he publicly touted its independence and conclusions *before* the arbitration:  "I want to express my appreciation to Ted Wells and his colleagues for performing a thorough and independent investigation, the findings and conclusions of which are set forth in today's comprehensive report."   Ex. 157 at 7. Goodell's public comments locked him into adopting the Wells Report in his eventual Award.

Finally, the CBA's designation of the Commissioner as the Article 46 arbitrator does not alter the conclusion that he may not arbitrate a dispute implicating his own conduct.[24]

---

[24] *See Morris v. N.Y. Football Giants*, 575 N.Y.S.2d 1013, 1016-17 (N.Y. Sup. Ct. 1991) (disqualifying NFL Commissioner as arbitrator because of "evident partiality and bias…with respect to this specific matter"); *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 716, 719 (E.D.N.Y. 1972) (same with respect to ABA Commissioner), *aff'd*, 468 F.2d 1064 (2d Cir. 1972); *see also State ex rel. Hewitt v. Kerr*, 2015 WL 2061986 (Mo. Apr. 28, 2015) (en banc) (vacating order compelling arbitration before Goodell, despite employment contract designating him as arbitrator, because of Goodell's "position of bias").  In *NHLPA v. Bettman*, the court declined to disqualify the NHL Commissioner as arbitrator because his particular bias on the arbitral issue "was fully known or knowable" to the NHLPA when it agreed to the arbitration provision.  1994 WL 738835, at *14 (S.D.N.Y. Nov. 9, 1994).  By contrast, the NFLPA's argument here has nothing to do with Goodell's *inherent* partiality as the League Commissioner. Rather, his evident partiality stems from the unforeseeable facts that his own testimony and conduct were at issue in the arbitration, and he chose to make pre-arbitration comments praising the conclusions of the Wells Report and touting Wells' independence.

Dated:  August 7, 2015                          Respectfully submitted,

                                                By: s/Jeffrey L. Kessler

                                                WINSTON & STRAWN LLP
                                                 Jeffrey L. Kessler
                                                 David L. Greenspan
                                                 Benjamin Sokoly
                                                 Jonathan J. Amoona (*pro hac vice*)
                                                 Angela A. Smedley
                                                 200 Park Avenue
                                                 New York, New York 10166
                                                 Telephone: (212) 294-6700
                                                 Facsimile: (212) 294-4700
                                                 jkessler@winston.com
                                                 dgreenspan@winston.com
                                                 bsokoly@winston.com
                                                 jamoona@winston.com
                                                 asmedley@winston.com

                                                NATIONAL FOOTBALL LEAGUE
                                                PLAYERS ASSOCIATION
                                                 DeMaurice F. Smith (*pro hac vice*)
                                                 1133 20th Street, N.W.
                                                 Washington, DC 20036
                                                 Tel:  (202) 756-9136
                                                 demaurice.smith@nflplayers.com

                                                *Attorneys for the NFLPA and Brady*

                                                GIBSON, DUNN & CRUTCHER LLP
                                                 Andrew S. Tulumello (*pro hac vice*)
                                                 1050 Connecticut Avenue, N.W.
                                                 Washington, DC 20036
                                                 Tel: (202) 955-8657
                                                 Fax: (202) 530-9678
                                                 atulumello@gibsondunn.com

                                                *Attorneys for Brady*

16