# EXHIBIT A



July 10, 2015

David Greenspan
Winston & Strawn
200 Park Avenue
New York, NY 10166-4193

Daniel Nash
Akin Gump
1333 New Hampshire Avenue NW, Ste. 400
Washington, DC 20036

### Re: Greg Hardy Appeal – Player Conduct Policy

Gentlemen:

Greg Hardy, a player then with the Carolina Panthers and currently with the Dallas Cowboys, was notified by letter from NFL Commissioner Roger Goodell dated April 22, 2015 that he was suspended without pay for the first ten games of the 2015 season and directed to undergo a clinical evaluation and to comply with any recommendations for counseling or treatment which may come from that evaluation. This discipline was based on a domestic violence incident in Charlotte, NC on or about May 13, 2014 which violated the League's Constitution & Bylaws, the NFL Players contract and the NFL Personal Conduct Policy ("PCP"). A timely appeal was filed on his behalf by the NFLPA, which appeal was heard on May 28, 2015. This letter will set forth the decision regarding that appeal, which follows careful review and consideration of the evidence of record, including documents submitted by the parties and arguments of counsel that were made at the hearing.

### BACKGROUND

There are significant differences in the parties' view of details of the incident giving rise to this discipline and appeal, but the basic underlying facts are not in dispute. Greg Hardy and Nicole Holder were in a romantic relationship from early fall of 2013 to the end of January 2014, when Hardy ended that relationship as the pair departed the Pro Bowl in Hawaii. Holder did not take the break-up well and sought to continue the relationship; after Hardy took back his key to his apartment in Charlotte they continued to see each other occasionally. On May 12, 2014 the pair, along with several friends and acquaintances, visited several clubs and bars where they "partied" and consumed generous amounts of alcohol. In the early morning hours, and after some friction between the couple during the prior evening, a group of approximately six people ended up in Hardy's apartment. Around 3:00 a.m. an altercation erupted between Hardy and Holder during which Hardy called the Charlotte police on 911. Police officers responded and

found the disturbance over, but after investigation charged Hardy on May 13, 2014 with Assault on a Female and Communicating Threats, misdemeanor offenses.

A bench trial was held on July 15, 2014 in the General Court of Justice for Mecklenburg County, District Court Division, before Judge Becky Thorne Tin. Hardy was found guilty of both charges - Assault on a Female and Communicating Threats – and sentenced to 60 days incarceration, suspended with 18 months of supervised probation. A notice of appeal was entered immediately, which effectively nullified the verdict and a trial *de novo* was scheduled.

By letter dated September 17, 2014, the NFL and the NFLPA agreed that Hardy would be placed on the Commissioner's Exempt list, meaning he would be paid but not eligible to play, until the criminal charges pending against him were adjudicated. Thus, Hardy sat out the rest of the 2014 season after the first game without loss of pay. On February 9, 2015 the charges against Hardy were dismissed by the District Attorney for Mecklenburg County due to the State's inability to locate Holder and have her testify at the trial. The next day the League notified Hardy's counsel that in view of the dismissal of charges in court the League then would consider whether Hardy had violated the League's PCP, and requested certain documents. Most of the requested materials were provided to the NFL, but not documents associated with a civil settlement between Hardy and Holder referenced by the District Attorney in his dismissal notice of February 9, 2015 (NFL, EXH.2A).

On March 4, 2015 Hardy, together with his counsel and NFLPA representatives, met with NFL staff attorneys and their consultant/investigator for domestic violence issues to discuss the PCP violation. The next week, on March 10, 2015, Hardy was interviewed by the NFL investigators at his counsel's office in Fort Lauderdale, Florida. That interview is described in detail in the investigative report of T&M Protection Resources dated April 10, 2015. (NFL Exhibit A). On April 22, 2015, Commissioner Goodell sent a letter to Hardy notifying him of the discipline to be imposed, which is the subject of this appeal. (NFL Exhibit I-J). That letter detailed the considerations underlying the decision regarding discipline, including the findings of the T&M investigation he directed. "The investigation is now concluded and establishes that there is more than sufficient credible evidence to determine that you engaged in conduct that violated the Personal Conduct Policy in multiple respects." (NFL Exhibit I-J, p. 2) The letter cited four instances where Hardy used physical force against Holder, causing a range of injuries, which the Commissioner found to constitute conduct detrimental to the League warranting the imposition of significant discipline – a suspension for ten games.

