**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

NATIONAL FOOTBALL LEAGUE                      :
MANAGEMENT COUNCIL,                           :
                                              :
                         Plaintiff,           :    Case No. 15-cv-5916 (RMB)(JCF)
                                              :
            -v.-                               :
                                              :
                                              :
NATIONAL FOOTBALL LEAGUE                      :
PLAYERS ASSOCIATION,                          :
                                              :
            Defendant-Counterclaimant.   :
                                              :
---------------------------------------------------------------- x

**THE NFLPA'S MEMORANDUM OF LAW IN OPPOSITION TO
THE NFL'S MOTION TO CONFIRM ARBITRATION AWARD**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................2

I.     THE AWARD VIOLATES THE LAW OF THE SHOP, AS TESTIFIED TO BY
       GOODELL, THAT THE NFL IS "REQUIRED TO GIVE PROPER
       NOTIFICATION" OF PLAYER DISCIPLINE .................................................... 2

       A.     The Award *Ignores* the Player Policies and Their Notice of Only a
              Collectively Bargained *Fine* for a First-Time Offense ...........................3

       B.     Brady Indisputably Had No Notice of the Competitive Integrity Policy................5

       C.     The NFL Has No Defense for the Lack of Notice That Brady Could Be
              Disciplined Under a "General Awareness" Standard ...............................6

       D.     Brady Had No Notice He Could Be Suspended for Declining to Produce
              Personal Communications .........................................................7

II.    THE AWARD DEFIES THE UNDISPUTED ESSENCE-OF-THE-CBA
       REQUIREMENT OF FAIR AND CONSISTENT DISCIPLINE................................... 10

III.   THE PROCEEDINGS WERE FUNDAMENTALLY UNFAIR ................................... 12

IV.    GOODELL WAS AN EVIDENTLY PARTIAL ARBITRATOR................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.,*
    492 F.3d 132 (2d Cir. 2007)...........................................................................15

*Connecticut Light & Power Co. v. Local 420 Int'l Bhd. of Elec. Workers, AFL-CIO,*
    718 F.2d 14 (2d Cir. 1983)..............................................................................9

*Emery Air Freight Corp. v. Local Union 295,*
    786 F.2d 93 (2d Cir. 1986)..............................................................................10

*Home Indem. Co. v. Affiliated Food Distribs.,*
    1997 WL 773712 (S.D.N.Y. Dec. 12, 1997) ....................................................13

*NHLPA v. Bettman,*
    1994 WL 738835 (S.D.N.Y. Nov. 9, 1994)......................................................14

*Trailways Lines, Inc. v. Trailways, Inc. Joint Council,*
    807 F.2d 1416 (8th Cir. 1986) ......................................................................8, 9

*United Steelworkers v. Enter. Wheel & Car Corp.,*
    363 U.S. 593 (1960)......................................................................................7, 9

*United Steelworkers v. Warrior & Gulf Nav. Co.,*
    363 U.S. 574 (1960)........................................................................................9

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Cork, Linoleum, &
    Plastic Workers,*
    461 U.S. 757 (1983)........................................................................................10

*Wackenhut Corp. v. Amalgamated Local 515,*
    126 F.3d 29 (2d Cir. 1997)..............................................................................10

STATUTES

FAA............................................................................................................................14

LMRA.........................................................................................................................14

## PRELIMINARY STATEMENT[1]

The NFL's Motion to Confirm ("NFL Motion") relies upon familiar boilerplate about the deference owed to arbitration awards.  But this is not the typical labor arbitration.  As this Court recently held, arbitration awards are not inviolate, and they must be vacated when they defy the essence of the parties' agreement.  Even the NFL does not deny this, nor that the Award must also be set aside if the Court finds it to be the product of fundamentally unfair proceedings or an evidently partial arbitrator.  The NFLPA has established each of these grounds for vacatur.

In an attempt to evade this reality, the NFL's submission is a memorandum of attempted misdirection to the Court.  At every turn, the NFL misstates the record—from the discipline that was actually imposed (by Vincent, under the Competitive Integrity Policy, for Brady's alleged "general awareness" of others' misconduct), to the Award that was actually rendered (which ignores—not "distinguishes"—settled law of the shop *and* the binding *Peterson* decision), to undisputed arbitration evidence (even the NFL does not deny Brady's lack of notice—the League merely tries to explain it away), to the arguments the NFLPA has actually presented to the Court (which present *legal* arguments for vacatur based on the *undisputed* facts of the case).

