

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

                      Plaintiff,

    - v. -

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

                    Defendant.

-------------------------------------------------------x

**DECISION & ORDER**

15 Civ. 5916 (RMB) (JCF)

15 Civ. 5982 (RMB) (JCF)

## I. Introduction

This Decision and Order resolves the parties' respective cross-motions to confirm and to

vacate NFL Commissioner Roger Goodell's July 28, 2015 Arbitration Award imposing a four-

game suspension on New England Patriots quarterback Tom Brady, pursuant to Section 301 of

the Labor Management Relations Act, 29 U.S.C. § 185, and Section 10 of the Federal Arbitration

Act, 9 U.S.C. § 10.[1]

In reaching its decision, the Court has reviewed the record herein, including without

limitation, (a) the investigation concerning allegedly deflated footballs used during the AFC

Championship Game on January 18, 2015 between the New England Patriots ("Patriots") and the

---

[1] On July 28, 2015, the National Football League Management Council ("Management Council"
or "Plaintiff") filed a Complaint in the United States District Court for the Southern District of
New York seeking to confirm the arbitration award. On July 29, 2015, the National Football
League Players Association ("Players Association" or "Defendant") filed a Petition to Vacate
Arbitration Award in the United States District Court for the District of Minnesota. The
Minnesota matter was immediately transferred to this district, under docket number 15 Civ.
5982, by U.S. District Judge Richard H. Kyle pursuant to the "first to file" rule. See National
Football League Players Association v. National Football League Management Council, Civ. No.
15-3168 (RHK/HB), slip op. at 2 (D. Minn. July 30, 2015).

1

Indianapolis Colts ("Colts"), initiated by the National Football League ("NFL" or "League") and co-led by NFL Executive Vice President and General Counsel Jeff Pash and Theodore V. Wells, Jr. of Paul, Weiss, Rifkin, Wharton & Garrison ("Pash/Wells Investigation" or "Investigation"); (b) the 139-page written report, dated May 6, 2015, which was the end product of the Pash/Wells Investigation ("Wells Report" or "Report"); (c) the letter, dated May 11, 2015, from NFL Executive Vice President Troy Vincent ("Vincent") to Patriots quarterback Tom Brady ("Brady") imposing a four-game suspension on Brady ("Vincent's Disciplinary Decision Letter" or "Vincent's Letter to Brady"); (d) the letter, dated May 11, 2015, from Vincent to Robert K. Kraft ("Kraft"), owner of the Patriots, imposing on the Patriots Club a fine of $1,000,000 and forfeiture of the first round "pick" in the 2016 NFL draft and the fourth round "pick" in the 2017 NFL draft; (e) the transcript of the arbitration hearing that took place on June 23, 2015 before NFL Commissioner Roger Goodell ("Goodell"), who had designated himself as arbitrator of Brady's appeal; (f) Goodell's Final Decision on Article 46 Appeal of Tom Brady, dated July 28, 2015 ("Final Decision" or "Award"), which affirmed Brady's four-game suspension; (g) the Management Council Complaint, dated July 28, 2015, seeking confirmation of the Award; (h) the Players Association Amended Answer and Counterclaim, dated August 4, 2015, seeking vacatur of the Award ("Def.'s Countercl."); (i) the Players Association's Memorandum of Law in Support of Motion to Vacate Arbitration Award, dated August 7, 2015 ("Def.'s Mem. Supp."); (j) the Management Council's Memorandum of Law in Support of Motion to Confirm and in Opposition to Motion to Vacate, dated August 7, 2015 ("Pl.'s Mem. Supp.); and (k) the further written submissions of the parties. The Court has also heard helpful oral argument from counsel on August 12, 2015 and on August 19, 2015.

**Based upon the foregoing and applicable legal authorities, the Court hereby denies the Management Council's motion to confirm the Award and grants the Players Association's motion to vacate the Award, thereby vacating the four-game suspension of Tom Brady, effective immediately.**

## II.     Background

### Pash/Wells Investigation & Wells Report

Shortly after the conclusion of the AFC Championship Game on January 18, 2015, senior NFL officials undertook an extensive (reportedly $3+ million) investigation into the circumstances surrounding the use by the Patriots of seemingly under-inflated footballs during that game's first half. On January 23, 2015, the NFL publicly announced that it had retained Theodore V. Wells, Jr. and his law firm to conduct an "independent" investigation, together with NFL Executive Vice President and General Counsel Jeff Pash. Wells Report at 1.

The Investigation specifically was conducted pursuant to the NFL Policy on Integrity of the Game & Enforcement of Competitive Rules, dated February 11, 2014 ("Competitive Integrity Policy"), which provides, in part:

> **Policy on Integrity of the Game & Enforcement of Competitive Rules**
>
> The following updated memorandum was sent on February 11, 2014 to Chief Executives, Club Presidents, General Managers, and Head Coaches from Commissioner Goodell regarding the Policy on Integrity of the Game & Enforcement of Competitive Rules . . .
>
> Actual or suspected violations will be thoroughly and promptly investigated. Any club identifying a violation is required promptly to report the violation, and give its full support and cooperation in any investigation. Failure to cooperate in an investigation shall be considered conduct detrimental to the League and will subject the offending club and responsible individual(s) to appropriate discipline.

Competitive Integrity Policy at A2-A3; see also Report at 22.

3

The Competitive Integrity Policy is found in Section A2 of the Game Operations Policy Manual for Member Clubs (2014 Edition) ("Game Operations Manual").[2]

The Wells Report includes the following narrative: During the course of the January 18, 2015 AFC Championship Game, Colts linebacker D'Qwell Jackson intercepted a pass thrown by Patriots quarterback Tom Brady. The intercepted ball was apparently handed to the Colts equipment staff, who used a pressure gauge and determined that the football was inflated to approximately 11 psi, i.e., below the range of 12.5 to 13.5 psi specified in Rule 2, Section 1 of the 2014 NFL Official Playing Rules ("Playing Rules"). NFL officials collected and tested eleven Patriots game balls and four Colts game balls at halftime and concluded that all eleven of the Patriots' game balls measured below 12.5 psi. The balls were re-inflated to approximately 13 psi and placed back in play.[3] Wells Report at 63-70.

---

[2] The Game Operations Manual also provides the following as to game balls:

> Once the balls have left the locker room, no one, including players, equipment managers, ball boys, and coaches, is allowed to alter the footballs in any way. If any individual alters the footballs, or if a non-approved ball is used in the game, the person responsible and, if appropriate, the head coach or other club personnel will be subject to discipline, including but not limited to, a fine of $25,000.

Game Operations Manual at A39-A40.

[3] Brady's passing performance during the game improved during the second half, after the footballs had been re-inflated. See Wells Report at 122 n.73 ("We were not asked by the NFL to investigate the potential competitive impact of the deflation of Patriots game balls and, therefore, do not make any findings or reach any conclusions on that issue. Nevertheless, we note that Brady's performance in the second half of the AFC Championship Game – after the Patriots game balls were re-inflated – improved compared to his performance in the first half. Specifically, in the first half, he completed 11 of 21 passes for 95 yards and one touchdown, and in the second half, he completed 12 of 14 passes for 131 yards and two touchdowns.").

4

On May 6, 2015, the findings of the Pash/Wells "independent" Investigation were made public.[4] The Investigation included reviews of player equipment, security footage, text messages, call logs, emails, press conferences, League rules and policies, and interviews with no less than sixty-six Patriots and NFL personnel. The Wells Report was accompanied by a separately commissioned analysis prepared by the consulting firm "Exponent."

The Wells Report concluded, among other things, that "in connection with the AFC Championship Game, it is more probable than not that New England Patriots personnel participated in violations of the Playing Rules and were involved in a deliberate effort to circumvent the rules." Wells Report at 2. It determined that Patriots employees Jim McNally ("McNally"), who was the Officials Locker Room attendant, and John Jastremski ("Jastremski"), who was a Patriots equipment assistant in charge of footballs, "participated in a deliberate effort to release air from Patriots game balls after the balls were examined by the referee [on January 18, 2015]." Id.

As to Brady, the Wells Report concluded that "**it is more probable than not that Brady was at least generally aware of the inappropriate activities of McNally and Jastremski involving the release of air from Patriots game balls**." Id. at 17 (emphasis added). The Wells Report also concluded that "it is unlikely that an equipment assistant and a locker room attendant would deflate game balls without Brady's knowledge and approval." Id. at 19.

The Wells Report acknowledged that "there is less direct evidence linking Brady to tampering activities than either McNally or Jastremski."[5] Id. at 17. It also stated that "[t]he

---

[4] Mr. Pash reviewed a draft and made written edits to the Wells Report prior to its release to the public. See discussion infra pp. 32-33.