## POSITION OF THE NFLPA

On behalf of the player the NFLPA asserts that the discipline imposed is arbitrary and unfair, and therefore must be set aside. They contend that the "pure legal question" whether the league impermissibly applied retroactively the PCP announced in December 2014, months after the incident at issue here occurred, to Hardy. Alternatively, even if the prior PCP published June 2013 was applied the discipline must be set aside or dramatically reduced because it is neither fair nor consistent with comparable cases under that Policy. The factual basis for the findings cited in Commissioner Goodell's letter of April 22 are disputed. "What the letter alleges happened, it didn't happen." Transcript p. 10.

3

The League is categorically prohibited from applying a new policy retroactively. That principle was made clear in the decisions by Judge Jones in the Ray Rice decision (NFLPA Exhibit 29); Commissioner Tagliabue in the New Orleans Saints "Bounty" case (NFLPA Exhibit 16) Judge Doty Order in Peterson Petition to Vacate Arbitration Award(NFLPA Exhibit 21); and by Commissioner Goodell's testimony in Rice NFLPA Exhibit 27).

The NFL intentionally attempted to obfuscate which policy it applied because, after the Doty decision on Peterson, it was clear that Hardy could not be suspended for ten games under the prior policy in view of the discipline history under that policy; that would not be "fair and consistent" because for many years nearly all violations of the policy involving domestic violence resulted in either a fine or a suspension of no more than two games. Because the new PCP was applied retroactively, which is contrary to the CBA, Hardy's punishment must be vacated in its entirety.

Hardy did not commit the acts alleged in the discipline letter. The presence of numerous discrepancies in the reports or testimony of several witnesses, investigators or experts indicates that the T&M Report, (NFL Exhibit 2) relied upon by Commissioner Goodell in making his decision on discipline, is flawed and unreliable. It is biased because the investigators are women with backgrounds in prosecuting domestic violence crimes. As examples cited: the 92 page report did mention Holder's testimony at trial that she used cocaine on the evening of the altercation, but included no discussion about how that might affect her behavior, memory, or perception. Transcript pp. 73-74; T&M said Holder's statement to a police domestic violence investigator eighteen hours after the incident "mirrors the testimony she gave at trial," although she also said at the trial that she was intoxicated and could not remember much. T&M credited the statements of a witness who told police on the phone she <u>saw</u> an assault while in fact she did not see, but only heard it; she also said the same to a police sergeant who interviewed her, but quickly corrected herself. The same witness reported she saw Hardy smash a lamp on the way to his apartment, but no broken lamps were found when police checked. Yet T&M considered her statements and testimony credible. That same witness was characterized by Commissioner Goodell in his discipline letter as "completely cooperative" with T&M investigators; however, the interview was not recorded and the T&M report said she abruptly ended the interview to go to work, but they never finished the interview. Transcript pp. 111-112. T&M did not ask her any "tough questions" yet described her statements as credible, consistent and reliable. "He didn't do it. There is no jury in the world that would convict him of this, none. The only way you get there is by systematically ignoring and leaving out everything that casts any doubt on the one theory..." Transcript p. 153.

The Commissioner's letter attaches significance to the judge's finding of guilt in the District Court, which should have been "totally disregarded" immediately upon the notice of appeal. Transcript. 89-91.

Other factors to be considered in determining appropriate discipline include whether this is a first offense of any NFL Policy and the disposition of any criminal charges; this is Hardy's first offense of any kind, and the charges against him were dismissed. This is not a case of conduct so egregious as to constitute aggravated circumstances; many of the prior cases cited seem to involve a similar or greater level of violence and injury. Choking is not an aggravating

factor – it is the conduct alleged as domestic violence. The lack of candor in the investigation cannot be an aggravating factor; Hardy simply denied allegations that he believed or knew were untrue, which is not a basis for additional suspension.

## **POSITION OF THE NFL**

The League asserts that the CBA gives discretion to the commissioner to impose discipline including fines, suspension of fixed or indefinite periods or banishment, with no limitation on the length of a suspension imposed. The cases cited by counsel for Hardy do not establish a "law of the shop" that no more than a two –game suspension may be imposed for a domestic violence violation of the PCP. The T&M investigators heard the arguments by counsel for Hardy at a meeting at the League office on March 4, 2015 and again at a meeting in counsel's Fort Lauderdale office on March 10, 2015 and considered them in reaching their conclusions.