The NFL's seismic shifts are nothing short of breathtaking.  Having publicly touted the "independence" of the Wells Report and Paul, Weiss as the linchpin of the purported fairness of the discipline, the "independent" Report has now been relegated to "thorough," the "independent" law firm has been relegated to "experienced and highly respected professionals," and the whole façade of "independence" has been relabeled "irrelevant."  NFL Mot. 1, 12.  Further, try as it might, the NFL cannot wish away the testimony of Wells stating, *e.g.*, "I want to

---

[1] Defined terms herein have the same meaning as in the NFLPA's Motion to Vacate the Arbitration Award ("NFLPA Mot.") and its Amended Answer and Counterclaim ("Answer").  Unless otherwise indicated, emphasis is added and internal citations are omitted throughout.

be clear—I did not tell Mr. Brady at any time that he would be subject to punishment for not giving—not turning over the documents"; "the analysis of [the halftime] data is ultimately dependent on assumptions and information that is uncertain"; and that he merely found Brady to be "generally aware" of others' misconduct—*not* that Brady "directed" it.[2]

As the Court has recognized, Brady categorically denied under oath any involvement in, or knowledge of, ball tampering. Moreover, with the benefit of hindsight—*because he had no notice* of the potential consequences—he testified that he regrets his initial decision not to turn over his electronic communications (a decision he rectified at the arbitration). However, any underlying factual disputes are not the basis for the NFLPA's Motion, which presents straightforward *legal* issues concerning lack of *notice* in defiance of the essence of the CBA, the absence of any ball testing *procedures* in contravention of the essence-of-the-CBA requirement of fair and consistent discipline, fundamentally unfair *proceedings*, and *evident partiality*. Each point presents a well-established ground for denying the NFL's Motion and vacating the Award.

## ARGUMENT

### I.   THE AWARD VIOLATES THE LAW OF THE SHOP, AS TESTIFIED TO BY GOODELL, THAT THE NFL IS "REQUIRED TO GIVE PROPER NOTIFICATION" OF PLAYER DISCIPLINE

Goodell's Award ignores the controlling *Peterson* decision entirely (*i.e.*, manifestly disregarding the law (*see* NFLPA Mot. 5 n.8)), and the NFL's Motion follows suit, relegating *Peterson* to a footnote, claiming it concerned "a distinct domestic violence policy not at issue here." NFL Mot. 7 n.1. *Peterson* cannot be so cavalierly cast aside. The decision conclusively establishes that the CBA affords players advance notice of discipline, and arbitrators are not free to disregard that essence-of-the-CBA requirement. NFLPA Mot. 3-5. Indeed, the law of the

---

[2] Hr'g Tr. 336:15-23; Ex. 7, Wells Report at 12; *id.* 17; Hr'g Tr. 274:20-275:2.

shop underlying *Peterson* (and *Rice* and *Hardy*) is *not* limited to domestic violence matters.  It is grounded in CBA arbitration awards dating back decades and dealing with players' right to notice of rules and penalties in situations as varied as the alleged locker room and on-field misconduct in *Bounty*, to a player's refusal to participate in a team practice in *Langhorne*, and to players missing mandatory weigh-ins in *Coles* and *Brown*.  NFLPA Mot. 4 n.6.  This is Labor Law 101 and why Goodell testified in *Rice,* without qualification, that under the CBA, the NFL is "***required to give proper notification***" of player discipline.  Ex. 122, *Rice* Tr. 100:13-14.[3]

The NFL argues that the Court is powerless to consider the law of the shop—ruled binding in *Peterson*—because Goodell's Award sustaining Brady's punishment is "final and binding."  NFL Mot. 3.  But so too was *Rice* and *all* of the other law of the shop that Goodell ignores; he was not at liberty to do so and dispense his own brand of industrial justice.  This is the same legal error Arbitrator Henderson made in *Peterson*, resulting in vacatur of the award because it "simply disregarded the law of the shop."  *Peterson* 14.  The NFL has already litigated and lost its argument that players' right to disciplinary notice does not require more than the mere recognition of the Commissioner's conduct detrimental authority under the Player Contract, and *Peterson* collaterally estops the NFL from relitigating that issue here.  NFLPA Mot. 5 n.7.

A.     **The Award *Ignores* the Player Policies and Their Notice of Only a Collectively Bargained *Fine* for a First-Time Offense**

The NFL claims that "[t]he Commissioner carefully considered each of the Union's arguments that Brady had been suspended without proper notice."  NFL Mot. 8.  This is false.

---

[3] As the Court stated, "everybody agrees" that "work rules must clearly and unambiguously establish the scope of the prohibited conduct as well as the consequences of the violations in order to be enforceable."  Aug. 12, 2015 Hr'g Tr. 32:8-15.  This principle is expressly adopted in *Brown*, which further provides that rules must be "consistently applied and enforced and *widely disseminated*."  Ex. 101 at 10.  The CBA law of the shop on notice has been followed as long ago as *Langhorne* (1994), and as recently as *Hardy* (July 2015).  Only the Award stands alone.