[5] On August 12, 2015, in response to the Court's question "Is there any direct evidence linking Mr. Brady to tampering," Daniel R. Nash of Akin Gump Strauss Hauer & Feld, representing the

5

evidence does not allow us to reach conclusions as to when McNally and Jastremski began their efforts to release air from Patriots game balls on game day . . . exactly how long those efforts have been ongoing, how frequently they occurred, how the idea originated or the full scope of communication related to those efforts." Id. at 16-17.

Brady has denied "any knowledge of or involvement in any efforts to deflate game balls after the pre-game inspection by the game officials." Id. at 129.

The Wells Report exonerated all (other) members of the Patriots staff. "[W]e do not believe there was any wrongdoing or knowledge of wrongdoing by Patriots ownership, Head Coach Belichick or any other Patriots coach in the matters investigated. We also do not believe there was any wrongdoing or knowledge of wrongdoing by Patriots Head Equipment Manager David Schoenfeld." Id. at 122.

Also, after investigating questions raised during the January 18, 2015 AFC Championship Game regarding one of the kicking balls, the Wells Report concluded that there was "no evidence to support any finding of wrongdoing with respect to the kicking ball." Id. at 132.

The Wells Report relied, in part, upon videotapes showing McNally entering and remaining inside a restroom with the game balls for approximately 1 minute and 40 seconds on his way to the playing field prior to the start of the AFC Championship Game. It also spotlighted text

Management Council, answered, "If you are asking, your Honor, is there a text or e-mail in which Mr. Brady specifically instructs somebody to put a needle in a football after the game official checked it? No, there is not such direct evidence." Aug. 12, 2015 Hr'g Tr. 22:3-9.

Mr. Nash also stated, "[o]ne of the things that gets ignored about the Wells Report – and it is certainly true and the Commissioner's decision explains this is the fact – that there may not be a specific smoking gun...does not mean that there is not evidence of culpability here." Id. at 22:24-23:4.

6

messages between McNally and Jastremski from 2014, including, among others, several texts which date back three to eight months prior to the AFC Championship Game.

The Wells Report also summarized testing and analysis performed by Exponent.[6] Exponent concluded that "the reduction in pressure of the Patriots game balls cannot be explained completely by basic scientific principles, such as the Ideal Gas Law, based on the circumstances and conditions likely to have been present on the day of the AFC Championship Game." Id. at 130. At the same time, the Wells Report acknowledged that "**[o]ur scientific consultants informed us that the data alone did not provide a basis for them to determine with absolute certainty whether there was or was not tampering, as the analysis of such data is ultimately dependent upon assumptions and information that is uncertain**." Id. at 131 (emphasis added).

Following the issuance of the Wells Report on May 6, 2015, both McNally and Jastremski were indefinitely suspended without pay by the Patriots.[7]

### Vincent Letter to Kraft

On May 11, 2015, Vincent wrote a disciplinary decision letter to Patriots owner Robert K. Kraft. Vincent advised Kraft that "[o]n May 6, independent investigator Ted Wells issued his report regarding the footballs used by the Patriots in this year's AFC Championship Game. That report established that the footballs used by the Patriots were inflated at a level that did not

---

[6] According to the Wells Report, Exponent examined, among other things, (1) measurement of the magnitude of the reduction in air pressure of Patriots game balls compared to Colts game balls, (2) the potential impact of game-day use and other physical factors which might reasonably be expected to affect the internal air pressure of footballs, (3) the potential impact of environmental factors on the day of the AFC Championship Game, (4) a statistical and physical analysis of the gauges used to measure the air pressure of the footballs pre-game and at halftime, and (5) how quickly an individual could partially deflate footballs in a ball bag using a sports ball inflation needle. Wells Report at 9-12.

[7] See Vincent Letter to Robert K. Kraft, discussed infra pp. 7-9.

7

satisfy the standard set forth in the NFL's Official Playing Rules and that the condition of the footballs was the result of deliberate actions by employees of the Patriots." Vincent Letter to Kraft at 1.

Vincent informed Kraft that the NFL had "determined that the Patriots have violated the NFL's Policy on Integrity of the Game and Enforcement of Competitive Rules [Competitive Integrity Policy], as well as the Official Playing Rules and the established guidelines for the preparation of game footballs set forth in the NFL's Game Operations Policy Manual for Member Clubs." Id. Vincent wrote that, "**[i]n making this determination, [the NFL has] accepted the findings contained in the comprehensive report independently prepared by Mr. Wells and his colleagues.**" Id. (emphasis added).

Vincent explained that the NFL "regard[s] violations of competitive rules as significant and deserving of a strong sanction, both to punish the actual violation and to deter misconduct in the future." Id. Vincent described "several factors that merit strong consideration in assessing discipline. The first is the club's prior record. In 2007, the club and several individuals were sanctioned for videotaping signals of opposing defensive coaches . . . ." Id. Vincent also identified "two significant failures" concerning "the extent to which the club and relevant individuals cooperated with the [Pash/Wells] investigation," namely (1) "the refusal by the club's attorneys to make Mr. McNally available for an additional interview, despite numerous requests by Mr. Wells and a cautionary note in writing of the club's obligation to cooperate in the investigation," and (2) "the failure of Tom Brady to produce any electronic evidence (emails, texts, etc.) despite being offered extraordinary safeguards by the investigators to protect unrelated personal information." Id. at 2-3. Vincent also stated that "it remains a fundamental principle that the club is responsible for the actions of club employees." Id. at 3.

8

The Vincent Letter to Kraft imposed the following discipline: (1) "for the violation of the playing rules and the failure to cooperate in the subsequent investigation, the New England Patriots are fined $1,000,000 and will forfeit the club's first round selection in the 2016 NFL Draft and the club's fourth round selection in the 2017 NFL Draft," and (2) "neither [McNally nor Jastremski] may be reinstated without my prior approval. If and when he resumes working for the Patriots, Mr. Jastremski is prohibited from having any role in the preparation, supervision, or handling of footballs to be used in NFL games during the 2015 season . . . . Mr. McNally is barred from serving as a locker room attendant for the game officials, or having any involvement with preparation, supervision, or handling of footballs or any other equipment on game day." Id. at 3.

### Vincent Letter to Brady

On May 11, 2015, Vincent sent a (separate) "disciplinary decision" letter to Brady, stating: "The Commissioner has authorized me to inform you of the discipline that, pursuant to his authority under Article 46 of the CBA [Collective Bargaining Agreement], has been imposed on you for your role in the use of under-inflated footballs by the Patriots in this year's AFC Championship Game. This activity represents a violation of longstanding playing rules developed to promote fairness in the game." Vincent Letter to Brady at 1; see also Award at 1.

The Vincent Letter to Brady referred directly to the Wells Report and its "general awareness" finding, and stated: "With respect to your particular involvement, the [R]eport established that there is substantial and credible evidence to conclude you were at least generally aware of the actions of the Patriots' employees involved in the deflation of the footballs and that it was unlikely that their actions were done without your knowledge. Moreover, the [R]eport documents your failure to cooperate fully and candidly with the investigation, including by

9

refusing to produce any relevant evidence (emails, texts, etc.) despite being offered extraordinary safeguards by the investigators to protect unrelated personal information, and by providing testimony that the [R]eport concludes was not plausible and contradicted by other evidence." Id. Vincent concluded that: "Your actions as set forth in the [R]eport clearly constitute conduct detrimental to the integrity of and public confidence in the game of professional football."[8] Id.

Vincent informed Brady that "pursuant to the authority of the Commissioner under Article 46 of the Collective Bargaining Agreement and [the] NFL Player Contract, you are suspended without pay for your club's first four games of the 2015 regular season."[9] Id. at 2.

## The Arbitral Process

On May 14, 2015, Brady, through the Players Association, appealed the four-game suspension. Def.'s Countercl. ¶ 14. Thereupon, Commissioner Goodell designated himself as arbitrator to hear Brady's appeal pursuant to CBA Art. 46 § 2(a), which provides that "the

---

[8] Paragraph 15 of the standard NFL Player Contract states as follows:

> Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

CBA App. A, ¶ 15.

[9] The suspension was to apply to games on September 10, 2015 (Pittsburg Steelers); September 20, 2015 (Buffalo Bills); September 27, 2015 (Jacksonville Jaguars); and October 11, 2015 (Dallas Cowboys). See SCHEDULE & STATS, http://www.patriots.com/schedule-and-stats.

Commissioner may serve as hearing officer in any appeal under Section 1(a) of this Article at his discretion."