Nowhere in the many cases cited does there appear any holding that any maximum exists for suspension by the Commissioner. The CBA establishes maximum discipline when the parties so intended, as with the Club Discipline provision, which also requires publication of a schedule of maximum discipline for each violation. Similarly the NFL Drug and Steroid Policies, both negotiated as part of the CBA includes maximum penalties allowed for each offense. Neither the CBA, nor any arbitration case imposes limits on the Commissioner's discretion to discipline for violations of the PCP.

Judge Doty's vacatur of the Peterson decision in no way commands or directs the arbitrator or the league to take any specific action against a league player – the decision is confined to the specific facts relevant to Mr. Peterson. The Judge Jones decision in Rice did not address retroactive application of the PCP, but rather was limited to the "double discipline" issue, where the player had been disciplined already and then it subsequently was increased.

Commissioner Goodell did not testify in Rice that he would not suspend a player for more than two games for domestic violence that occurred before Hardy's misconduct. He merely said he would not apply the new disciplinary standards recently announced to Ray Rice because he had already disciplined him. Hardy was on notice that he could be suspended for more than two games because no such limitation is found in the CBA, the PCP, or the Player Contract he signed. Under the prior policy and the current one he could be fined, suspended, banished from the league, or his contract could be terminated by the Commissioner. The investigators were not able to interview Holder because she did not make herself available. The County District Attorney reported that the State had reliable information that Holder and Hardy had reached a civil settlement, which was the reason she was unavailable or trial or interview.

This is not a criminal case – the standard here does not require proof beyond a reasonable doubt. What a jury might do is of no relevance in this case. Hardy did more than just proclaim his innocence, and his story told to the investigators and the league simply does not seem credible. This case involved multiple assaults in a highly threatening environment with military style assault weapons that contributed to Holder's injuries. The suspension assessed should be upheld.

## DISCUSSION

Any inquiry into the propriety of the Commissioner's decision about discipline of a player must necessarily begin with the CBA, which governs all aspects of discipline of players. The parties addressed the Commissioner's authority to discipline players for conduct detrimental in the CBA when they agreed to a provision in the standard form Player Contract:

> 15. INTEGRITY OF THE GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player, therefore acknowledges his awareness that if he is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract. CBA Appendix A, NFL Player Contract Para 15

Thus, the CBA explicitly recognizes the Commissioner's right to discipline for conduct detrimental – including to suspend the Player for a period certain or indefinitely. The breadth of the Commissioner's discretion in meting out such discipline is implicit, as there are no limits imposed on the length of any suspension. By contrast the CBA imposes requirements for establishing and publishing maximum fines for discipline by clubs for any misconduct or by the league for on-field infractions. See CBA Articles 42, Sec. 2 and 46 (b). Moreover, the Policy on Anabolic Steroids and the Policy on Substances of Abuse, both negotiated by the NFLPA and NFL and incorporated by reference in the CBA, establish maximum fines or suspensions for specified violations. There is no doubt that the parties to the CBA can and do impose limitations on disciplinary authority when they want, and that they did not do so for conduct detrimental, which is the basis for the PCP.

Counsel for Hardy contends that the NFL improperly applied the PCP issued on December 10, 2014 (NFLPA Exhibit 2) to this case, rather than the one issued in June 2013 (NFLPA Exhibit 1) and that for several reasons such retroactive application is, as a matter of law, impermissible and any discipline must be vacated. See Transcript pp 22, 25, 28. The NFL is accused of attempting to obfuscate which policy is being applied here. Transcript p 30.

My detailed review of the record did not reveal any identification by the NFL of which policy was applied. The PCP historically has been issued in June each year. The record in this case includes the policy from 2013 (NFLPA Exhibit 1) and 2014 (NFLPA Exhibit 2) It also includes documents identified on the NFLPA Exhibit list as PCP effective 08/28/2014 (NFLPA Exhibit 4) and PCP effective 12/10/2014 (NFLPA Exhibit 6). Those two do not bear an effective date, and indeed do not appear to be final versions of a new policy. (Exhibit 4, captioned "Memorandum to All NFL Personnel," was distributed at a meeting of NFL Owners and subsequently sent to all employees. That one-page communication clearly is not a complete Player Conduct Policy revision, but rather a statement of planned future actions regarding domestic violence and sexual assault. Exhibit 6, dated December 2014 and captioned Personal Conduct Policy, appears to be a draft even though it is not labeled as such. In fact,