The Award makes no mention—none—of the applicable Player Policies, which the NFLPA presented at the arbitration.[4]  This willful disregard of the Player Policies is all the more astounding because they are right on point.  According to the Award, "[h]ere we have a player's uncoerced participation in a scheme to violate a competitive rule that goes to the integrity of the game."  Award 14.  The Player Policies, meanwhile, apply to "equipment violations" that "*affect[] the integrity of the competition and can give a team an unfair advantage.*"  Ex. 114 at 15.  They specifically provide that ***"First offenses will result in fines,"*** at the collectively bargained amount of $5,512 or $8,268.  *Id.* at 15, 20.  Goodell's disregard for the Player Policies is a clear essence-of-the-agreement violation.

The NFL tries to obscure the Commissioner's disregard for the Player Policies by citing his finding that Brady "[had] ample reason to expect that a violation of that rule … would be deemed conduct detrimental."  NFL Mot. 6.  But even accepting this premise, Brady having notice that an infraction "would be deemed conduct detrimental" does not give notice about the potential *penalty* of a four-game *suspension* when the Player Policies expressly provide that for equipment violations affecting the "integrity of the competition," ***"First offenses will result in fines."***  Ex. 114 at 15.[5]  This conclusion follows from the fact that a specifically applicable disciplinary policy necessarily controls over the general provision that certain behavior might be deemed "conduct detrimental."  For example, in *Rice* and *Peterson*, the players were on notice

---

[4] *Compare* Hr'g Tr. 25:12-26:22 *and* Ex. 205, NFLPA Post-Hearing Brief 9 *with* Award.

[5] The NFL writes that "[t]he policy the Union cites expressly provides that '[o]ther forms of discipline, including higher fines and suspension[s] may also be imposed.'"  NFL Mot. 6 (citing Ex. 114 at 20).  While the Player Policies allow for suspensions for certain infractions (*e.g.*, safety violations), they unambiguously provide that, with respect to uniform and equipment violations, ***"First offenses will result in fines."***  Ex. 114 at 15 (emphasis in original).  Indeed, the very page the NFL cites reinforces the rule of "***fines for first-time offenders." Id.*** 20.  Moreover, having taken the position that Brady was *not* punished pursuant to the Player Policies, the NFL may not seek to justify any discipline under those policies now.

that acts of domestic violence could be deemed conduct detrimental.  However, Judge Jones and Judge Doty both ruled that the heightened penalties in the New Policy for domestic violence could not be retroactively applied to the players because they had no notice of them—the previously existing penalties had to be applied.  *Rice* 16; *Peterson* 12-14.

For the same reason, the Court should reject the NFL's contention that Paragraph 15 of the standard form NFL Player Contract satisfies the CBA requirement of disciplinary notice here. It simply sets forth a general acknowledgment that players may be fined or suspended for conduct detrimental, but it is silent, unlike the Player Policies, regarding anything related to equipment tampering.  Ex. 108.  The same generalized conduct detrimental language appeared in Peterson's and Rice's (and the *Bounty* players') Player Contracts, but their discipline was still vacated for want of notice.  The mere fact that players generally know they can be punished for conduct detrimental is insufficient when, as here, there is a specifically applicable policy.  To conclude otherwise would render the Player Policies—and the notice they provide—a nullity.

### B. Brady Indisputably Had No Notice of the Competitive Integrity Policy

The NFL does not deny that players do not receive the Competitive Integrity Policy or that Brady never saw the Policy.  *Compare* Answer ¶¶ 113-116 *with* NFL Mot. 6.  Unable to rectify this fatal notice failure, the NFL argues that "this policy 'was *not* the source or the basis for the discipline imposed here.'"  NFL Mot. 6.  But this assertion flies in the face of the undisputed record.  For example, the Wells Report specifically states—*on the first page*—that "[t]he investigation was conducted pursuant to the [Competitive Integrity Policy]" (Ex. 7 at 1),[6] and Vincent testified that he "based [his] recommendations of discipline … solely upon reading the Wells report."  Hr'g Tr. 244:19-22.  Moreover, Wells testified with respect to the

---

[6] *See also* Ex. 136 at 2 (letter commencing League investigation pursuant to the Policy).