On May 19, 2015, Patriots owner Robert Kraft is reported to have stated that "I don't want to continue the rhetoric that's gone on for the last four months. I'm going to accept, reluctantly, what he [Commissioner Goodell] has given to us [the Patriots' organization], and not continue this dialogue and rhetoric, and we won't appeal."[10]

#### Brady's Motion for Recusal

On May 19, 2015, the Players Association filed a motion seeking Goodell's recusal from arbitrating Brady's appeal, arguing (1) "You cannot lawfully arbitrate whether you committed a CBA violation by delegating exclusive conduct detrimental disciplinary powers to Troy Vincent," (2) "You cannot lawfully arbitrate a hearing in which you are a central witness," (3) "You cannot lawfully arbitrate issues which you have publicly prejudged" [apparently referring to Commissioner Goodell's public comments on May 6, 2015 about the Wells Report: "I want to express my appreciation to Ted Wells and his colleagues for performing a thorough and independent investigation, the findings and conclusions of which are set forth in today's comprehensive report"], and (4) "You cannot lawfully arbitrate a matter implicating the competence and credibility of NFL staff." [11] Def.'s Countercl. Ex. 157.

---

[10] See Braden Campbell, Full text of Robert Kraft's statement accepting NFL's Deflategate punishment, Boston.com (May 19, 2015, 2:24 PM),
http://www.boston.com/sports/football/patriots/2015/05/19/full-text-robert-kraft-statement-accepting-nfl-deflategate-punishment/j7iIso2vPuGvdFPU6hNqRK/story.html.

[11] In other NFL arbitrations, including In the Matter of Ray Rice ("Ray Rice") and In the Matter of New Orleans Saints Pay-for-Performance ("Bounty-Gate"), Commissioner Goodell recused himself, and appointed, as **independent arbitrators**, former U.S. District Judge Barbara S. Jones and former NFL Commissioner Paul J. Tagliabue.

On June 2, 2015, Commissioner Goodell issued his "Decision on NFLPA's Motion to Recuse," concluding that "[o]ur Collective Bargaining Agreement provides that 'at his discretion,' the Commissioner may serve as hearing officer in 'any appeal' involving conduct detrimental to the integrity of, or public confidence in, the game of professional football. I will exercise that discretion to hear Mr. Brady's appeal."[12] Id., Ex. 160 at 1.

## Brady's Discovery Motion(s)

On May 22, 2015, Brady, through the Players Association, requested "[a]ll Documents created, obtained, or reviewed by NFL investigators (including by Mr. Wells and his investigative team at the Paul, Weiss firm and NFL security personnel) in connection with the Patriots Investigation (including all notes, summaries, or memoranda describing or memorializing any witness interviews)." Id., Ex. 159, at 2.

Brady also moved to compel the testimony of NFL Executive Vice President and General Counsel Jeff Pash ("Pash") (and of Ted Wells) at the arbitral hearing. Mr. Pash, a Harvard-trained lawyer, former partner at Covington & Burling LLP, and a senior executive of the NFL, as noted, had been designated co-lead investigator alongside Wells. Id., Ex. 166 at 3-6; Ex. 181

_____

[12] Commissioner Goodell also determined that (1) "the identity of the person [Vincent] who signed the disciplinary letter is irrelevant," (2) "there can be no dispute that this is an appeal of *Commissioner* discipline: as the letter signed by Mr. Vincent explains in its first sentence, 'The Commissioner has authorized me to inform you . . .," (3) "I did not delegate my disciplinary authority to Mr. Vincent; I concurred in his recommendation and authorized him to communicate to Mr. Brady the discipline imposed under my authority as Commissioner," (4) "I am not a necessary or even an appropriate witness, much less a 'central witness' as the NFLPA contends . . . [as] I do not have any first-hand knowledge of any of the events at issue . . . [n]or did I play a role in the investigation that led to Mr. Brady's discipline," and (5) "[n]or have I 'prejudged' this appeal. I have publicly expressed my appreciation to Mr. Wells and his colleagues for their thorough and **independent** work. But that does not mean that I am wedded to their conclusions or to their assessment of the facts. Nor does it mean that, after considering the evidence and argument presented during the appeal, I may not reach a different conclusion about Mr. Brady's conduct or the discipline imposed." Id., Ex. 160 (emphasis added).

(January 23, 2015 NFL Press Release stating: "The investigation is being led jointly by NFL

Executive Vice President Jeff Pash and Ted Wells . . . ."). The NFLPA sought testimony from

Pash regarding "(i) the NFL's involvement in the Paul, Weiss firm's work in connection with the

Patriots Investigation and (ii) the League's prior punishment or lack of punishment concerning

the incidents described in Document Requests 4 and 5 . . . [Document Request 4: "All documents

concerning all prior incidents – whether implicating players, Clubs, or Club personnel –

involving alleged or actual violations of NFL playing rules involving equipment, apparel, or

other game-day playing items (including, but not limited to, footballs, tees, gloves, helmets,

pads, eyewear, and cleats/turf shoes), regardless of whether discipline was ultimately assessed."

Id., Ex. 166 at 3. Document Request 5: "All documents concerning all prior incidents involving

an alleged failure to cooperate (including, but not limited to, any alleged failure to produce

electronic information) on the part of an NFL player in an NFL investigation, regardless of

whether or not discipline was ultimately assessed." Id.]."[13] Id., Ex. 166 at 4.

On June 22, 2015, Commissioner Goodell denied Brady's document request. Goodell cited

to CBA Article 46, noting "[i]n appeals under Section 1(a), the parties shall exchange copies of

any exhibits upon which they intend to rely no later than three (3) calendar days prior to the

hearing." Id., Ex. 208 at 4. Goodell stated that "the collective bargaining agreement provides

for tightly circumscribed discovery and does not contemplate the production of any other

documents in an Article 46 proceeding other than under these terms. In short, on the basis of my

---

[13] At the time of the document request, the Players Association may have been unaware that Mr. Pash had "reviewed a draft of the Wells Report and provided Paul, Weiss with comments prior to the Report's public release." See Def.'s Countercl. ¶ 161 (citing Award at 19 n.21; June 23, 2015 Hr'g Tr. 268:17-25); see also discussion infra pp. 32-33.

interpretation of the Collective Bargaining Agreement, I deny the NFLPA's motion for discovery." Id.

Commissioner Goodell also identified "other independent ground" for his decision to deny discovery. "First, I did not review any of Paul, Weiss' internal interview notes or any other documents generated by Paul, Weiss other than their final report. The Paul, Weiss interview notes played no role in the disciplinary decisions; **the Wells Report was the basis for those decisions**. [Cf. discussion infra p. 17 (regarding Goodell's reliance upon "the available electronic evidence, coupled with information compiled in the investigators' interviews")]. The Management Council has produced to the NFLPA that report, which contains a detailed accounting of witness comments, and Mr. Wells will be available to testify about the substance and conclusions of the report. In addition, I understand that the Management Council produced all of the NFL documents considered by the investigators in preparing their report, including notes of interviews conducted by in-house NFL investigators **prior to** the time that the Paul, Weiss investigation began." Id. (emphasis added).

Commissioner Goodell granted the motion to compel the testimony of Wells, but denied the motion to compel the testimony of designated co-lead investigator Pash. With regard to Pash, Commissioner Goodell contended "[b]ecause Article 46 of our Collective Bargaining Agreement does not address the permitted scope of witness testimony at appeals hearings, it is within the reasonable discretion of the hearing officer [Goodell] to determine the scope of the presentations and, where appropriate, to compel the testimony of any witnesses whose testimony is necessary for a hearing to be fair." Id. at 1. Goodell stated that "Jeff Pash, the NFL's general counsel, does not have any first-hand knowledge of the events at issue here. Nor did he play a substantive

14

role in the investigation that led to Mr. Brady's discipline; his role was limited to facilitating access by Mr. Wells to witnesses and documents." Id. at 2.

## Arbitral Hearing

On June 23, 2015, an arbitration appeal hearing was conducted before Commissioner (and Arbitrator) Goodell. The hearing included the testimony of Vincent, Brady, and Wells, as well as Dr. Daniel R. Marlow, Professor of Physics at Princeton University, Dr. Edward A. Snyder, Dean of the Yale School of Management, Dr. Robert D. Caligiuri, Vice President of Exponent, and Dr. Duane Steffey, Director of the Statistical and Data Sciences Group at Exponent.

Paul, Weiss acted as counsel to the NFL at the hearing. See June 23, 2015 Hr'g Tr. 267:15-20, 279:14-18; see also discussion infra pp. 37-38 (regarding Paul, Weiss's dual and seemingly inconsistent roles as "independent" investigator **and** counsel to the NFL). Paul, Weiss partner Lorin L. Reisner, a member of the investigative team and a co-author of the Wells Report, conducted the cross-examination(s) of Brady and Dr. Snyder, and he conducted the direct examination(s) of Dr. Caligiuri, Dr. Steffey, and Dr. Marlow, on behalf of the NFL.