Commissioner Goodell's memorandum to Chief Executives and Club Presidents dated December 9, 2014 states: "We will review these issues in detail on Wednesday, but I want to highlight a number of the key elements of the draft Policy, to help inform our discussion at the meeting." NFLPA Exhibit 5, p. 2. (emphasis added).  Thus I conclude that, notwithstanding their identification as Personal Conduct Policy documents in the exhibit list, NFLPA Exhibits 4 and 6 are not those policies, and no authentic, final Personal Conduct Policy promulgated after June 2014 appears in this record.

In his April 22 Discipline Letter Commissioner Goodell states the discipline imposed "would be appropriate under any version of the Personal Conduct Policy or its predecessors," NFL Exhibit 1-5, p. 8. Transcript p. 25.  Hardy argues that any retroactive application of the Policy has been found improper by Judge Jones, arbitrator in the Rice appeal, and Judge Doty on his vacatur of the arbitration decision in the Peterson appeal (under appeal to the Circuit Court of Appeals).  I find the record here insufficient to determine when a new policy was promulgated or effective.  Those in the record dated June 2013 and June 2014 are identical, and may simply reflect annual distributions to players.  While this record includes documents written and distributed after the May 13, 2014 incident, it is my opinion that they do not in fact constitute a new policy but rather explain and expand on the policy which has existed for several years with some enhancements consistent with the prior versions.  Here it is unclear if there ever was a complete new policy published, but I do not find that either the draft sent to owners for discussion at their December 2014 meeting (NFLPA Exhibit 3) or the attached Memorandum to All NFL Personnel given to owners for distribution to players constitutes such new policy.

The Goodell letter of August 28, 2014 to NFL Owners discussed a broad range of planned action steps regarding domestic violence and sexual assault including expand education of all NFL personnel; ensure that employee assistance programs and hotlines are staffed with personnel trained in this area; engage in community outreach efforts to help young people have healthy relationships; and include domestic violence and sexual assault issues in public service work.  NFLPA Exhibit 3.  All of this reflects the League's renewed concern about and commitment to address domestic violence and sexual assault in society.  The final step described actions regarding NFL employees – "…consistent with our Personal Conduct Policy, our own response to domestic violence or sexual assault incidents by NFL personnel will include new elements of evaluation, treatment and family, as well as enhanced discipline….." NFLPA Exhibit 3. P 3.(emphasis added).  Then the letter contains the following statement about discipline:

> Effective immediately violations of the Personal Conduct Policy regarding assault, battery, domestic violence or sexual assault that involve physical force will be subject to a suspension without pay of six games for a first offense, with consideration given to mitigating factors, as well as a longer suspension when circumstances warrant.  Among the circumstances that would merit a more severe penalty would be a prior incident before joining the NFL, or violence involving a weapon, choking, repeated striking, or when the act is committed against a pregnant woman or in the presence of a child.
> These disciplinary standards will apply to all NFL personnel. NFLPA Exhibit 3, p. 3.

The changes in how the league responds to incidents of domestic violence are consistent with the terms of the prior published versions of the PCP, except for the addition of terms related to the nature of discipline imposed on employees for violations. I agree that the league seems purposefully vague about which policy is being applied here, and that the statements of Commissioner Goodell and Senior Vice President Adolpho Birch in their testimony in the Rice appeal suggest they may have believed they were acting under a new policy. See NFLPA Exhibit 27. Similarly, public statements by league Executive Vice President Jeff Pash characterized the changes as a new policy. NFLPA Exhibit 8.

The analysis of "new policy vs old" may be inappropriate here. The arguments on retroactive application of the policies miss the mark. This policy is not a law, subject to ex post facto considerations. Rather, it simply communicates a process for exercise of the Commissioner's authority to govern conduct detrimental to the interests of football –a prohibition that has existed for decades without material changes in the CBA, player contract, or Constitution & Bylaws of the NFL. The Commissioner has had broad authority to decide what constitutes conduct detrimental, and broad discretion to determine appropriate discipline for violations. Under the policy in place in any year since Hardy entered the League the conduct alleged here has been prohibited by some version of a Personal Conduct Policy which addresses certain behavior including domestic violence, as conduct detrimental. The discipline imposed could have been levied under any one of those prior Personal Conduct Policies, none of which mentioned any specific length of possible suspensions. Hardy has suffered no adverse affects from the possible misidentification of which Policy was applied, nor from the new aspects of the "process" (outside investigator, exempt list, education by professionals, etc.) which could, in the Commissioner's discretion, have been directed in past years. Therefore, I think it is not necessary to sort out which policy was applied, because the result would be the same under either.