Competitive Integrity Policy:

> Q. To your knowledge, that's the only policy that you were told about that you were conducting your investigation pursuant, correct?  A. That is correct.  Q. Okay.  Now, at the time you did this report, did you have any knowledge or did you determine whether or not that policy was ever given out to players?  A. I have no knowledge one way or the other.  Q. Did you learn for the first time today at this hearing that it was not given out to players?  A. I think—I think I heard something to that effect.  Q. Today?  A. In terms of whatever knowledge I have is what I heard today.

Hr'g Tr. 272:8-23; *see also id.* 250:13-20 (Vincent).  The NFL repeating over and over that the

Competitive Integrity Policy was not applied to Brady simply does not make it so.

> **C.  The NFL Has No Defense for the Lack of Notice That Brady Could Be Disciplined Under a "General Awareness" Standard**

The NFL does not deny that no NFL player has *ever* been punished for "general

awareness" of another person's alleged misconduct.  Because this unprecedented standard is

indefensible under the CBA requirement of disciplinary notice, the NFL does not even try to

defend it, and instead claims that "[t]he Commissioner did not discipline Brady for merely being

'generally aware' of a violation of the playing rules."  NFL Mot. 8.  Although the NFL now

denies that it applied a "generally aware" disciplinary standard, that is exactly what Vincent

wrote in his letter *imposing the discipline*:

> With respect to your particular involvement, the report established that there is substantial and credible evidence to conclude you were ***at least generally aware of the actions of the Patriots' employees*** involved in the deflation of the footballs and that it was unlikely that their actions were done without your knowledge.

Ex. 10 at 1.  Vincent's letter says *nothing else* about Brady's alleged involvement in ball

tampering.  Moreover, Vincent testified that the discipline he imposed rests exclusively on the

findings of the Wells Report (*supra*), which specifically declines to conclude that Brady was

directly involved in ball tampering.  Wells merely found in his Report "that it is more probable

than not that Brady was at least generally aware of the inappropriate activities of McNally and

Jastremski," and he testified to the same effect at the arbitration.  Ex. 7 at 17.[7]

Despite this record, the NFL now argues that Brady was suspended "for having 'approved of, consented to, and provided inducements in support of' 'a scheme to tamper with the game balls.'"  NFL Mot. 8 (citing Award 13, 17-18).  But the NFL cites to *the Award* to make this argument—not to the *source* of the discipline, *i.e.*, Vincent's letter and the Wells Report.  As the Court observed, the Award accuses Brady of having participated in a "scheme" *fourteen times*—but the word does not appear *once* in the 139 page Wells Report or the Vincent discipline letter.  This is a clear essence-of-the-CBA violation.  As the Article 46 arbitrator, Goodell only had the authority to adjudicate the discipline appealed to him; *Peterson* establishes that the arbitrator has no CBA authority to justify a suspension on a *different* basis from that upon which it was imposed.  *Peterson* 15-16.

Indeed, it is settled law that arbitrators may not lawfully "exceed[] the scope of the [parties'] submission."  *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  Here, the matter submitted to Goodell for arbitration was Brady's appeal of the discipline imposed upon him for alleged "general awareness."  Goodell did not have the authority, sitting as the Article 46 arbitrator, to support the discipline *ab initio* on grounds not found when the discipline was imposed.  *Peterson* is conclusive.

### D.    Brady Had No Notice He Could Be Suspended for Declining to Produce Personal Communications

As Wells testified:  "***I want to be clear—I did not tell Mr. Brady at any time that he would be subject to punishment for not giving—not turning over the documents.  I did not say***

---

[7] "I'm hesitating about the word 'direct,' because what I do say in the report is I don't think they would have done it without his knowledge and awareness.  Now, but I don't have a phrase, you are correct, where I say he directed them.  What I say is I believe that they would not have done it unless they believed he wanted it done in substance."  Hr'g Tr. 274:20-275:2 (Wells).

***anything like that***."[8]   The Award ignored Wells' testimony, and now the NFL's Motion does

too.  This undisputed admission compels vacatur for lack of any notice, let alone adequate notice.

Pretending that Wells did not give this testimony, the League instead responds *only* to the

Union's argument that *Bounty* precludes a suspension for obstructing an investigation, arguing

that Goodell "determined that the *Bounty* decision was not applicable to the facts that he had

found here," and that this "interpretation" is immune from this Court's review.  NFL Mot. 6-7.

But what the NFL calls Goodell's "interpretation" of *Bounty* is a euphemism for ignoring the

holding of *Bounty*.   The Award states that *Bounty* is "fundamentally different" from this case

because coaches had encouraged the non-cooperation.   Award 14.   Yet the actual holding in

*Bounty* contains no such limitation; rather, Commissioner Tagliabue's ruling is extremely broad:

> There is no evidence of a record of past suspensions based purely on obstructing a
> League investigation.  In my forty years of association with the NFL, I am aware
> of many instances of denials in disciplinary proceedings that proved to be false,
> but I cannot recall any suspension for such fabrication.