At the hearing, the Players Association, represented by Jeffrey L. Kessler of Winston & Strawn, argued that Brady had been disciplined pursuant to the Competitive Integrity Policy which is provided "to Chief Executives, Club Presidents, General Managers, and Head Coaches." Competitive Integrity Policy at A2. As a player, Brady was not provided with the Competitive Integrity Policy. Brady instead received the 2014 NFL League Policies for Players ("Player Policies").[14] Kessler contended:

---

[14] The Player Policies state, under the heading "Other Uniform/Equipment Violations," the following:

> League discipline may also be imposed on players whose equipment, uniform, or On Field violations are detected during postgame review of video, who repeat violations on

15

This is called League Policies for Players [Player Policies]. This is what the players are given. And it's interesting. It said 'for players.' What is not here is the competitive integrity rule [Competitive Integrity Policy] that Mr. Wells used in his report or anything about it...and it's clear Mr. Wells didn't use this [Player Policies]; he used the other one [Competitive Integrity Policy] . . . And by the way, the fine is $5,512 for the first offense. That's it. That's the only notice that a player has ever had about anything regarding equipment is in the [P]layer's [P]olic[ies] . . . .

June 23, 2015 Hr'g Tr. 25:12-24, 26:16-22.

## Goodell's Award or Final Decision

On July 28, 2015, Commissioner Goodell published a 20-page Award or Final Decision on Article 46 Appeal of Tom Brady, which, as noted, upheld Brady's four-game suspension. In the Award, Goodell states, among other things, (1) "[i]n appeals of Commissioner discipline under Article 46, the hearing officer gives appropriate deference to the findings of the **disciplinary decision** under review; that is so even when the Commissioner serves as hearing officer [i.e., as in this case]," (2) "I am bound, of course, by standards of fairness and consistency of treatment among players similarly situated," (3) "[i]t bears emphasis [] that my finding of tampering with the game balls is not based solely on the Exponent study and the testimony of the scientific experts, but instead on consideration of all of the evidence in the record, including the conduct, text messages, and other communications discussed in both the Wells Report and at the hearing," (4) "it is unlikely that an equipment assistant and a locker room attendant would deflate game balls without Brady's knowledge and approval and that Mr. McNally and Mr. Jastremski would not personally and unilaterally have engaged in such conduct in the absence of Brady's

---

the same game day after having been corrected earlier, or who participate in the game despite not having corrected a violation when instructed to do so. *First offenses will result in fines.*

Id. at 15 (emphasis in original).

16

awareness and consent," (5) "[t]he most significant new information that emerged in connection with the appeal was evidence that on or about March 6, 2015 – the very day that that he was interviewed by Mr. Wells and his investigative team – Mr. Brady instructed his assistant to destroy the cellphone that he had been using since early November 2014, a period that included the AFC Championship Game and the initial weeks of the subsequent investigation," and (6) "the conduct at issue here – specifically the willful destruction of potentially relevant evidence – goes well beyond Mr. Brady's failure to respond to or fully cooperate with the investigation." Award at 1, 5, 7-9, 17 (emphasis added).

Goodell determined that **"the available electronic evidence, coupled with information compiled in the investigators' interviews, leads me to conclude that Mr. Brady knew about, approved of, consented to, and provided inducements and rewards in support of a scheme by which, with Mr. Jastremski's support, Mr. McNally tampered with the game balls."** Id. at 10 (emphasis added). This finding by Goodell goes far beyond the "general awareness" finding in the Wells Report or in Vincent's May 11, 2015 Disciplinary Decision Letter to Brady. Compare Award at 10 with Report at 2 and Vincent Letter to Brady at 1.

Goodell went on to say: "Neither the NFL nor any NFL member club has subpoena power or other means to compel production of relevant materials or testimony. Nonetheless, the NFL is entitled to expect and insist upon the cooperation of owners, League employees, club employees and players in a workplace investigation and to impose sanctions when such cooperation is not forthcoming, when evidence is hidden, fabricated, destroyed, when witnesses are intimidated or not produced upon reasonable request, or when individuals do not provide truthful information." Id. at 13. Goodell contended: "There should be no question in anyone's mind that active obstruction of a conduct detrimental investigation may and will itself be deemed conduct

detrimental and subject to discipline, as the standard Player Contract provides, by a fine in a reasonable amount, by suspension for a period certain or indefinitely, or by termination of the player's contract." Id. at 17.

As for discipline, Goodell stated "I am very aware of, and believe in, the need for consistency in discipline for similarly situated players." Id. at 14. **"In terms of the appropriate level of discipline, the closest parallel of which I am aware is the collectively bargained discipline imposed for a first violation of the policy governing performance enhancing drugs [four-game suspension] . . . ."** Id. at 16 (emphasis added).

Commissioner Goodell concluded as follows: "(1) Mr. Brady **participated** in a scheme to tamper with the game balls after they had been approved by the game officials for use in the AFC Championship Game, and (2) Mr. Brady willfully obstructed the investigation by, among other things, affirmatively arranging for destruction of his cellphone knowing that it contained potentially relevant information that had been requested by the investigators." Id. at 13. "All of this indisputably constitutes conduct detrimental to the integrity of, and public confidence in, the game of professional football," stated Goodell. Id. (emphasis added).

### III.    Legal Standard

"Although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute at issue." Gilmer v. Interstate/Johnson Lane Corp., 111 S. Ct. 1647, 1655 (1991) (quoting Shearson/Am. Express Inc. v. McMahon, 107 S. Ct. 2332, 2340 (1987)). "The deference due an arbitrator does not extend so far as to require a district court to countenance, much less confirm, an award obtained without the requisites of fairness or due process." Kaplan v. Alfred Dunhill of London, Inc., No. 96 Civ. 259 (JFK), 1996 WL 640901, at *7 (S.D.N.Y. Nov. 4, 1996).

18

Under the Federal Arbitration Act ("FAA"), "the validity of an award is subject to attack only on those grounds listed in [9 U.S.C.] § 10, and the policy of the FAA requires that an award be enforced unless one of those grounds is affirmatively shown to exist." Wall Street Assocs. L.P. v. Becker Paribas Inc., 27 F.3d 845, 849 (2d Cir. 1994). For example, FAA § 10 provides that the Court may vacate an arbitral award "where the arbitrators were guilty of . . . refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). The Court may also vacate an arbitral award "where there was evident partiality . . . " 9 U.S.C. § 10(a)(2).

A "principal question for the reviewing court is whether the arbitrator's award draws its essence from the collective bargaining agreement, since the arbitrator is not free to merely dispense his own brand of industrial justice." 187 Concourse Assocs. v. Fishman, 399 F.3d 524, 527 (2d Cir. 2005) (quoting Saint Mary Home, Inc. v. Serv. Emps. Int'l Union, Dist. 1199, 116 F.3d 41, 44 (2d Cir. 1997)). "[A]s the proctor of the bar gain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the 'industrial common law of the shop' and the various needs and desires of the parties." United States v. Int'l Bhd. of Teamsters, 954 F.2d 801, 809 (2d Cir. 1992) (quoting Alexander v. Gardner-Denver Co., 94 S. Ct. 1011, 1022 (1974)) (emphasis omitted).

It is the "law of the shop" to provide professional football players with advance notice of prohibited conduct and potential discipline. In In the Matter of Reggie Langhorne ("Langhorne"), Arbitrator Richard R. Kasher vacated the discipline of a player who had refused to take part in practice, holding that the player "was entitled at some time to be placed on notice as to what consequences would flow from his refusal to participate in . . . practice. Any disciplinary program requires that individuals subject to that program understand, with

19

reasonable certainty, what results will occur if they breach established rules." Slip op. at 25 (Apr. 9, 1994). In NFLMC v. NFLPA (Ricky Brown) ("Ricky Brown"), Arbitrator Michael H. Beck vacated a fine imposed upon a player for missing a mandatory weigh-in, and observed that "adequate notice is the fundamental concept in discipline cases." Slip op. at 10 (July 16, 2010).

In the Bounty-Gate case, former NFL Commissioner Paul J. Tagliabue, appointed as arbitrator by Commissioner Goodell after Goodell had recused himself, vacated the suspension of a player who had allegedly obstructed the League's investigation into the New Orleans Saints' bounty program (involving alleged monetary incentives to injure opposing players). Slip op. at 1 (Dec. 11, 2012). Tagliabue stated: "There is no evidence of a record of past suspensions based purely on obstructing a League investigation. In my forty years of association with the NFL, I am aware of many instances of denials in disciplinary proceedings that proved to be false, but I cannot recall any suspension for such fabrication. There is no evidence of a record of past suspensions based purely on obstructing a League investigation." Id. at 13.

## IV. Analysis

An arbitrator's factual findings are generally not open to judicial challenge, and we accept the facts as the arbitrator found them. See Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 213 (2d Cir. 2002); see also Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp., 143 F.3d 704, 726 (2d Cir. 1998).