The Commissioner had good and sufficient basis to conclude that Hardy had violated the NFL Personal Conduct Policy by using physical force against Holder. He did not personally investigate the facts surrounding the alleged assault, but rather engaged outside experts, T&M Protection Resources ("T&M"), with deep experience at investigating incidents of domestic violence. Those experts reviewed documents, photographs, police and medical reports, court records, and transcripts and recordings of interviews, telephone calls and trial proceedings. They interviewed witnesses, police investigators, experts and Hardy. After a two-month investigation T& M produced a 92 page report which concluded that "…Gregory Hardy violated the league's Personal Conduct Policy by engaging in a number of assaultive acts on Nicole Holder on May 13, 2014 and by lying to League officials and League-retained investigators during the course of the League's investigation."

Counsel for Hardy attacked the T&M report on many fronts and argued that he was certain that no reasonable jury would find Hardy guilty under the facts present, but T&M did. As we know, however, the standard of proof in NFL discipline cases is a preponderance of evidence, not the criminal trial standard of beyond a reasonable doubt.

Hardy, accompanied by his counsel and NFLPA representative, met with NFL officials and the lead investigator from T&M in New York on March 4, 2015; they also met with T&M investigators in his counsel's office in Fort Lauderdale, Florida the following week. On both occasions his trial counsel actively participated in the discussion and apparently did most of the talking for Hardy.

The T&M report reflects that the investigators listened to and considered what counsel raised in the two meetings, but nonetheless declined to attribute much credibility to Hardy's version of the events on May 13, 2014. The Commissioner reasonably relied on the findings of his retained investigators, as presented in the T&M Report, and described his basis for decision on each of the four instances of violent conduct cited in his discipline letter. That report provides more than ample support for his conclusion that violations of the policy had occurred, and for his decision to issue discipline accordingly.

The Union's position is that the standard of review for discipline imposed by the Commissioner is "fair and consistent." Transcript p. 30. The NFL did not disagree. That standard is adopted here.

It was argued by counsel for Hardy that nearly all domestic violence cases under the PCP resulted in discipline of no more than a two week suspension, until the implementation of new standards for discipline including a six-week suspension for a first offense, absent mitigating or aggravating circumstances. I find that to be an accurate depiction of the historical record, supported by exhibits cited and largely unrefuted by the league. However, that is not dispositive of the question of fair and consistent discipline. As I have said before, the Commissioner's authority and discretion in deciding appropriate discipline is not circumscribed or limited by the CBA, and he is not forever bound to hold discipline at the same level. In my experience as a hearing officer I have seen, and upheld, increases in the usual level of discipline without prior notice, not surprising with a policy which is unilaterally promulgated by the league without negotiation.

No testimonial evidence was presented at this appeal hearing, although counsel for Hardy declared at the outset that "it's not a case where there is no dispute that the underlying conduct was conduct detrimental to the league. We very much dispute the allegations in this letter." Trancript p. 11, referring to NFLPA Exhibit 7. Yet, the entire defense to the factual allegations consisted of attacking the credibility of the principle witnesses, Nicole Holder and Kristina Laurence, and the T&M confidential report signed by Lisa Friel. Details of police interview statements, often presented by audio or video recordings, tapes of 911 calls, statements to NFL investigators and the transcript of the July 15, 2014 trial in State v Hardy were used to highlight inconsistencies and discrepancies in the report. On the other hand, Hardy had little to say, at least on the record, in the interviews with league officials or investigators, or at the appeal hearing. Instead, his counsel spoke for him extensively. The best documentation of Hardy's explanation in his own words of events on May 13, 2014 is the transcript of the July 15, 2014 trial. See NFL Exhibit 2A.