*Bounty* 13.[9]  As the *Peterson* Court ruled, Goodell was not free to "simply disregard[] the law of

the shop."  *Peterson* 14.   This is true of both *Bounty* and the disciplinary precedent for non-

cooperation—a $50,000 fine imposed in the case of Brett Favre.  Answer ¶ 128.

Finally, the NFL argues that the Court should ignore *Bounty* because the Second Circuit

does not recognize, as does the Eighth, the rule that an arbitrator violates the essence of the

agreement where he disregards the law of the shop.  *See Trailways Lines, Inc. v. Trailways, Inc.*

---

[8] Hr'g Tr. 336:15-23 (Wells).

[9] The Award further purports to "distinguish" *Bounty* because the "decision itself states that it
'should not be considered precedent for whether similar behavior in the future merits player
suspensions or fines.'"  NFL Mot. 7 (citing Award 14-15 n.14).   However, the quoted language
concerned the alleged bounty program—not non-cooperation.   Moreover, here, the Award
sustained a *four-game* suspension whereas *no* suspension had ever previously been sustained for
such conduct.   As *Bounty* holds:  such "a sharp change in sanctions or discipline can often be
seen as arbitrary and as an impediment rather than an instrument of change."  *Bounty* 6.

*Joint Council*, 807 F.2d 1416, 1424-26 (8th Cir. 1986); *Peterson* 13-14.  But the principle is settled:  an award that disregards the essence of the CBA must be vacated, *see Enter. Wheel*, 363 U.S. at 597, and no less an authority than the Supreme Court has held that "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself."  *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960).

The law of this Circuit is no different, identifying only "certain circumstances" in which "arbitrators may set aside or modify a previous award," as exceptions to "the usual practice of arbitrators to find prior awards final and binding."  *Connecticut Light & Power Co. v. Local 420 Int'l Bhd. of Elec. Workers, AFL-CIO*, 718 F.2d 14, 20 (2d Cir. 1983);[10] *accord Trailways*, 807 F.2d at 1425 (citing and expanding upon *Connecticut Light*:  "Although an arbitrator generally has the power to determine whether a prior award is to be given preclusive effect, courts have also recognized that the doctrine of res judicata may apply to arbitrations with strict factual identities.").  Thus, in determining that a subsequent award could supplant a prior award, the *Connecticut Light* court identified the presence of one of these limited "circumstances," stating that, "if [the] earlier award was, as [the second arbitrator] put it, 'analytically unsound,' then it was not binding on the subsequent arbitration proceedings."  *Connecticut Light*, 718 F.2d at 20.  Here, by contrast, Goodell was not free to ignore the binding law of *Bounty* without "persuasively" explaining how that precedent—involving "the same company, the same union, essentially the same issue, and interpretation of the same contract," *compare Trailways*, 807 F.2d at 1425-26—satisfies one of the *Connecticut Light* factors for not following an otherwise final

---

[10] Those exceptions apply when: "(1) the previous decision was clearly an instance of bad judgment; (2) the decision was made without the benefit of some important and relevant facts or considerations; or (3) new conditions have arisen questioning the reasonableness of the continued application of the decision."  *Id.* (citing Elkouri).  Not one of these exceptions applies to *Bounty* or the other law of the shop ignored by Goodell; the NFL does not argue otherwise.

and binding award.  Moreover, even putting *Bounty* aside, the undisputed fact in *this* case is that

Brady had zero notice that he could be suspended for failure to fully cooperate, or even for

alleged obstruction, which is dispositive under the legally preclusive *Peterson* decision.[11]

## II.    THE AWARD DEFIES THE UNDISPUTED ESSENCE-OF-THE-CBA REQUIREMENT OF FAIR AND CONSISTENT DISCIPLINE

*First*, it is undisputed that, prior to Brady, "no player may have been suspended before

for tampering with game footballs *or* obstructing an investigation."  Award 14.  Rather than

explaining how leaping from *no* punishment to a *four-game suspension* could possibly comport

with the CBA requirement of fair and consistent discipline, the NFL offers only the non-sequitur

that the Union's position "fails for the same reasons as its 'notice' arguments."  NFL Mot. 9.