The Court is fully aware of the deference afforded to arbitral decisions, but, nevertheless, concludes that the Award should be vacated. The Award is premised upon several significant legal deficiencies, including (A) inadequate notice to Brady of both his potential discipline (four-game suspension) and his alleged misconduct; (B) denial of the opportunity for Brady to examine one of two lead investigators, namely NFL Executive Vice President and General

20

Counsel Jeff Pash; and (C) denial of equal access to investigative files, including witness interview notes.

## (A) Inadequate Notice of Discipline and Misconduct

### (i) No Notice of Four-Game Suspension: Steroid Use Comparison

The Court finds that Brady had no notice that he could receive a four-game suspension for general awareness of ball deflation by others or participation in any scheme to deflate footballs, and non-cooperation with the ensuing Investigation. Brady also had no notice that his discipline would be the equivalent of the discipline imposed upon a player who used performance enhancing drugs.

During the August 19, 2015 oral argument, it became apparent that no specific determination was made either in the Vincent's Disciplinary Decision Letter or the Goodell Award as to what portion of Brady's discipline was attributable to alleged ball tampering and what discipline was attributable to non-cooperation (and, for that matter, what discipline was attributable to the destruction of Brady's phone):

Q [Court]: "So which of the four games [suspension] is attributable to ball tampering, and which is attributable to failure to cooperate?"

A [Nash]: "Well, the Award doesn't specify, and I don't believe there's any requirement in the CBA to break it down that way. I think the Commissioner makes a judgment, and he says this in the Award, he says taking the record as a whole, considering all of the factors, he determined that a four-game suspension was the appropriate sanction."

Aug. 19, 2015 Hr'g Tr. 59:17-25.

At the same time, in upholding Brady's four-game suspension, Commissioner Goodell concluded that it was appropriate to apply the same discipline that the NFL metes out for steroid use:

21

[T]he closest parallel of which I am aware is the collectively bargained discipline imposed for a first violation of the policy governing performance enhancing drug . . . In our most recent Collective Bargaining Agreement, the parties (a) agreed to continue that level of discipline for a first violation [i.e., four-game suspension] and (b) further agreed that a player found to have used both a performance enhancing drug and a masking agent would receive a six-game suspension. **The four-game suspension imposed on Mr. Brady is fully consistent with, if not more lenient than, the discipline ordinarily imposed for the most comparable effort by a player to secure an improper competitive advantage and (by using a masking agent) to cover up the underlying violation.**

Award at 16 (emphasis added).[15]

The Court finds that the NFL's collectively bargained for "Policy on Anabolic Steroids and Related Substances" ("Steroid Policy") is sui generis. It cannot, as a matter of law, serve as adequate notice of discipline to Brady. It also cannot reasonably be used as a comparator for Brady's four-game suspension for alleged ball deflation by others in the first half of the AFC Championship Game and for non-cooperation in the ensuing Investigation. The Steroid Policy is incorporated into the 2014 Player Policies, which sets forth in great detail "testing procedures," "procedures in response to positive tests or other evaluation," "suspension and related discipline," "appeal right," "burdens and standards of proof," and "discovery," none of which

---

[15] Commissioner Goodell also argued that "the discipline imposed on Mr. Brady is not excessive or without precedent, and is in fact fair and reasonable," citing to (1) a four-game suspension "recently imposed on the General Manager of the Cleveland Browns for a first violation of a league rule intended to maintain fair competition and the integrity of the game" [where General Manager Ray Farmer was disciplined for having sent player substitution and play-calling texts to coaching staff during games], and (2) "similar examples of discipline imposed on coaches for conduct detrimental that bears on the integrity of the game, including the one-year suspension of Sean Payton [Head Coach of the New Orleans Saints] and the six-game suspension of Joe Vitt [Assistant Head Coach & Linebackers Coach of the New Orleans Saints] imposed in connection with the Saints' pay-for-performance bounty program" [where Payton and Vitt were said to have concealed their involvement in the bounty program, and failed to terminate the program when the League first investigated reports of its existence]. Award at 16 n.17. **Commissioner Goodell added: "I do not rely on those examples to determine the discipline imposed on Mr. Brady, but they reinforce my conclusion, based principally on the penalties associated with violations of the steroid policy."** Id. (emphasis added).

22

has anything to do with Brady's conduct and/or his discipline. See NFL Policy on Anabolic Steroids and Related Substances at 5-16.

The Court is unable to perceive "notice" of discipline, or any comparability between a violation of the Steroid Policy and a "general awareness" of the inappropriate activities of others, or even involvement in a scheme by others to deflate game balls on January 18, 2015, and non-cooperation in a football deflation investigation. Oral presentations before the Court on August 19, 2015 did little to clarify the Commissioner's reliance upon Steroid Policy disciplinary measures in Brady's case:

> Q [Court]: So I ask you the same question . . . how is [the Steroid Policy] like deflating a football and not cooperating? Clearly the question is a fair question to pose because clearly Mr. Goodell felt that he had to explain [Brady's] four-game suspension. And his explanation about steroid use, in my mind, only raised more questions than it answered, because I don't see − I still don't see how the four games is comparable to a player using steroids and a masking agent.

> A [Nash]: I think in the Commissioner's judgment it goes to the integrity of the game.

Aug. 19, 2015 Hr'g Tr. 63:15-25.

The Award offers no scientific, empirical, or historical evidence of any comparability between Brady's alleged offense and steroid use. Often, steroid use has to do with critical issues of health, injury, addiction, and peer pressure, among other factors. See Steroid Policy at 1-2 (listing several factors related to the use of "Prohibited Substances," including "a number of physiological, psychological, orthopedic, reproductive, and other serious health problems, [such as] heart disease, liver cancer, musculoskeletal growth defects, strokes, and infertility"). None of these factors is (remotely) present here.

**The Court finds that no player alleged or found to have had a general awareness of the inappropriate ball deflation activities of others or who allegedly schemed with others to let**

23

air out of footballs in a championship game and also had not cooperated in an ensuing investigation, reasonably could be on notice that their discipline would (or should) be the same as applied to a player who violated the NFL Policy on Anabolic Steroids and Related Substances. Brady had no such notice. "When it is clear that the arbitrator 'must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract [] and not incorporated in it by reference . . . the arbitrator has failed to draw the award from the essence of the collective bargaining agreement." In re Marine Pollution Serv., Inc., 857 F.2d 91, 94 (2d Cir. 1988) (quoting Ethyl Corp. v. United Steelworkers, 768 F.2d 180, 184-85 (7th Cir. 1985), cert. denied 106 S. Ct. 1184); see also Bounty-Gate, slip op. at 6 ("In other words, rightly or wrongly, a sharp change in sanctions or discipline can often be seen as arbitrary and as an impediment rather than an instrument of change.").

In further support of his claim that there was no notice of his discipline, Brady points to the testimony of Mr. Wells, who acknowledged the following at the arbitration hearing:

I want to be clear -- I did not tell Mr. Brady at any time that he would be subject to punishment for not giving -- not turning over the documents [emails and texts]. I did not say anything like that.

June 23, 2015 Hr'g Tr. 336:19-23.

Brady contends that "[n]o player suspension in NFL history has been sustained for an alleged failure to cooperate with – or even allegedly obstructing – an NFL investigation." Def.'s Mem. Supp. 9. As support, he cites to Arbitrator and former NFL Commissioner Tagliabue in the Bounty-Gate case for the following observation:

In December 2010, the NFL fined Brett Favre $50,000 – but did not suspend him – for obstruction of a League sexual harassment investigation. Although not entirely comparable to the present matter, this illustrates the NFL's practice of fining, not suspending a player, for serious violations of this type. There is no evidence of a record of past suspensions based purely on obstructing a League investigation. **In my forty years of association with the NFL, I am aware of many instances of denials in disciplinary proceedings that proved to be false, but I cannot recall any suspension**

24

**for such fabrication. There is no evidence of a record of past suspensions based purely on obstructing a League investigation.**

Def.'s Countercl. ¶ 129; id., Ex. 113, Bounty-Gate, slip op. at 13 (emphasis in original).

It is the "law of the shop" to provide professional football players with (advance) notice of prohibited conduct and of potential discipline. See, e.g., Langhorne, slip op. at 25 ("Any disciplinary program requires that individuals subject to that program understand, with reasonable certainty, what results will occur if they breach established rules."). Because there was no notice of a four-game suspension in the circumstances presented here, Commissioner Goodell may be said to have "dispense[d] his own brand of industrial justice." 187 Concourse Assocs., 399 F.3d at 527 (citation omitted). "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 80 S. Ct. 1358, 1361 (1960).