After a bench trial of some 10 hours which produced a transcript of 372 pages, Judge Becky Thorne Tin required only minutes to reach a verdict of guilty. After hearing the testimony

of Holder, Hardy, Hardy's manager/assistant Sammy Curtis, Laura Ewenikki, and Katrina Laurence, all subject to cross examination, she contrasted the stories told by Hardy and Holder and concluded that the testimony of Holder was consistent and credible, and also corroborated by physical evidence and testimony of Laurence. The Court said of Laurence, who had no stake in the matter:

> Laurence did not testify to anything close to the testimony by Mr. Curtis or Mr. Hardy. The only witness in this case who has no interest in the outcome other than that justice be done, her testimony corroborates that of Ms. Holder. NFL Exhibit 2A, p. 367.

It may be, as represented by counsel, that North Carolina law effectively nullifies the verdict in a bench trial once an appeal is noticed, but the transcript of that trial is in this record without objection, and was cited by both parties. It is not surprising that others, including T&M investigators, could reach the same conclusions as Judge Tin after reviewing the transcript. Moreover, the trial transcript is the best evidence available in this record, testimony given under oath in open court and subject to cross examination. I note that Hardy was present at the entire appeal hearing but declined to testify. Transcript p 236 – 238. Lisa Friel, the principal author of the T&M report, also was present during the entire appeal hearing but was not called to testify about the details of the investigation she headed. Thus this hearing officer was not afforded the opportunity to assess the credibility of two key players in this matter who were available to testify.

One witness who was not available was Nicole Holder, the purported victim of Hardy's assault. The NFL reported that she could not be located, which was consistent with the experience of the district attorney prior to the scheduled trial de novo, necessitating his dismissal of the case. NFL Exhibit 2A.

The Player Conduct Policy dated June 2013 provides that, after an investigation, "…the Commissioner will have full authority to impose discipline as warranted." NFLPA Exhibit 1. It also includes the following language:

> Discipline may take the form of fines, suspension, or banishment from the League and may include a probationary period and conditions that must be satisfied prior to or following reinstatement. The specifics of the disciplinary response will be based on the nature of the incident, the actual or threatened risk to the participant and others, any prior or additional misconduct (whether or not criminal charges were filed), and other relevant factors.

NFLPA Exhibit 1.

The Commissioner's Memorandum to All NFL Personnel, sent to employees at the end of August 2014 provides in pertinent part:

> Violations of the Personal Conduct Policy regarding assault, battery, domestic violence and sexual assault that involve physical force will be subject to enhanced

Case 1:15-cv-05916-RMB-JCF   Document 37-1   Filed 08/07/15   Page 11 of 13

10

discipline. A first offense will be subject to a suspension of six weeks without pay. Mitigating circumstances will be considered, and more severe discipline will be imposed if there are aggravating circumstances such as the presence or use of a weapon, choking, repeated striking, or when the act is committed against a pregnant woman or in the presence of a child.

NFLPA Exhibit 4.

The discipline letter to Hardy cited four instances where he used physical force against Holder: 1)caused her to land in a bathtub; 2) caused her to land on a futon covered with at least four semi-automatic rifles; 3) placed his hands around her neck and applied enough pressure to leave visible marks; and 4) shoved her against a wall. NFLPA Exhibit 7, pp. 305. Whether one looks at "the nature of the incident, the actual or threatened risk to the participant…" or at the examples of "aggravating circumstances," the same level of discipline could be upheld. The material difference between the August 2014 memorandum is the new baseline for discipline at a six-week suspension; that is a change which cannot fairly be applied to conduct which occurred prior to the announcement.

This record establishes convincingly that Holder suffered physical injuries at the hands of Hardy and while I find those injuries to be serious, it is not clear that they were the result of conduct which warrants the extraordinary level of discipline imposed here. First, the circumstances of Holder landing in the tub are unclear; while it is reasonable to find Hardy responsible, the record is less clear on what injuries resulted. Second there is ample basis for the Commissioner to conclude Hardy caused Holder to land on a futon based on the T&M report and the transcript of the bench trial. However, there is no evidence that the several firearms on the futon were related to the assault. There is no allegation or evidence that Hardy handled the guns in any way or made any threat to use them or even referred to them at all. The mere presence of firearms legally possessed cannot alone constitute aggravating circumstances to justify increased discipline. It does appear, however, that falling on the firearms when she was pushed onto the futon caused most of the several large contusions on Holder's body and painful injuries to Holder. Third, the evidence established that Holder was held with hands around her neck, and that no person other than Hardy has been suggested as responsible. Choking is one of the examples of aggravating circumstances in the August 2014 Memorandum, and holding a person's neck while exerting sufficient pressure to leave bruises in the shape of a hand print likely amounts to choking. It also adds a cruel, dangerous and threatening element to the nature of the incident which would merit increased discipline under any of the prior policies. Fourth, there is evidence in the record to support the conclusion that Hardy slammed Holder against a wall. That would be the fourth of several separate assaults on Holder, each of which is sufficient to support discipline under the PCP.