*Second*, the NFL offers no response to the undisputed fact that its failure to provide for

ball pressure testing procedures meant that the data needed to determine the cause of ball

deflation reflected in the halftime measurements was never collected, leaving the NFL to base

discipline on a sea of admitted uncertainties when the alleged tampering boiled down to a tiny

change in PSI.  NFLPA Mot. 11-12.  Wells himself concluded that the scientific consultants'

"analysis of [the halftime measurements] is ultimately dependent upon assumptions and

---

[11] The NFL's remaining cases are unavailing.  *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Cork, Linoleum, & Plastic Workers*, 461 U.S. 757 (1983) concerned an arbitrator's conclusion that he was not bound by a prior award because the previous arbitrator had acted outside of his *jurisdiction*.  *Id.* 765.  There is no claim here that Commissioner Tagliabue in *Bounty*, or Judge Jones in *Rice*, overstepped their jurisdiction by holding that the CBA requires notice.  The NFL also cites dicta in *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29 (2d Cir. 1997) for the proposition that "failure to follow arbitral precedent is not a reason to vacate an award."  NFL Mot. 2, 7.  However, "[t]he role of the doctrine of *stare decisis* in arbitration [was] not [even] raised" in *Wackenhut*, given that "one of the two [purportedly precedential] awards … was not even called to the attention of the arbitrator" and "the other [was] distinguishable."  126 F.3d at 32-33.  No such circumstance is present here—*Bounty* and other law of the shop precedent are precisely on point and were submitted to Goodell.  Finally, *Emery Air Freight Corp. v. Local Union 295* is inapposite, presenting the question of whether a dispute was arbitrable under an already-expired CBA.  786 F.2d 93, 100-101 (2d Cir. 1986).

information *that is uncertain*." Ex. 7 at 12.  Wells further testified that this "uncertainty" was

because the NFL and referees had no understanding of what data to collect:

> What I found in interviewing referees and just witnesses in general is that there
> was *no appreciation for the Ideal Gas Law* and the possible impact that that
> might have.  And so people didn't appreciate that if you measured a ball in a hot
> locker room and then took it out to a cold field, you have automatic drop.[12]

As Vincent similarly testified:

> Q. And nobody recorded the temperature in the room at the halftime testing,
> correct?  A. Not to my knowledge.  Q. Right. You didn't tell anybody to record
> the exact time when different balls were tested at the halftime, correct?  A. No,
> sir.  Q. And to your knowledge, nobody recorded that?  A. Not to my knowledge.
> Q. You didn't tell anybody to record whether or not the balls were tested on the
> Colts before reinflating the Patriots' balls or after? You didn't instruct anybody to
> record that anywhere, correct?  A. No, sir.  Q. And to your knowledge, it was not
> recorded anywhere?  A. Not to my knowledge.  Q. Okay. You didn't instruct
> anyone to indicate whether the balls were wet or dry at the time they were being
> tested, correct  A. No….
>
> Q. And the reason for no one doing this is because neither you nor anyone else
> was thinking about the Ideal Gas Law or how time or temperature or wetness my
> affect these readings, right?  A. Correct.[13]

The NFLPA's position is thus not that Goodell "should have reached different findings of fact"

(NFL Mot. 9), but that the *League's* testimony confirms there was no fair and consistent basis to

impose discipline based on the halftime data.

*Finally*, the purported independence of Paul, Weiss and the Wells Report was identified

by the NFL as the crux of the supposed fairness of Brady's discipline.  The Award, Vincent's

discipline letter, and the Wells Report are replete with references to Paul, Weiss' touted

"independence."[14]  And, Goodell, in response to a question at a press conference "about how can

you  be fair hearing the appeal," responded by emphasizing that, "first off, it was an independent

---

[12] Hr'g Tr. 314:17-23 (Wells); *see also* Answer ¶¶ 66-73, 140-141.

[13] Hr'g Tr. 235:2-23, 237:11-15, 238:14-18 (Vincent); *see also* Answer ¶¶ 66-73, 138-139.

[14] *E.g.*, Award 1, 2, 19; Ex. 10; Ex. 7 at 1, 24.

investigation."[15]   Now, however, the NFL's Motion mentions Paul, Weiss' purported "independence" only to declare it "irrelevant."  NFL Mot. 12.  The NFL is right to abandon this false pretense of independence—the hearing revealed, among other things, that Paul, Weiss (i) acted as the NFL's counsel in an attorney-client relationship with the duty to zealously defend its client, (ii) was hired to defend Brady's discipline at the arbitration, and (iii) offered the NFL's General Counsel the chance to comment on the draft Wells Report.  Answer ¶¶ 157, 161.  Having now abandoned the pretense of independence, the NFL can no longer use it to try to justify the discipline as "fair and consistent," as required by the essence of the CBA.