### (ii)    No Notice of Any Discernible Infraction

The Players Association argues that "[t]he basis for Brady's punishment was the very narrow finding in the Wells Report [and reiterated in the Vincent Disciplinary Decision Letter] that [Brady] was . . . 'generally aware' of ball deflation by two members of the Patriots equipment staff." Def.'s Mem. Supp. 8. No NFL policy or precedent provided notice that a player could be subject to discipline for general awareness of another person's alleged misconduct.[16]

---

[16] During these proceedings, the Court acknowledged some difficulty in understanding the meaning of the Wells Report/Vincent Disciplinary Decision Letter finding of "generally aware":

> Q [Court]:    I am not sure I understand what in the world that means, that phrase. So, it says: *at least generally aware of the inappropriate activities of Mr. McNally and Jastremski involving the release of air from Patriot game balls.* So, I don't know what that is. You know, did he [Brady] know that McNally took the balls unaccompanied into the bathroom? Did he know that in the bathroom, if in fact it happened, McNally deflated the balls? Did he know that McNally then went on to the field with the balls?

25

The Management Council counters that "[a]ll of [Brady's] 'notice' arguments were carefully considered and rejected by the Commissioner based on his assessment of the evidence – including Brady's credibility – and his interpretation of the CBA and past precedent." Pl.'s Mem. Supp. 5. And, it adds, "[t]he Commissioner did not discipline Brady merely for being 'generally aware' of a violation of the playing rules. Rather, as the Award makes clear, the Commissioner suspended Brady (1) for having 'approved of, consented to, and provided inducements in support of' 'a scheme to tamper with game balls after they had been approved by the game officials for use in the AFC Championship Game' and (2) for having 'willfully obstructed' the subsequent investigation."[17]  Id. at 8 (quoting Award at 13, 17-18).

The record is clear that Vincent's Letter to Brady and the Award itself rely upon the Wells Report finding that Brady was "generally aware" of the alleged ball tampering misconduct of Patriots equipment staff. Vincent's Letter to Brady unquestionably adopts the Wells Report finding that "it is more probable than not that Tom Brady (the quarterback for the Patriots) was at least generally aware of the inappropriate activities of McNally and Jastremski involving the release of air from Patriots game balls." Compare Wells Report at 2 with Vincent Letter to

---

| A [Nash]:  | He is saying that by the evidence Mr. Brady knew that these individuals were involved in deflating the footballs. |
| Q [Court]: | He didn't say that . . . he didn't say that he knew, he said that . . . he was at least generally aware of the inappropriate activities. |
| A [Nash]:  | Generally aware is knew, I believe, your Honor. |

Aug. 12, 2015 Hr'g Tr. 24:12-25:17 (emphasis in original).

[17] The Vincent Letter to Brady – unlike the Award – does **not** conclude that "Brady knew about, approved of, consented to, and provided inducements and rewards in support of a scheme by which, with Mr. Jastremski's support, Mr. McNally tampered with the game balls." Compare Vincent Letter to Brady with Award at 10. Nor does the Vincent Letter to Brady – unlike the Award – say that Brady "participated in a scheme to tamper with game balls after they had been approved by the game officials for use in the AFC Championship Game . . . ." Compare Vincent Letter to Brady with Award at 13.

Brady at 1 ("With respect to your particular involvement, the [R]eport established that there is substantial and credible evidence to conclude you were at least generally aware of the actions of the Patriots' employees involved in the deflation of the footballs and that it was unlikely that their actions were done without your knowledge."). And Goodell's Final Decision confirms that "[t]he Wells Report and accompanying material were the product of an extensive and independent investigation and formed the factual basis for the discipline that was imposed on both the Patriots and Mr. Brady." Award at 2.

With respect to "general awareness" of others' misconduct – which is the principal finding in both the Wells Report and the Vincent Letter – Brady had no notice that such conduct was prohibited, or any reasonable certainty of potential discipline stemming from such conduct.[18] The Court concludes that, as a matter of law, no NFL policy or precedent notifies players that they may be disciplined (much less suspended) for general awareness of misconduct by others. And, it does not appear that the NFL has ever, prior to this case, sought to punish players for such an alleged violation. See Def.'s Countercl. ¶ 104. The absence of such notice violated the "law of the shop." See Langhorne, slip op. at 25; see also Ricky Brown, slip op. at 10 ("A rule must clearly and unambiguously establish the scope of prohibited conduct, as well as the consequences of violations, in order to be enforceable . . . .").

___

[18] With respect to any "scheme" to deflate footballs during the AFC Championship Game, Brady had no notice of a possible four-game suspension, as required by the "law of the shop." See discussion supra pp. 21-24. And, with respect to Brady's non-cooperation with the Pash/Wells Investigation, Brady similarly had no notice of a four-game suspension. See discussion supra pp. 24-25.

### (iii) No Notice of Suspension as Opposed to Fine: Competitive Integrity Policy vs. Player Policies

The Players Association argues that "[u]nder the Player Policies, Brady had notice only of

fines – not suspensions – for player equipment violations designed to gain a competitive

advantage." Def.'s Countercl. ¶ 106. With respect to "Other Uniform/Equipment Violations,"

and as noted supra p. 15 n.14, the Player Policies state in relevant part, the following:

> League discipline may also be imposed on players whose equipment, uniform, or On
> Field violations are detected during postgame review of video, who repeat violations on
> the same game day after having been corrected earlier, or who participate in the game
> despite not having corrected a violation when instructed to do so. *First offenses will
> result in fines.*

Player Policies at 15 (emphasis in original).

Under the corresponding "2014 Schedule of Fines," a first offense of "other uniform/equipment

violations" results in a fine of $5,512. Id. at 20.

The Players Association contends that "[i]nstead of applying the Player Policies, Vincent

punished Brady pursuant to . . . violations of the Competitive Integrity Policy, which is only

incorporated into the Game Operations Manual and provided to 'Chief Executives, Club

Presidents, General Managers, and Head Coaches,'" and **not** to players such as Brady.[19] Def.'s

Countercl. ¶ 113.

---

[19] It is undisputed that the Pash/Wells Investigation was undertaken pursuant to the Competitive
Integrity Policy, i.e., "pursuant to the Policy on Integrity of the Game & Enforcement of
Competitive Rules," which is incorporated into Section A2 of the Game Operations Manual.
Wells Report at 1. See discussion supra pp. 3-4.

Vincent's testimony at the arbitration hearing on June 23, 2015 regarding his suspension letter to
Brady confirms that the source of Brady's discipline was the Wells Report, and that the NFL
policy relied upon by Vincent was the Competitive Integrity Policy:

> Q [Kessler]: So you based your recommendations of discipline in this letter solely upon
> reading the Wells report? That's what I wanted to establish.
>
> A [Vincent]: Yes.

The Management Council responds that the Players Association is "ask[ing] the Court to reevaluate the evidence and construe past arbitration precedent differently" and that Commissioner Goodell previously rejected the argument that "the Player Policy regarding 'equipment violations' only put Brady on notice of a potential fine." Pl.'s Mem. Supp. 5. Goodell also contends that the Competitive Integrity Policy was "not the source or basis for the discipline imposed here." Id. at 6. Rather, he says, the general "conduct detrimental" standard was the source of Brady's discipline. Id. Goodell argued: "Mr. Brady had notice, and in fact was fully aware of, the established rule governing the pressure of NFL games [sic] balls . . . **and [had] ample reason to expect that a violation of that rule . . . would be deemed conduct detrimental.**" Id. (quoting Award at 18) (emphasis added).

A player's right to notice is at the heart of the CBA and, for that matter, of our criminal and civil justice systems. While "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause . . . there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice . . . ." Texaco, Inc.

---

June 23, 2015 Hr'g Tr. 244:19-22.

| Q [Kessler]: | Now, the policy that you cite in your letter, in your discipline letter regarding Mr. Brady . . . [w]here do you find the policy that says that footballs can't be altered with respect to pressure? Is that going to be in the Competitive Integrity Policy that Wells cited in his report? |
| A [Vincent]: | Game-Day Operations Manual. |
| Q [Kessler]: | **In the manual? Okay. Is it correct, to your knowledge, that the manual is given to clubs and GMs and owners, et cetera, but the manual is not given out to players; is that correct, to your knowledge?** |
| A [Vincent]: | **That's correct, to my knowledge.** |

Id. at 250:13-251:1 (emphasis added).

v. Short, 102 S. Ct. 781, 795 (1982) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 70 S. Ct. 652, 656 (1950)); see also Lankford v. Idaho, 111 S. Ct. 1723, 1729 (1991).

Brady was on notice that equipment violations under the Player Policies could result in fines. See discussion supra p. 28. He had no legal notice of discipline under the Competitive Integrity Policy, which is incorporated into the Game Operations Manual and distributed solely to – and, therefore, provides notice to – "Chief Executives, Club Presidents, General Managers, and Head Coaches," and not to players.[20] Game Operations Manual at A2.