## CONCLUSION

After consideration of all the record evidence and arguments, I conclude that the Commissioner acted within his authority and properly exercised his discretion in finding that Hardy violated the NFL Personal Conduct Policy. Hardy was arrested and charged with Assault on a Female and Communicating Threats. A bench trial before a District Court Judge, at which Hardy, Holder and several other witnesses testified, resulted in a finding of guilt on both charges. That verdict was largely due a lack of credibility by Hardy and his employee in their testimony.

11

An outside investigative firm with deep experience in domestic violence crimes was retained by the NFL to investigate this matter. T&M which reviewed police and medical reports, interviewed witnesses and law enforcement investigators, reviewed the transcript of the bench trial, and met twice with Hardy and his counsel. The report to the NFL detailed factual support for its findings that Hardy assaulted Holder on May 13, 2014, and enumerated the specific incidents set out in the discipline letter. See NFL Exhibit 2, pp 304; pp 70-91. The report concluded with a finding that Hardy "...violated the League's Personal Conduct Policy by engaging in a number of assaultive acts on Nicole Holder on May 13, 2014 and by lying to League officials and League retained investigators during the course of the investigation." NFL Exhibit 2, p 92. It was entirely appropriate and reasonable for the Commissioner to rely on that report in making his decision to discipline Hardy.

The judge, at the end of the bench trial, said:

After reviewing all of the evidence, the Court finds the testimony of Ms. Holder, the prosecuting witness, to be consistent and credible. It is corroborated by physical evidence [Holder] had bruises, scrapes, swelling on her back, on her arms, her underarm, her shoulder, her elbow, feet and her hand. The medical records further corroborate her testimony. NFL Exhibit I-G, trial transcript at p. 366.

The judge concluded with the statement that "the Court is entirely convinced beyond a reasonable doubt that Mr. Hardy is guilty" of assaulting and threatening Ms. Holder. The Commissioner, employing a lower standard of proof, came to the same conclusion, and so does this hearing officer on the appeal.

As discussed above, I find that the conduct of Hardy clearly violates the letter and spirit of any version of the PCP since its inception, and of the NFL Constitution and Bylaws long before then. The egregious conduct exhibited here is indefensible in the NFL, and that is not a new development. Hardy cannot avoid his well-deserved discipline by claiming the wrong policy was applied; basic notions of fairness and due process have not been violated here. Even the so-called "industrial due process doctrine" has no application where the conduct was known to be prohibited.

Without objection by the NFL, Hardy's position that "fair and consistent" is the applicable standard of review for discipline appeals in the NFL was adopted. In applying that standard, I am mindful of arguments in recent cases that historical precedent creates a "law of the shop" that acts of domestic violence, under the PCP, can get a maximum discipline of a two week suspension. Again, I reject that proposition. The Commissioner is given broad authority to identify and discipline employees for conduct detrimental, in his sole discretion. Nothing in the CBA or elsewhere limits that discretion except the basic notion of fairness and consistency. The presence of such limits on discipline in the CBA for other conduct which violates policies or rules shows that the negotiators know how to impose limits on the Commissioner's (or Club's) discretion to discipline players.

12

      Many of the past cases rise to a comparable level of violence. The key consideration here, however is not how serious the injuries inflicted were, what weapons were used, or who else was put in danger, it is the fact that multiple separate assaults took place over a period of time. This differs from the cases in which the victim was pushed, hit or grabbed once. Holder was attacked repeatedly and suffered injuries from each. Here I find aggravating circumstances, for Hardy's conduct was egregious. However, ten games is simply too much, in my view, of an increase over prior cases without notice such as was done last year, when the "baseline" for discipline in domestic violence or sexual assault cases was announced as a six-game suspension. Therefore, the discipline of Mr. Hardy hereby is modified to a suspension of four games; all other terms of the discipline letter remain in place.

                                                 Sincerely,

                                                 *Harold Henderson* (mb)

                                               Harold Henderson
                                               Hearing Officer

cc:    Adolpho Birch
       Heather McPhee