## III.   THE PROCEEDINGS WERE FUNDAMENTALLY UNFAIR

The NFL concedes that "[a] hearing lacking fundamental fairness is one that 'denies a party sufficient opportunity to present proof of a claim or defense,'" and that parties to an arbitration must have "had an adequate opportunity to present [] evidence and arguments."  NFL Mot. 10 (quoting SDNY authorities).  This acknowledgement dooms the Award.

*First*, the NFL's Motion concedes that Goodell summarily rejected Brady's delegation ground for appeal ***prior*** to the hearing, on ***no*** evidentiary record.  Answer ¶¶ 150-152.  In fact, the NFL specifically writes that Goodell "***deci[ded] not to hear evidence***" on the Union's position that Goodell had improperly delegated his "exclusive" conduct detrimental authority to Vincent.  NFL Mot. 12.  What the NFL refers to as the Commissioner "confirming" the facts of his purported non-delegation was nothing more than Goodell making "findings" about his own conduct and credibility while "deci[ding] not to hear evidence."  Mot. 12.  This epitomizes the denial of "an adequate opportunity to present … evidence and arguments" and thus of

---

[15] Ex. 191; *see also* Ex. 181 (announcing "independent" investigation led by Wells and Pash).

fundamental fairness.  *Cf.* NFL Mot. 10-11 (quoting authorities).[16]

*Second*, the NFL does not dispute that Vincent relied exclusively on the Wells Report to impose Brady's discipline, but nonetheless persists in arguing that the investigative files underlying that Report "played no role in the decision on appeal."  Mot. 12.  Fundamental fairness dictated that Brady have a meaningful opportunity to *challenge* the Wells Report's conclusions—especially when the NFL's lawyers from Paul, Weiss had access to those very documents when examining witnesses at the hearing.  *Home Indem. Co. v. Affiliated Food Distribs.*, 1997 WL 773712, *4 (S.D.N.Y. Dec. 12, 1997) (reviewing "affirmative duty of arbitrators to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other party [before the hearing is closed]" and finding a failure to do so "a violation of [FAA § 10(a)(3)], where a party can show prejudice as a result.").[17]

*Third*, the NFL continues to claim that, despite Pash's "co-lead investigator" title, he had "no substantive role in the investigation," so that depriving Brady of Pash's testimony was not unfair.  NFL Mot. 11.  But the NFL does not deny that Pash edited the Wells Report, or that Wells testified he did not know what edits Pash made.  Hr'g Tr. 269:4-21.  Thus, there would have been nothing "cumulative" (NFL Mot. 11) about Pash testifying about his edits to, and involvement in, the Wells Report.  That opportunity, however, was denied Brady.

---

[16] The NFL states that "nothing in CBA Article 46 (or anywhere else in the CBA) prohibits delegation of initial disciplinary decisions" (NFL Mot. 12) but declines to acknowledge the pending CBA grievance on this very issue.  The propriety of the Commissioner delegating his "exclusive" conduct detrimental disciplinary authority is before the CBA arbitrator, not the Court, but the point here is that it was fundamentally unfair for Goodell to make "findings" about his own disputed delegation conduct and to then peremptorily reject this ground for appeal.

[17] The NFL's citation to the CBA discovery procedures (NFL Mot. 11-12) does not help it as the investigative files were "relied upon" by Paul, Weiss at the hearing.  Nor does the NFL's misleading quotation of Judge Jones in *Rice*—where the NFL *voluntarily* produced its investigative files because it had previously been ordered to do so in *Bounty*.  Ex. 166L.

## IV.    GOODELL WAS AN EVIDENTLY PARTIAL ARBITRATOR

Finally, the NFL mischaracterizes the NFLPA's evident partiality position as a challenge to the Commissioner's "unilateral appointment right" and "inherent bias."  NFL Mot. 13-15. The NFLPA, however, has carefully stated (Mot. 14-15 and Answer (¶¶ 164-169) that this is **not** the basis of its evident partiality contention.  Rather, the NFLPA contends that "Goodell's direct involvement in the issues to be arbitrated disqualified him from serving as arbitrator."  NFLPA Mot. 14.  As such, the NFL's authorities simply do not engage the Union's argument.  And, as held in *NHLPA v. Bettman*, 1994 WL 738835, *13 (S.D.N.Y. Nov. 9, 1994), "[o]bviously, even the agreed-upon appointment of an arbitrator with known links to one side of the controversy does not immunize the status or conduct of the decisionmaker from all judicial scrutiny."[18]

The NFLPA will not repeat here the details of Goodell's personal involvement in the arbitration issues, *e.g.*, adjudicating his own delegation conduct and proclaiming the Wells Report's "independence" even before the NFLPA had a chance to challenge it at the arbitration. NFLPA Mot. 14-15.  The NFL offers **no** response to **any** of these undisputed facts.