NFL arbitral precedent confirms that because Brady did not have notice of the Competitive Integrity Policy, that Policy could not serve as the basis for disciplinary action against him. Judge Jones (in Ray Rice) and U.S. District Judge David S. Doty (in NFLPA v. NFL (Adrian Petersion)) ("Adrian Peterson") each held that the increased NFL penalties set forth in a "new" policy for domestic violence [New NFL Personal Conduct Policy (Aug. 2014)] could not be applied to Rice and Peterson, respectively, because these players (only) had notice of discipline under the 2007 Personal Conduct Policy. "[T]he Commissioner has acknowledged that he did not have the power to retroactively apply the New Policy: The policy change was forward looking because the League is required to provide proper notice." Adrian Peterson, No. Civ. 14-4990 (DSD/JSM), 2015 WL 795253, at *5 (D. Minn. Feb. 26, 2015) appeal docketed, No. 15-1438 (8th Cir. Feb. 27, 2015) (internal citations omitted); see also Ray Rice, slip op. at 7, 16 (same). Judge Doty held that "[t]his determination is consistent with prior NFL arbitration decisions recognizing the importance of notice in advance of discipline." Adrian Peterson, 2015 WL 795253, at *5 n.4.

---

[20] As noted, the Patriots Club and its management were, in fact, sanctioned under the Competitive Integrity Agreement for "violation of the playing rules [related to ball tampering] and [] failure to cooperate in the subsequent investigation." See discussion supra pp. 7-9.

## Conduct Detrimental

Commissioner Goodell contends that Brady's discipline stems from the general CBA policy precluding players from engaging in any conduct that is "detrimental to the integrity of, or public confidence in, the game of professional football." Pl.'s Mem. Supp. 3 (citing CBA Art. 46 §1(a)). Goodell states that "[n]o prior conduct detrimental proceeding is directly comparable to this one," Award at 14, and, in doing so, he draws a distinction between "[t]he conduct at issue here" and "the [foot]ball-warming incident in Minnesota last year, in which a *Carolina Panthers* ball attendant was observed warming a ball on the *Vikings'* sideline; there was no evidence of any intentional attempt to violate or circumvent the rules, no player involvement, and no effort to conceal the ball attendant's conduct." Id. at 15 (emphasis in original). The Players Association counters that the Panthers matter helps to prove its point regarding notice as, "[t]he NFL sent a warning *to the Club* . . . [and] [n]o . . . players were either investigated or punished. This [] was consistent with the Competitive Integrity Policy's application to Clubs and the lack of any 'general awareness' standard." Def.'s Countercl. ¶ 117 (emphasis in original).

Commissioner Goodell contends that "[t]he conduct at issue here is also very different from the incident involving the Jets' equipment staff member who 'attempted to use' unapproved equipment in plain view of the officials to prepare kicking balls prior to a 2009 game against the Patriots. There was no evidence of any player involvement. However, it bears mention that the Jets' employee was suspended from his regular game-day duties for a period longer than the suspension under review here." Award at 15. The Players Association counters that "the Jets' kicker – the *player* who could have benefitted from the alleged 'attempt to gain a competitive advantage' – was not investigated, let alone disciplined. This was perfectly consistent with the

31

Competitive Policy's application to Clubs [and Club personnel], not players." Def.'s Countercl. ¶ 116 (emphasis in original).

Goodell's reliance on notice of broad CBA "conduct detrimental" policy – as opposed to specific Player Policies regarding equipment violations – to impose discipline upon Brady is legally misplaced. In both the Ray Rice case and the Adrian Peterson case, the players could, **perhaps**, be said to appreciate that acts of domestic violence might be deemed "conduct detrimental." And yet, in both of these cases, the players were disciplined only after findings were made under the specific domestic violence policy [New NFL Personal Conduct Policy (Aug. 2014)]. See Adrian Peterson, 2015 WL 795253, at *5-6; Ray Rice, slip op. at 16. Rightly so, because an applicable specific provision within the Player Policies is better calculated to provide notice to a player than a general concept such as "conduct detrimental." See In re Lehman Bros. Holdings Inc., 761 F.3d 303, 313 (2d Cir. 2014) cert. denied sub nom. Giddens v. Barclays Capital Inc., 135 S. Ct. 2048 (2015) ("To the extent that there appears to be conflict between these provisions, the specific governs the general."); John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 670 n.8 (2d Cir. 1983) ("Where the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield.").

## (B) Commissioner Goodell Improperly Denied Brady the Opportunity to Examine Designated Co-Lead Investigator Jeff Pash

The Players Association contends that Commissioner Goodell's denial of the testimony of Jeff Pash at the arbitral hearing was fundamentally unfair because (1) "the NFL publically declared that NFL Executive Vice President and General Counsel Jeff Pash was the co-lead investigator on the Wells-Pash Investigation," and (2) Pash was allowed to review a draft of the Wells Report and to provide Paul, Weiss with written comments or edits prior to the Report's

release to the public. Def.'s Countercl. ¶¶ 159, 161 (citing Award at 19 n.21; June 23, 2015 Hr'g Tr. 268:17-25).

The Management Council responds that Mr. Wells "testified that Pash had played 'no substantive role in the investigation,' and any comments he may have provided on a draft of the report 'did not impact' the Paul, Weiss findings," and that "[i]n light of the fact that 'arbitrators have substantial discretion to admit or exclude evidence,' the decision not to have **cumulative testimony from Pash** is not subject to challenge." Pl.'s Mem. of Law in Supp. at 11 (quoting Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F.3d 99, 107 (2d Cir. 2013)) (emphasis added).

In determining what evidence to admit, "[a]n arbitrator need not follow all the niceties observed by the federal courts." Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997) (quoting Bell Aerospace Co. Div. of Textron v. Local 516, 500 F.2d 921, 923 (2d Cir. 1974)). "However, although not required to hear all the evidence proffered by a party, an arbitrator 'must give each of the parties to the dispute an adequate opportunity to present its evidence and argument.'" Id. (quoting Hoteles Condado Beach v. Union De Tronquistas Local 901, 763 F.2d 34, 39 (1st Cir. 1985). "A fundamentally fair hearing requires that the parties be permitted to present evidence and cross-examine adverse witnesses." Kaplan, 1996 WL 640901, at *5; see also Tempo Shain, 120 F.3d at 20 ("[T]here was no reasonable basis for the arbitration panel to determine that . . . omitted testimony would be cumulative . . . . [T]he arbitration panel must "**indicate in what respects [] testimony would be cumulative**.") (emphasis added).

NFL precedent demonstrates that, in Article 46 arbitration appeals, players must be afforded the opportunity to confront their investigators. See, e.g., Def.'s Countercl. Ex. 166D, Bounty-Gate Pre-Hr'g Order No. 4 (in which former NFL Commissioner Tagliabue, acting as arbitrator,

ordered that Jeffrey Miller, Lead Investigator and NFL Vice President of Security, be compelled to testify). In the Ray Rice case, Judge Jones held that the "key elements of a 'fundamentally fair hearing'" include a grievant's ability to "present evidence and cross-examine witnesses," and that an arbitrator should "compel[] the witnesses necessary for the hearing to be fair." Def.'s Countercl. Ex. 166E, Ray Rice Order on Discovery and Hearing Witnesses at 1-2 (quoting Kaplan, 1996 WL 640901, at *5). Judge Jones ordered Commissioner Goodell to testify in the Ray Rice arbitration and concluded that "[t]o limit the available witnesses knowledgeable about the content of that meeting to the individuals the NFL is willing to produce would prevent Mr. Rice from presenting his case and runs the risk of providing an incomplete picture of the content of a meeting that both parties have identified as critical." Id.

The Court finds that Commissioner Goodell's denial of Brady's motion to compel the testimony of Mr. Pash was fundamentally unfair and in violation of 9 U.S.C. § 10(a)(3). Given Mr. Pash's very senior position in the NFL, his role as Executive Vice President and General Counsel, and his designation as co-lead investigator with Ted Wells, it is logical that he would have valuable insight into the course and outcome of the Investigation and into the drafting and content of the Wells Report. It is also problematic to the Court that there was no specification by Goodell as to the ways Pash's testimony would have been "cumulative."

The Management Council does not deny that Mr. Pash provided edits to the Wells Report, in advance of its release. The testimony from Mr. Wells is illustrative:

Q [Kessler]: Do you know what the contents were of [Mr. Pash's] comments?

A [Wells]: I do not, except to say that they couldn't have been that big a deal because I don't think I heard about them. But, you know, Mr. Pash is a very good Harvard-trained lawyer. If you give a Harvard-trained lawyer a report this thick, he's going to have some kind of comment. So I assume whatever it was, it was some kind of wordsmithing. I can tell you this without waiving any privilege.

34

June 23, 2015 Hr'g Tr. 269:4-13.