Although no more than objective partiality is required to disqualify Goodell (NFLPA Mot. 14-15), the Award in fact evidences his *actual* bias.  It is more smear campaign than reasoned decision—a propaganda piece written for public consumption, at a time when the NFL believed the transcript would be sealed from public view, to validate a multi-million-dollar "independent" investigation.  For example:

- Goodell leads the Award with a "gotcha!" discussion about Brady purportedly destroying his phone, never acknowledging that Brady had turned over all of his emails and all of his phone bills (which demonstrated that Wells already had all

---

[18] The NFL's attempt to distinguish *Morris* and *Erving* because both cases arise under the FAA and not the LMRA is a distinction without a difference, as the law is clear that the FAA is used as a guide by the courts for LMRA arbitration cases.  Answer 1 n.1 (collecting cases).

relevant text communications from other sources) or mentioning that it was Brady's career-long practice to recycle his phones because of Brady's privacy concerns.[19]

- Goodell found that Brady's increased communications with Jastremski after the AFC Championship game "undermine[d] any suggestion that the communications addressed *only* preparation of footballs for the Super Bowl rather than the tampering allegations" (Award 9) when Brady actually testified—at length—that he *did* discuss the tampering allegations with Jastremski because he was concerned they were causing Jastremski considerable stress and he wanted to know what had happened.[20]

- Goodell wrote that the NFLPA's expert, Dean Snyder, "performed no independent analysis or experiments" (Award 6) when Snyder testified for two hours about the statistical, regression, and other analyses that his team conducted (Hr'g Tr. 150-227).

- Goodell wrote in the Award (at 8) that Brady testified "that the Patriots' equipment personnel would not do anything to game balls that was inconsistent with what he wanted" when Brady actually testified that this is why he "do[es]n't think anyone would tamper with the ball" (Hr'g Tr. 147:21-22).

- Goodell radically changed Wells' finding of "general awareness" of purported ball deflation by others into a conspiratorial "scheme" when the hearing record contains not a shred of evidence about any such "scheme" that Goodell could cite.[21]

The point here is not that the Court needs to decide any disputed issues of fact, but that the Award itself evidences a clearly biased agenda—not an effort at fairness and consistency.[22]

At a minimum, any reasonable person would have to find Goodell to be partial.  *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007).

---

[19] *Compare* Award 1-2 *with* Answer ¶¶ 22, 82, 99-100.  Goodell's plan to arrive at his preferred conclusion rather than the truth is further evidenced by his declining Brady's offer to provide even more information about his phone communications.  Award 12 n.11.

[20] Hr'g Tr. 130:8-18, 143:21-144:14, 74:25-75:20, 134:12-23, 142:4-10.

[21] *Compare* Award 10 *with* Hr'g Tr. 274:20-275:2 (Wells).

[22] It was no accident that the NFL "leaked" its accusation of phone destruction *before* the Award came down in order to "bias" the public discussion.  Tom Curran, *Another NFL Leak: Smith "Hears" Brady "Destroyed Phone*," CSNNE.com, July 28, 2015, http://www.csnne.com/new-england-patriots/another-nfl-leak-via-stephen-a-smith-tom-brady-destroyed-phone.

Dated:  August 14, 2015                    Respectfully submitted,

                                           By: s/Jeffrey L. Kessler

                                           WINSTON & STRAWN LLP
                                             Jeffrey L. Kessler
                                             David L. Greenspan
                                             Benjamin Sokoly
                                             Jonathan J. Amoona (*pro hac vice*)
                                             Angela A. Smedley
                                             200 Park Avenue
                                             New York, New York 10166
                                             Telephone: (212) 294-6700
                                             Facsimile: (212) 294-4700
                                             jkessler@winston.com
                                             dgreenspan@winston.com
                                             bsokoly@winston.com
                                             jamoona@winston.com
                                             asmedley@winston.com

                                           NATIONAL FOOTBALL LEAGUE
                                           PLAYERS ASSOCIATION
                                             DeMaurice F. Smith *(pro hac vice)*
                                             1133 20th Street, N.W.
                                             Washington, DC 20036
                                             Tel:  (202) 756-9136
                                             demaurice.smith@nflplayers.com

                                             *Attorneys for the NFLPA and Brady*

                                           GIBSON, DUNN & CRUTCHER LLP
                                             Andrew S. Tulumello (*pro hac vice*)
                                             1050 Connecticut Avenue, N.W.
                                             Washington, DC 20036
                                             Tel: (202) 955-8657
                                             Fax: (202) 530-9678
                                             atulumello@gibsondunn.com

                                             *Attorneys for Brady*