The Court recognizes that arbitrators are "endowed with discretion to admit or reject evidence and determine what materials may be cumulative or irrelevant." Abu Dhabi Inv. Auth. v. Citigroup, Inc., No. 12 Civ. 283 (GBD), 2013 WL 789642, at \*8 (S.D.N.Y. Mar. 4, 2013) aff'd, 557 F. App'x 66 (2d Cir. 2014) cert. denied, 135 S. Ct. 137, 190 L. Ed. 2d 45 (2014). However, the NFL fairly cannot suggest, without more than the testimony of the NFL's retained counsel, that the edits from Mr. Pash were not significant or that his testimony would have been "cumulative." Pl.'s Mem. Supp. 11. Mr. Wells acknowledged that he did not know the content of Mr. Pash's pre-release edits, and thus there was simply "no reasonable basis for the arbitration panel to determine that . . . [the] omitted testimony would be cumulative." See Tempo Shain, 120 F.3d at 20.

Denied the opportunity to examine Pash at the arbitral hearing, Brady was prejudiced. He was foreclosed from exploring, among other things, whether the Pash/Wells Investigation was truly "independent," and how and why the NFL's General Counsel came to edit a supposedly independent investigation report. Def.'s Countercl. ¶ 162; Report at 1 ("[The Report] was prepared entirely by the Paul, Weiss investigative team and presents the independent opinions of Mr. Wells and his colleagues."). Brady was also prejudiced because there was no other witness, apart from Pash, who was as "competent to address the substantive core of the claim." See Commercial Risk Reinsurance Co. v. Sec. Ins. Co. of Hartford, 526 F. Supp. 2d 424, 429 (S.D.N.Y. 2007). As co-lead investigator and senior executive with the NFL, Pash was in the best position to testify about the NFL's degree of involvement in, and potential shaping of, a heralded "independent" Investigation. The issues known to Pash constituted "evidence plainly pertinent and material to the controversy," Tempo Shain, 120 F.3d at 19 (quoting 9 U.S.C. §

10(a)(3)), and Commissioner Goodell's refusal to hear such evidence warrants vacatur of the Award under 9 U.S.C. § 10(a)(3).

## (C) Commissioner Goodell Improperly Denied Brady Equal Access to Investigative Files

As noted at supra pp. 13-14, Commissioner Goodell denied the Players Association's request for documents, memoranda, summaries, or notes of witness interviews created during the Pash/Wells Investigation, contending, among other things, that "[t]he Paul, Weiss interview notes played no role in the disciplinary decisions; the Wells Report was the basis for those decisions." Def.'s Countercl. Ex. 208, at 4; but see discussion supra p. 17 (regarding information "compiled in the investigators' interviews").

Brady contends that, to his detriment, he was denied the opportunity effectively to challenge the conclusions of the Wells Report and that such denial "was especially egregious considering the NFL's counsel [the Paul, Weiss firm] at the arbitration *did* have access to the files," which Brady was seeking. Def.'s Mem. Supp. 12-14 (emphasis in original). The Court notes that the Paul, Weiss role in this case seems to have "changed" from "independent" investigators to NFL's retained counsel at the arbitral hearing. Among other things, this change in roles may have afforded Goodell (and Pash) greater access to valuable impressions, insights, and other investigative information which was not available to Brady.

Courts have held that "[t]he absence of statutory provision for discovery techniques in arbitration proceedings obviously does not negate the affirmative duty of arbitrators to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other party. . . . [A] failure to discharge this simple duty would constitute a violation of FAA § 10(a)(3), where a party can show prejudice as a result." Home Indem. Co. v. Affiliated Food Distribs., Inc., No. 96 Civ. 9707 (RO), 1997 WL 773712, at *4 (S.D.N.Y. Dec. 12, 1997)

(citing Chevron Transp. Corp. v. Astro Vencedor Compania Naviera, S.A., 300 F. Supp. 179,
181 (S.D.N.Y. 1969)).

The Court finds that Commissioner Goodell's denial of the Players Association's motion to
produce the Paul, Weiss investigative files, including notes of witness interviews, for Brady's
use at the arbitral hearing was fundamentally unfair and in violation of 9 U.S.C. § 10(a)(3) and
that Brady was prejudiced as a result. The interview notes were, at the very least, the basis for
the Wells Report, and Brady was prejudiced by his lack of access to them. Brady was denied the
opportunity to examine and challenge materials that may have led to his suspension and which
likely facilitated Paul, Weiss attorneys' cross-examination of him. Because the investigative
files included the unedited accounts of the witness interviews, the Wells testimony at the arbitral
hearing failed to put Brady "in the same position as the document[s] would [have]." See
Postlewaite v. McGraw-Hill, Inc., No. 98 Civ. 0611 (LLS), 1998 WL 751687, at *4 (S.D.N.Y.
Oct. 28, 1998) aff'd sub nom. Postlewaite v. McGraw Hill, Inc., 10 F. App'x 16 (2d Cir. 2001).

Compounding Brady's prejudice is the fact that, as noted, Paul, Weiss acted as both alleged
"independent" counsel during the Investigation and also (perhaps inconsistently) as retained
counsel to the NFL during the arbitration.[21] Paul, Weiss uniquely was able to retain access to

---

[21] The following colloquy occurred at the arbitration hearing:

|            |                                                                              |
|------------|------------------------------------------------------------------------------|
| Q [Kessler]: | Did you consider the NFL to be your client for purposes of the attorney-client privilege -- |
| A [Wells]: | Yeah. |
| Q [Kessler]: | -- with respect to the preparation of this investigative report? |
| A [Wells]: | Yes. |

June 23, 2015 Hr'g Tr. 267:15-20.

Q [Kessler]:   And would you be paid additional amounts for the work that [Paul, Weiss
               partner] Mr. Reisner is doing today or others assisting the NFL? That
               would be additional [to the Investigation] bills, right?

investigative files and interview notes which it had developed; was able to use them in direct and cross-examinations of Brady and other arbitration witnesses; share them with NFL officials during the arbitral proceedings; and, at the same time, withhold them from Brady.

Commissioner Goodell had the "the affirmative duty . . . to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other party." See Home Indem. Co., 1997 WL 773712, at *4 ("A failure to discharge this simple duty would constitute a violation of [FAA § 10(a)(3)], where [as here] a party can show prejudice as a result."); see also Def.'s Countercl. Ex. 166L, Tr. 633-34, 889, 891 (Bounty-Gate) (where Arbitrator Tagliabue ordered the production of NFL investigative reports and redacted witness memoranda).

## V. Brady's Other Claims

In view of the Court's determinations regarding the inadequacy of notice and discovery afforded to Brady, the Court does not reach Brady's other claims, which include the following:

---

A [Wells]:    I hope so.

Id. at 279:14-18.

| Q [Kessler]: | Would your principal colleague on this case be Mr. Lorin Reisner, who is seated over there? |
| A [Wells]: | Correct |
| Q [Kessler]: | Now, Mr. Reisner, you observed, was representing the NFL and cross-examining Mr. Brady and Mr. Snyder in this proceeding; is that correct? |
| A [Wells]: | That is -- I saw it. You saw it. |
| Q [Kessler]: | Okay. So, and Mr. Reisner was one of the principal lawyers working with you on this independent investigation, right? |
| A [Wells]: | If you read the report, it basically says that. |

Id. at 270:3-14.

a) Brady argues that Commissioner Goodell was "evidently partial" within the meaning of 9 U.S.C. § 10(a)(2), contending, among other things, that "a central ground of [his] appeal was the issue of Goodell improperly delegating to Vincent his exclusive authority to discipline players for conduct detrimental to the NFL." Def.'s Countercl. ¶ 165.

b) Brady argues that "Goodell purports to sustain the suspension on factual conclusions that Brady participated in ball tampering – but those factual conclusions [that "Mr. Brady knew about, approved of, consented to, and provided inducements and rewards in support of a scheme by which, with Mr. Jastremski's support, Mr. McNally tampered with the game balls"] appear nowhere in the Wells Report and were not the basis for the discipline imposed by Vincent." Def.'s Countercl. ¶ 126. Brady contends that "Judge Doty's ruling in Peterson makes clear than an Article 46 arbitrator lacks CBA authority to justify discipline on a basis not found in the discipline being appealed." Id. (citing Adrian Peterson, 2015 WL 795253, at *6).

c) Brady also argues that "prior to serving as hearing officer, the Commissioner publicly lauded the reliability of the Wells Report [which was conducted by NFL retained counsel] – the issue at the very heart of Brady's appeal." This "locked him into supporting the Wells Report and rendered him incapable of reaching a contrary conclusion in Brady's appeal, as doing so would undermine his own competency as Commissioner." Id. ¶ 167.

## VI. Conclusion & Order

For the reasons stated herein, the Management Council's motion to confirm the arbitration award [ECF No. 4] is denied and the Players Association's motion to vacate the arbitration award [ECF No. 28] is granted. Brady's four-game suspension is vacated, effective immediately. The Clerk is respectfully requested to close cases 15 Civ. 5916 and 15 Civ. 5982.

Dated: New York, New York
September 3, 2015

**RICHARD M. BERMAN, U.S.D.J.**